# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AMBASSADORS INTERNATIONAL, INC., <u>et al.</u>,[1] | Case No. 11-_____ (___) |
| Debtors. | Joint Administration Requested |

**MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364 AND 507 AND RULES 2002, 4001 AND 9014 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (I) APPROVING POSTPETITION FINANCING AND REPAYMENT OF CERTAIN PREPETITION OBLIGATIONS, (II) AUTHORIZING USE OF CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY AND (VI) SCHEDULING A FINAL HEARING**

Ambassadors International, Inc. ("<u>Ambassadors</u>") and its affiliated U.S. debtors and debtors-in-possession (collectively, the "<u>Debtors</u>") in the above-captioned bankruptcy cases, by and through their undersigned counsel, hereby submit this motion (the "<u>Motion</u>") pursuant to sections 105, 361, 362, 363, 364 and 507 of title 11 of the U.S. Code (the "<u>Bankruptcy Code</u>") and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") for entry of an interim order (the "<u>Interim Order</u>") and a final order (the "<u>Final Order</u>"): (i) approving postpetition financing and the roll-up of the Prepetition Working Capital Facility Obligations (as defined below), (ii) authorizing use of Cash Collateral (as defined below), (iii) granting liens and providing superpriority administrative expense status, (iv) granting adequate protection, (v) modifying the automatic stay and (vi) scheduling a final hearing (the "<u>Final</u>

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Ambassadors International, Inc. (8605); Ambassadors Cruise Group, LLC (2448); Ambassadors, LLC (0860); EN Boat LLC (8982); AQ Boat, LLC (5018); MQ Boat, LLC (5095); DQ Boat, LLC (5064); QW Boat Company LLC (0658); Contessa Boat, LLC (9452); CQ Boat, LLC (9511); American West Steamboat Company LLC (0656); and Ambassadors International Cruise Group (USA), LLC (7304). The mailing address for each Debtor is 2101 4th Avenue, Suite 210, Seattle, WA 98121.

Hearing"). In support of the Motion, the Debtors rely upon and fully incorporate by reference the Declaration of Mark Detillion, the Chief Financial Officer of Ambassadors International, Inc., in Support of First Day Motions (the "Detillion Declaration") and the Declaration of Christopher Shepard in Further Support of a Sale of Substantially All Assets of Certain of the Debtors and Related Debtor-in-Possession Financing (the "Shepard Declaration"). In further support of the Motion, the Debtors respectfully state as follows:

## BANKRUPTCY RULE 4001 STATEMENT

1. By this Motion, and for the reasons set forth below, the Debtors respectfully request entry of the Interim Order and the Final Order: (I) (a) authorizing the Debtors to enter into the Amended and Restated Credit and Guaranty Agreement (Postpetition) (the "DIP Credit Agreement"), by and among each of Ambassadors, Degrees Limited, Wind Star Limited and Wind Spirit Limited (each non-Debtor affiliates) as borrowers, Ambassadors and certain of its direct and indirect debtor and non-Debtor subsidiaries as guarantors, the lenders party thereto from time to time (the "DIP Lenders") and Law Debenture Trust Company of New York, as administrative agent and collateral agent (in such capacities, and including any successor administrative agent, the "DIP Agent,"), which provides for borrowing under a multiple draw term loan facility (the "DIP Facility") in an interim amount of $5,000,000 (the "Interim New Money DIP Loans") and a final amount of (i) $10,000,000 less any amounts advanced under the Interim Order as Interim New Money DIP Loans, and (ii) a roll-up of all outstanding Prepetition Working Capital Facility Obligations into the DIP Facility; (b) authorizing the Debtors to execute, deliver and perform under the DIP Credit Agreement and the other related loan and security documents (collectively, and together with the Interim Order and the Final Order, the "DIP Financing Documents"); (c) granting liens and superpriority claims to

the DIP Agent and DIP Lenders; (d) authorizing the Debtors to use "Cash Collateral" as such term is defined in Section 363(a) of the Bankruptcy Code (the "Cash Collateral") and, pursuant to sections 361 and 363 of the Bankruptcy Code, provide adequate protection for the benefit of the Prepetition Secured Parties (as defined below); (e) approving certain stipulations of the Debtors with respect to the Prepetition Working Capital Facility and the Second Lien Notes (defined below); and (f) authorizing the waiver of the Debtors' rights under section 506(c) of the Bankruptcy Code upon entry of the Final Order; (II) scheduling the Final Hearing; and (III) granting related relief.

2.      In accordance with the requirements under Bankruptcy Rule 4001 and Local Rule 4001-2(a)(ii), the significant terms of the DIP Facility are:[2]

(a)     Borrowers: Ambassadors, Wind Star Limited, Wind Spirit Limited and Degrees Limited.

(b)     Guarantor(s):  Each of the Borrowers and each of Ambassadors' directly and indirectly owned subsidiaries.

(c)     Administrative Agent and Collateral Agent:  Law Debenture Trust Company of New York.

(d)     DIP Lenders:  Certain funds and accounts managed or advised by Whippoorwill Associates, Inc. ("Whippoorwill"), as lenders under the DIP Credit Agreement.

(e)     Type and Amount of the DIP Facility:  The DIP Facility amends and restates the Prepetition Working Capital Facility and is a senior secured, superpriority, multiple draw, non-amortizing term loan facility with an aggregate principal amount up to $5,000,000 under the Interim Order and $10,000,000, less any amount drawn under the Interim Order plus a roll-up of all Prepetition Working Capital Obligations, under the Final Order.  See DIP Credit Agreement § 2.1; Interim Order ¶ 2(b).

(f)     Use of Proceeds:  In each case subject to the Budget, the Debtors may use the DIP Facility proceeds to (i) pay interest, fees and expenses associated with the DIP Facility; (ii) provide for the ongoing working capital expenditure needs of the

---

[2]     This summary is qualified in its entirety by the terms and provisions of the DIP Agreement and proposed Interim Order.  If there is any conflict between this summary and the DIP Agreement, the terms of the DIP Agreement shall control.

Debtors and each of the Borrowers and Guarantors that is not a Debtor in these Cases, (the "Non-Debtor Credit Parties") during the pendency of the Chapter 11 Cases (as defined below), (iii) make the Adequate Protection Payments (as defined below), (iv) pay prepetition obligations of the Debtors as consented to by the DIP Lenders, and (v) provide for other general corporate purposes of the Debtors and the Non-Debtor Credit Parties (including professional costs incurred and paid in accordance with the Budget). See DIP Credit Agreement § 2.6; Interim Order ¶ 3.

(g)    Maturity Date:   All commitments of the DIP Lenders shall terminate on the earliest of (i) the date that is 120 days after the Petition Date; (ii) twenty-five (25) days following the Petition Date, if the Final Order has not been entered by such date; and (c) the date on the maturity of the obligations under the DIP Facility (the "DIP Obligations") is accelerated and the commitments under the DIP Facility are irrevocably terminated in accordance with the DIP Credit Agreement. See DIP Credit Agreement § 1.1; Interim Order ¶ 15.

(h)    Borrowing Conditions:   The Debtors' ability to draw on the DIP Facility is subject to, among other things, (i) entry of the Interim Order (including the grant of adequate protection described herein); (ii) the revolver under the Prepetition Working Capital Facility being undrawn as of the Petition Date; (iii) the Court having entered an order mutually satisfactory to the DIP Lenders and the Debtors authorizing the Debtors to maintain the Debtors' and the non-Debtor subsidiaries' existing cash management system; (iv) completion of preparation of the Budget; (v) the payment of all fees and expenses owing to the DIP Lenders; (vi) the Debtors' entry into the Asset Purchase Agreement (as defined in the DIP Credit Agreement); (vii) each of the Credit Parties (as defined in the DIP Credit Agreement) having filed all required tax returns and having delivered copies of such tax returns to DIP Lenders; (viii)  the DIP Lenders' satisfaction with the results of certain tax diligence; and (ix) the Debtors' compliance with the Bankruptcy Milestones (as defined below). See DIP Credit Agreement § 3.1; 3.2; Interim Order ¶ 2(c).

(i)    Security:  Subject to the Carve-Out, all obligations under the DIP Facility will be secured by a perfected lien on and security interests (the "DIP Liens") in all of the real, personal and mixed property, whether now owned or hereafter acquired of the Debtors, including, without limitation, any vessels, cash, any investments of such cash, deposit accounts, inventory, equipment, goods, general intangibles, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, equipment, general intangibles, documents, instruments, interest in leaseholds, real property, patents, copyrights, trademarks, trade names, other intellectual property, Equity Interests (as defined in the DIP Credit Agreement), the proceeds of all of the foregoing, and subject to entry of the Final Order, the Avoidance Actions (defined below) and any proceeds thereof (all such assets, collectively, the "DIP Collateral"). See DIP Credit Agreement § 1.1; Interim Order ¶¶ 2(d)-(e).

The DIP Liens shall include, without limitation, and in each case subject to the Carve-Out, the following: (i) pursuant to section 364(c)(2) of the Bankruptcy Code, a perfected, first priority lien on all DIP Collateral that is unencumbered as of the Petition Date and, upon entry of the Final Order, the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code, and any other avoidance or similar actions under the Bankruptcy Code or similar state law and the proceeds thereof (the "<u>Avoidance Actions</u>"), whether received by judgment, settlement or otherwise; (ii) pursuant to section 364(c)(3) of the Bankruptcy Code, a perfected junior lien upon all DIP Collateral that is subject to valid and perfected and unavoidable liens in existence on the Petition Date or that is subject to valid liens in existence on the Petition Date that are perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code, other than the Primed Liens (as defined below) (the "<u>Prepetition Senior Liens</u>"); and (iii) pursuant to section 364(d)(1) of the Bankruptcy Code, a perfected first priority senior "priming" lien on all DIP Collateral that is subject to (a) the liens securing the Working Capital Facility Obligations (the "<u>Working Capital Facility Liens</u>") (prior to the Roll-Up or to the extent that any of the Working Capital Facility Liens are successfully challenged in accordance with the Interim Order or Final Order), and (b) the liens securing the Second Lien Notes (the "<u>Second Lien Note Liens</u>" and, together with the Working Capital Facility Liens, the "<u>Primed Liens</u>"), which Primed Liens shall be primed by and made subject and subordinate to the perfected first priority senior priming liens to be granted to the DIP Agent, which senior priming liens in favor of the DIP Agent shall also prime any liens granted after the Petition Date to provide adequate protection in respect of the Primed Liens.  <u>See</u> DIP Credit Agreement § 4.25; Interim Order ¶¶ 2(d)(i)-(iii) and 2(e).

(j)     <u>Superpriority Claim</u>:  Subject to the Carve-Out, the DIP Agent and DIP Lenders shall have claims entitled to the benefits of section 364(c)(1) of the Bankruptcy Code, having superpriority over any and all administrative expenses of the kind that are specified in sections 105, 326, 328, 330, 331, 363, 364, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 and 1114 of the Bankruptcy Code (the "<u>DIP Superpriority Claims</u>").  <u>See</u> DIP Credit Agreement § 4.25; Interim Order ¶ 2(j)(i).

(k)     <u>Carve-Out</u>:  The DIP Liens and the DIP Superpriority Claims shall be subordinate only to the following (the "<u>Carve-Out</u>"):  (i) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6); (ii) until the issuance of a Carve-Out Notice (as defined in the DIP Credit Agreement) (which the DIP Lender may only issue upon an Event of Default), the allowed and reasonable fees and expenses of professionals employed by the Debtors and any official committee ("<u>Case Professionals</u>") in the amounts set forth in the Budget; and (iii) following delivery of a Carve-Out notice, an aggregate amount (the "<u>Residual Carve-Out</u>") not to exceed $150,000, provided that (a) any payments made to Case Professionals for services rendered prior to the delivery of the Carve-Out notice and in accordance with the Budget and (b) any fees and expenses of Case Professionals accrued prior to the delivery of the Carve-Out notice in the amounts set forth in the

Budget and subsequently allowed, shall not reduce the Residual Carve-Out. <u>See</u> DIP Credit Agreement § 4.25; Interim Order ¶ 9.

The Carve-Out shall exclude any fees and expenses incurred in connection with the assertion or joinder of any claim, counterclaim, action or proceeding challenging the DIP Loan, the Working Capital Facility Obligations, the Working Capital Facility Liens, the Second Lien Notes, the Second Lien Note Liens, or the related claims and liens issued in connection therewith. <u>See</u> Interim Order ¶ 10.

No more than $25,000 of the Carve-Out may be used by any official committee or any representative of the estate to investigate claims and/or liens of the holders of claims and liens issued pursuant to the Prepetition Secured Debt Documents Time in which any estate representative may bring an action challenging such liens and claims shall expire no later than 60 days after the formation of an official committee of unsecured creditors. <u>See</u> Interim Order ¶ 11.

(l) <u>Interest Rate</u>: The DIP Facility shall bear interest at a rate of 12% per annum (with a default rate of interest at 14% per annum), which is the same rate as set forth in the Prepetition Credit Agreement. <u>See</u> DIP Credit Agreement §§ 2.8; 2.10.

(m) <u>Fees</u>: Upon the closing, the DIP Lenders shall be paid a commitment fee of $200,000. <u>See</u> DIP Credit Agreement § 2.11

(n) <u>Events of Default</u>: The DIP Credit Agreement sets forth various Events of Default, including without limitation, (i) failure to obtain entry of the Interim Order within two (2) business days following the Petition Date; (ii) failure to obtain entry of the Final Order within twenty-five (25) days following the Petition Date; (iii) failure to make payments when due; (iv) cross defaults with certain material agreements; (v) material breaches of covenants, representations and warranties; (vi) institution by the Debtors' or the non-Debtor subsidiaries of any proceeding or investigation or support same by any other person who may challenge the status and/or validity, and/or perfection and/or priority of the Prepetition Senior Liens or the DIP Liens; (vii) the filing of a plan of reorganization or liquidation or disclosure statement, or any amendment to such plan or disclosure statement that does not provide for the payment in full of the obligations under the DIP Facility without the consent of the DIP Lenders; (viii) dismissal or conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; (ix) appointment of a chapter 11 trustee or examiner with enlarged powers relating to the operation of the Debtors' business; (x) the entry of an order granting any other super-priority claim or lien equal or superior in priority to the DIP Superpriortiy Claims or DIP Liens; (xi) the entry of one or more orders granting relief from the automatic stay so as to allow third parties to proceed against any asset of the Debtors or the non-Debtor borrowers or guarantors having a fair market value in excess of $100,000 in the aggregate; (xi) the sale of any of the non-Debtor borrowers or guarantors' assets outside of the ordinary course of business, or the entry of an order approving the sale of

6

substantially all of the Debtors' assets, if (a) the net cash consideration for such sales is less than the full amount of the then outstanding obligations under the DIP Facility or (b) such net cash proceeds are not sufficient to make, or are not immediately applied to, payment in full in cash of all of the obligations under the DIP Facility (unless waived by the DIP Lenders or in connection with a sale transaction wherein the DIP Lenders are among the purchasers of the assets or pursuant to the Sale Motion); (xii) failure to comply with the Bankruptcy Milestones (as defined below); and (xiii) other Events of Default as more specifically set forth in the DIP Credit Agreement. See DIP Credit Agreement §§ 8.1; 5.16; Interim Order ¶ 17.

(o) <u>Remedies Upon Default</u>: Upon the occurrence of an Event of Default, the DIP Lenders may, upon five (5) days' prior written notice to the Debtors (including their bankruptcy counsel), counsel for any official committee, the prepetition secured parties and the U.S. Trustee, exercise all rights and remedies in accordance with the DIP Financing Documents without being required to obtain relief from, the automatic stay imposed by section 362(a) of the Bankruptcy Code; provided, however, that the Debtors or another party-in-interest may, during such five (5) day notice period seek a determination of the Bankruptcy Court that no event of default has occurred and the DIP Lenders shall not take any of the foregoing actions pending the determination of the Bankruptcy Court. Immediately following the giving of notice by the DIP Agent of an occurrence of an Event of Default, any obligation otherwise imposed on the DIP Agent or the DIP Lenders to provide any loan or advance to the Debtors pursuant to the DIP Facility shall be immediately suspended. See DIP Credit Agreement § 8.1; Interim Order ¶ 18.

(p) <u>Indemnification</u>: The Debtors and non-Debtor borrowers and guarantors agree to indemnify the DIP Lender and DIP Agent and their respective officers, directors, employees, affiliates, agents, attorneys, financial advisors, and controlling persons and hold them harmless from and against all costs, expenses (including fees, disbursements and other charges of counsel) and liabilities of any such indemnified person arising out of or relating to any claim or litigation or other proceedings (regardless of whether any such indemnified person is a party thereto), that relate to the DIP Facility; provided that no indemnified party will be indemnified for its gross negligence or willful misconduct. See DIP Credit Agreement § 10.3.

(q) <u>506(c) Waiver</u>: Upon entry of the Final Order, the Debtors will waive their estates' rights under section 506(c) of the Bankruptcy Code. See Interim Order ¶ 13.

(r) <u>Limitations on Claims</u>: The Debtors may not (a) interfere with enforcement of DIP Agent's rights against any Collateral after any event of default under the DIP Facility; (b) object to or contest the validity, extent, amount, perfection, priority, or enforceability of the obligations under the DIP Facility, and the DIP Liens; and (c) object to or contest the validity, extent, amount, perfection, priority, or

enforceability of the obligations and liens under the Prepetition Working Capital Facility and Second Lien Notes. As set forth above, no more than $25,000 of the Carve-Out may be used by any official committee or any representative of the estate to investigate claims and/or liens of the Prepetition Secured Parties. The time in which any estate representative (other than the Debtors) may bring an action challenging such liens and claims shall expire no later than forty-five (45) days after the Petition Date. See Interim Order ¶¶ 7, 11.

(s) <u>Liens on Avoidance Actions</u>: Upon entry of the Final Order, DIP Lenders will be granted a lien on any Avoidance Actions and the proceeds thereof. <u>See</u> Interim Order ¶ 2(d)(i).

(t) <u>Bankruptcy Milestones</u>: The Debtors' ability to obtain Loans under the DIP Facility is subject to the Debtors' compliance with certain milestones in connection with a 363 Sale (as defined below) (the "<u>Bankruptcy Milestones</u>"), including (i) on the Petition Date, the Debtors are required to file a motion (the "<u>Sale Motion</u>"), in form and substance acceptable to the Debtors and the DIP Lenders, seeking Court approval and entry of (A) an order approving the bid protections, auction process and sale procedures for a sale of all or substantially all of the assets of the Credit Parties under section 363 of the Bankruptcy Code (the "Bidding Procedures Order") and (B) an order approving the sale of certain of the Debtors' assets to the "highest and best" bidder consistent with the terms of the Asset Purchase Agreement (as defined in the DIP Credit Agreement) (the "<u>Sale Order</u>"); (ii) on the Petition Date, the Debtors shall file a motion seeking authority to shorten time with respect to a hearing on the Sale Motion (with respect to the relief sought in the Bidding Procedures Order); (iii) the Court shall have entered the Bidding Procedures Order by no later than fifteen (15) days following the Petition Date; (iv) the Court shall have entered the Sale Order no later than forty (40) days following the Petition Date; and (v) (A) with respect to a sale to the APA Purchaser (as defined in the DIP Credit Agreement), the Debtors shall consummate and close an Approved Sale (as defined in the DIP Credit Agreement) consistent with the Sale Order not later than forty-five (45) days after the Petition Date the (the "<u>Sale Period</u>"), and (B) with respect to a sale to any party other than the APA Purchaser acceptable to the Requisite Lenders in their sole discretion, the date that is ten (10) days after the expiration of the Sale Period (the "<u>Extended Sale Period</u>"), provided that, (x) the Debtors have entered into a definitive purchase agreement acceptable to the Requisite Lenders (as defined in the DIP Credit Agreement) in their sole discretion with such purchaser during the Sale Period; (y) such definitive agreement is not subject to any conditions precedent other than the passage of time; and (z) an authorized officer of Ambassadors delivers a certificate to the DIP Agent, in form and substance satisfactory to the Requisite Lenders in their sole discretion, demonstrating compliance with Section 6.7(d) of the DIP Credit Agreement (minimum liquidity) during the period through the date that is ten (10) days after the expiration of the Extended Sale Period. <u>See</u> DIP Credit Agreement §§ 5.16; 8.1; Interim Order ¶ 17.

(u)    <u>Adequate Protection</u>:  As adequate protection for the use of, and for any diminution in the value of, collateral securing the Prepetition Working Capital Facility and the Second Lien Notes (the "<u>Prepetition Collateral</u>"), (a) the Prepetition Secured Parties will be granted replacement liens and superpriority claims, in each case, of the same relative priority as enjoyed under the Second Lien Notes and the Prepetition Working Capital Facility, to the extent of the postpetition diminution in value of their respective prepetition collateral, subject, in each case, to the Carve-Out and the DIP Superpriority Claims; (b) the Prepetition Agent, the Prepetition Lenders and the Second Lien Trustee will, during the pendency of the Chapter 11 Cases, receive payments in cash on a current basis of all reasonable fees, costs and expenses of their professionals arising in connection with the Chapter 11 Cases; and (c) the DIP Agent, the Prepetition Agent and the Second Lien Trustee shall have the right to credit bid their claims in any sale of the Debtors' assets.  <u>See</u> Interim Order ¶ 4.

(v)    <u>Acknowledgements/Stipulations</u>:  In the Interim Order, the Debtors acknowledge (i) the validity, enforceability and perfection of the Prepetition Secured Parties' respective prepetition liens and (ii) the validity, enforceability and amount of the Prepetition Secured Parties' respective prepetition claims.  <u>See</u> Interim Order ¶ E.

## JURISDICTION AND VENUE

3.    The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.    This is a core proceeding pursuant to 28 U.S.C. § 157(b).

5.    The statutory predicates for the relief sought herein are sections 105(a), 361, 362, 363, 364 and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014.

## BACKGROUND

6.    On the date hereof (the "<u>Petition Date</u>"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "<u>Chapter 11 Cases</u>").  The Debtors are continuing in the possession of their assets and the management of their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  The Debtors have requested that these Chapter 11 Cases be consolidated for procedural purposes.  As of the date hereof, no official committee of unsecured creditors ("<u>Creditors' Committee</u>") has been appointed.

7.     A description of the Debtors' business operations, capital structure, the events leading up to the commencement of the Chapter 11 Cases and the facts and circumstances supporting the relief requested herein is set forth in the Detillion Declaration filed contemporaneously herewith and which is incorporated herein by reference.

## A.     Prepetition Secured Debt

8.     Pursuant to that certain Credit and Guaranty Agreement, dated as of March 23, 2010 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "Prepetition Credit Agreement," and together with all other loan and security documents executed in connection therewith, the "Prepetition Credit Documents"), among Degrees Limited, Wind Star Limited and Wind Spirit Limited,  as borrowers, Ambassadors and certain of its direct and indirect Debtor and non-Debtor subsidiaries as guarantors (the "Prepetition Working Capital Facility Guarantors", and, together with the Prepetition Working Capital Facility Borrowers, the "Prepetition Working Capital Facility Credit Parties"), certain lenders party thereto (the "Prepetition Lenders") and Law Debenture Trust Company of New York as administrative agent and collateral agent (together with its permitted successors, the "Prepetition Agent"), the Prepetition Lenders provided a first lien secured credit facility comprised of (a) up to $5,000,000 in aggregate maximum principal amount of revolving commitments and (b) up to $10,000,000 in aggregate principal amount of term loan commitments (the "Prepetition Working Capital Facility").

9.     As of the Petition Date, approximately $9.575 million is outstanding under the term loan and no amounts are outstanding under the revolving commitments.  Borrowings under the Prepetition Working Capital Facility are secured on a first priority basis by substantially all the assets of Prepetition Working Capital Facility Credit Parties and guaranteed

by the Prepetition Working Capital Facility Guarantors. The Prepetition Working Capital Facility matures on January 2, 2012.

10. Additionally, as a result of the Exchange Offer (as defined in the Detillion Declaration), on November 13, 2009, Ambassadors issued $18 million on 10% Second Lien Notes (the "Second Lien Notes"), issued pursuant to an Indenture, dated as of November 13, 2009 (as supplemented by that certain First Supplemental Indenture, dated as of March 23, 2010, and as further amended, supplemented, restated or otherwise modified, the "Second Lien Indenture") among Ambassadors, as issuer, certain of Ambassadors' Debtor and non-Debtor subsidiaries as guarantors (the "Prepetition Second Lien Guarantors" and, together with Ambassadors, the "Prepetition Second Lien Credit Parties") and Wilmington Trust FSB as collateral agent and trustee (in such capacities, the "Second Lien Trustee").

11. The Second Lien Notes contain a payment in kind (PIK) component allowing Ambassadors to capitalize the interest into the principal. As of the Petition Date, the Debtors are indebted to certain holders of the Second Lien Notes (the "Noteholders", and together with the Prepetition Lenders, the Prepetition Agent and the Second Lien Trustee, the "Prepetition Secured Parties") for approximately $19.7 million plus accrued and unpaid interest. The Second Lien Notes are secured by substantially all of the assets of the Prepetition Second Lien Credit Parties and guaranteed by the Prepetition Second Lien Guarantors. The Second Lien Notes mature on January 15, 2012.

12. The Prepetition Agent and the Second Lien Trustee are party to that certain Intercreditor Agreement dated as of March 23, 2010 (as amended, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "Prepetition

Intercreditor Agreement"), that governs the respective rights, interests, obligations, priority, and positions of the Prepetition Agent and the Second Lien Trustee.

**B.        The Debtors' Need for Postpetition Financing**

13.        As set forth more fully in the Detillion Declaration and the Shepard Declaration, the Debtors do not have sufficient sources of working capital, even with the use of Cash Collateral, to operate their business while they implement a process of selling substantially all of their assets pursuant to section 363 of the Bankruptcy Code (a "363 Sale") without the financing requested in this Motion.  The Debtors' ability to obtain sufficient working capital to operate through an auction and closing is critical to preserving the Debtors' going concern value and maximizing the value of the Debtors' assets for the benefit of the Debtors' estates.  The DIP Lenders have provided the Debtors with a commitment letter, pursuant to which the DIP Lenders have agreed to provide the financing contemplated by the DIP Credit Agreement, subject to the terms and conditions set forth therein.  The DIP Facility will provide the Debtors with additional liquidity to fund operations during the Chapter 11 Cases up to $10,000,000, which is necessary for the continuation of the Debtors as a going concern.

14.        In addition to the proceeds of the DIP Facility, the Debtors must also be able to continue to use their cash on hand to maintain their business operations.  The Debtors' obligations to the Prepetition Lenders and Noteholders, however, are secured by first and second priority liens and security interests (subject to the Prepetition Intercreditor Agreement) in substantially all of the Debtors' assets, including Cash Collateral.  As such, the Debtors do not have much, if any, unencumbered cash with which to operate their business and thus have an immediate need for additional liquidity.  Moreover, the Prepetition Lenders and Noteholders are unwilling to lend additional funds in excess of the Prepetition Secured Debt other than as set

forth in the DIP Credit Agreement. Although the use of Cash Collateral is necessary to the operation of the Debtors' business, the use of Cash Collateral alone is insufficient to operate the Debtors' business successfully. Therefore, the Debtors' immediate need for additional liquidity, in conjunction with their use of Cash Collateral, can only be obtained through entry into the proposed postpetition financing.

15. The Debtors are seeking authority to enter into the DIP Credit Agreement and roll-up all outstanding obligations under the Prepetition Working Capital Facility (the "Prepetition Working Capital Facility Obligations") into the DIP Facility (the "Roll-Up"). If the Roll-Up is approved upon entry of the Final Order, the aggregate commitments under the DIP Facility will be approximately $19,575,000, of which $10,000,000 shall be available for new advances under the DIP Facility in accordance with the DIP Credit Agreement and approximately $9,575,000 of which will be comprised of rolled up Prepetition Working Capital Facility Obligations, which shall be deemed to have been issued under the DIP Credit Agreement. As the DIP Lenders and the Prepetition Lenders are the same, the Debtors will not draw on the DIP Facility to pay the Prepetition Working Capital Facility Obligations, instead, the Prepetition Working Capital Facility shall be amended and restated and the Roll-Up shall not be deemed a novation, refinancing or replacement of the Prepetition Working Capital Facility Obligations. As the Working Capital Facility Obligations will still be outstanding (and, if the Roll-Up is approved will be deemed to be part of the DIP Facility), prior to the Petition Date, and in connection with Whippoorwill's commitment to provide the DIP Facility and act as the stalking horse bidder in a 363 Sale, (i) the Prepetition Agent and Whippoorwill as lender under the Prepetition Working Capital Facility; and (ii) Whippoorwill as holder of approximately 87.8% of the Second Lien Notes entered into a forbearance agreement with the Debtors, pursuant

to which Whippoorwill agreed, subject to certain terms and conditions contained therein, to forebear from exercising remedies with respect to the Non-Debtor Credit Parties[3], including the three non-debtor entities that are the owners of the Windstar cruise vessels.  The Roll-Up is an integral part of the DIP Facility and necessary for the Debtors to obtain the required financing.

16.     Although summarized above, the terms of the DIP Facility are fully contained in the DIP Credit Agreement, substantially in the form attached as <u>Exhibit A</u> to the proposed Interim Order, and in the other DIP Financing Documents.  Pursuant to the DIP Credit Agreement, advances under the DIP Facility will be made in accordance with the 13-week budget and cash flow forecast attached as <u>Exhibit B</u> to the proposed Interim Order (the "<u>Budget</u>"), subject to any variances thereto permitted by the DIP Credit Agreement.  Proceeds of the DIP Facility may be used for the ongoing working capital expenses, the payment of prepetition obligations as may be approved by the Court, payment of interest and fees to the DIP Lenders, and other general corporate purposes.

17.     Upon consummation of a 363 Sale, the DIP Facility will be assumed (if the sale is to the APA Purchaser or will be repaid in full (including the Working Capital Facility Obligations) out of the proceeds of a sale to anyone other than the APA Purchaser.

## RELIEF REQUESTED

18.     By this Motion, the Debtors seek entry of an order:

(i)     Authorizing the Debtors to obtain secured postpetition financing from the DIP Lenders on a secured and superpriority basis pursuant to the terms and conditions of DIP Credit Agreement;

(ii)    Authorizing the Debtors to execute and deliver the DIP Financing Documents and to perform such other acts as may be necessary or desirable in connection with the DIP Financing Documents;

---

[3]     Each of the Non-Debtor Credit Parties is an entity incorporated in the Bahamas or the Marshall Islands and has no substantial assets in the United States.

(iii)    Authorizing the Debtors to Roll-Up all outstanding Prepetition Working Capital Facility Obligations, upon entry of the Final Order;

(iv)    Authorizing the Debtors to use the proceeds of loans advanced under the DIP Financing Documents in a manner consistent with the terms and conditions of the Budget, the DIP Financing Documents, the Interim Order, and the Final Order;

(v)    Authorizing the Debtors to use Cash Collateral in a manner consistent with the terms and conditions of, and for the expenditures set forth in, the Budget and the Interim and Final Orders;

(vi)    Granting the DIP Liens to the DIP Agent, for the benefit of itself and the DIP Lenders, subject to the priorities set forth in the DIP Credit Agreement, the Interim Order and the Final Order;

(vii)    Granting the DIP Superpriority Claims to the DIP Lenders;

(viii)    Authorizing the Debtors to pay the fees, costs and expenses of the DIP Agent and the DIP Lenders (including all reasonable and documented, out-of-pocket fees, expenses and disbursements of their professionals), in connection with negotiation, preparation, execution and administration of the DIP Financing Documents**,** in each case to the extent provided in and in accordance with the terms of the DIP Financing Documents and the Interim and Final Orders;

(ix)    Providing adequate protection to the Prepetition Secured Parties for any diminution in value of their respective interests in the Prepetition Collateral, including the Cash Collateral;

(x)    Modifying the automatic stay to the extent set forth in the DIP Credit Agreement, the Interim Order and the Final Order; and

(xi)    Scheduling the Final Hearing.

## A.    Highlighted Provisions Under Local Rule 4001-2.

19.    Local Rule 4001-2 requires that certain provisions contained in the DIP Credit Agreement and/or Interim Order be highlighted, and that the Debtors justify the inclusion of such highlighted provisions. The Debtors believe the following provisions of the DIP Credit

Agreement and Interim Order implicate Local Rule 4001-2, and that such provisions are justified

and necessary in the context and circumstances of these Chapter 11 Cases:

(a) *Local Rule 4001-2(a)(i)(B)*: Under the Interim Order, the Debtors acknowledge (i) the validity, enforceability and perfection of the Prepetition Secured Parties' respective prepetition liens and (ii) the amount, validity and enforceability of the Prepetition Secured Parties' respective prepetition claims. Any Creditors' Committee appointed in the Chapter 11 Cases will have forty-five (45) days from the first date scheduled by the U.S. Trustee to appoint the Committee to investigate and/or pursue any claims against the Prepetition Secured Parties regarding their respective prepetition liens and claims (or, if no Creditors' Committee is appointed, parties in interest with requisite standing will have forty-five (45) days following the Petition Date). Given the timing of the proposed 363 Sale, this provision was a condition to the DIP Credit Agreement required by the DIP Lenders, and the Debtors do not believe that the DIP Lenders will extend the DIP Facility without it. Accordingly, the Debtors believe this provision is reasonable under the circumstances and necessary to enable the Debtors to obtain the financing they need to avoid immediate irreparable harm. <u>See</u> Interim Order ¶¶ E, 7.

(b) *Local Rule 4001-2(a)(i)(C)*: Upon entry of the Final Order, the Debtors shall waive their estates' rights under section 506(c) of the Bankruptcy Code. This provision was a condition to the DIP Credit Agreement required by the DIP Lenders, and the Debtors do not believe that the DIP Lenders will extend the DIP Facility if the Final Order does not include a section 506(c) waiver. Accordingly, the Debtors believe this provision is reasonable under the circumstances and necessary to enable the Debtors to obtain the financing they need to operate postpetition. <u>See</u> Interim Order ¶ 13.

(c) *Local Rule 4001-2(a)(i)(D)*: The Final Order grants the DIP Lenders a lien on any Avoidance Actions and the proceeds thereof. This provision was a condition to the DIP Credit Agreement required by the DIP Lenders, and the Debtors do not believe that the DIP Lenders will extend the DIP Facility if the Final Order does not include a lien on Avoidance Actions and the proceeds thereof. Accordingly, the Debtors believe this provision is reasonable under the circumstances and necessary to enable the Debtors to obtain the financing they need to operate postpetition. <u>See</u> Interim Order ¶ 2(d)(i).

(d) *Local Rule 4001-2(a)(i)(E)*: The DIP Credit Agreement contains provisions that provide for a "roll-up" of the Prepetition Working Capital Facility Obligations, pursuant to which all amounts outstanding under the Prepetition Working Capital Facility will be deemed to have been issued under the DIP Credit Agreement (as described in greater detail in

paragraph 15 above). Under the facts and circumstances of the Chapter 11 Cases, approval of the Roll-Up is appropriate because the DIP Lenders would not agree to enter into the DIP Facility without it. See DIP Credit Agreement § 2.1; Interim Order ¶ 2(b).

20. The Debtors believe that each of the foregoing provisions are reasonable under the circumstances and necessary to enable the Debtors to obtain the financing they require to pursue a sale of their assets as a going concern and thereby maximize the value of their estates. The DIP Lenders required each of these provisions as a condition to entering the DIP Credit Agreement, and the Debtors do not believe that the DIP Lenders will extend the proposed DIP Facility if any of the foregoing provisions are not approved.

**B.      Use of Cash Collateral and Grant of Adequate Protection.**

21. In the ordinary course of their business, the Debtors generate cash from the use of prepetition collateral. The Debtors need the use of this collateral, including Cash Collateral, to maintain their assets, pay employees, taxes, vendors, overhead and other necessary expenses. The Debtors need to supplement their use of Cash Collateral with the funding being provided by the DIP Facility to continue to operate their business and to maximize the value of their estates. It is imperative that the Debtors obtain the authority to use Cash Collateral to avoid immediate and irreparable harm to their business operations and their estates.

22. The Prepetition Secured Parties are entitled pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code to adequate protection of their interests in the Prepetition Collateral, including the Cash Collateral. Accordingly, the Debtors have agreed, subject to the Court's approval, to provide the Prepetition Secured Parties with the following adequate protection:

(a)      Adequate Protection Liens. To the extent of any diminution in value of the prepetition security interests, the Prepetition Secured Parties shall be granted effective and perfected as of Interim Order entry date a security interest in and

17

liens on the collateral of the Debtors, with the priorities set forth in the Interim Order and subject and subordinate to the Carve-Out and the DIP Liens.

(b)      Super-Priority Claim.  To the extent of any diminution in value of the prepetition security interests of the Prepetition Secured Parties, such parties shall be granted superpriority administrative expense claims in the Chapter 11 Cases as provided for in section 507(b) of the Bankruptcy Code with the priorities set forth in the Interim Order, and junior to the Carve-Out and the DIP Superpriority Claims.

(c)      Adequate Protection Payments.  The Prepetition Secured Parties shall receive from the Debtors current cash payments (the "Adequate Protection Payments") as follows: (i) to the Prepetition Agent and the Prepetition Lenders in the form of: (x) monthly payments of interest, fees and other amounts due under the Prepetition Credit Documents and (y) ongoing payment in cash on a current basis, no less than monthly, and including any amounts incurred prior to the Petition Date,  of the Prepetition Agent's and the Prepetition Lenders' reasonable and documented fees, costs and expenses in connection with the Chapter 11 Cases including, without limitation, the fees of Whippoorwill in its capacity as Prepetition Lender (including, without limitation, the fees and expenses of Gibson, Dunn & Crutcher, LLP as counsel to Whippoorwill and legal and other professionals' fees and expenses, including any fees and expenses related to a sale process for a sale of any of the Debtors' assets pursuant to section 363 of the Bankruptcy Code) and (ii) in respect of the Second Lien Notes, ongoing payment in cash on a current basis, no less than monthly, and including any amounts incurred prior to the Petition Date, of the reasonable and documented fees, costs and expenses of the Second Lien Trustee and Whippoorwill, in its capacity as majority holder of the Second Lien Notes, in connection with the Chapter 11 Cases, including, without limitation, legal and other professionals' fees and expenses (including, without limitation, the fees and expenses of Covington & Burling LLP as counsel to the Second Lien Trustee), and any fees and expenses related to a sale process for a sale of any of the Debtors' assets pursuant to section 363 of the Bankruptcy Code.

(d)      Right to Credit Bid.  The DIP Agent (on behalf of the DIP Lenders), the Prepetition Agent (on behalf of the Prepetition Lenders) and the Second Lien Trustee (on behalf of the Noteholders and, for the avoidance of doubt, not on behalf of itself as purchaser) shall each have the right to "credit bid" the allowed amount of the DIP Lenders' claims, the Prepetition Lenders' claims and the Noteholders' claims, respectively, during any sale of the Prepetition Collateral, including without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any reorganization plan subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code.

The Prepetition Secured Parties have agreed to consent to the use of their Cash Collateral on the condition that the foregoing adequate protection is approved.

<strong><u>BASIS FOR THE RELIEF REQUESTED</u></strong>

**A.**      <u>**The Court Should Approve the DIP Facility**</u>

23.      As described above, it is essential to the success of these Chapter 11 Cases that the Debtors immediately obtain access to sufficient postpetition financing, without which the Debtors' ability to maintain their business operations will be compromised. The Debtors' continuing ability to maximize the value of their estates and their ability to pursue the proposed 363 Sale therefore depends upon the expeditious approval of the DIP Facility and the related actions requested herein.

24.      As set forth below, the Court should approve the Debtors' entry into the DIP Credit Agreement because, among other reasons, no alternative financing exists and the DIP Lenders are prepared to make an immediate cash infusion to the Debtors. The terms of the proposed DIP Facility (including the Roll-Up) are fair and reasonable, and the Debtors' agreement to such terms is within their sound business judgment.

## B.    The Debtors were Unable to Obtain Alternative Financing

25.    Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, the court may authorize the debtor to obtain credit or incur debt (i) with priority over any and all administrative expenses specified in section 503(b) or 507(b) of the Bankruptcy Code, (ii) secured by a lien on property of the estate that is not otherwise subject to a lien, or (iii) secured by a junior lien on property of the estate that is subject to a lien.  11 U.S.C. § 364(c).

26.    Section 364(d) of the Bankruptcy Code further allows a debtor to obtain credit secured by a senior or equal lien on property of the estate that is subject to a lien commonly referred to as a "priming lien", provided that (i) the debtor is unable to obtain such credit otherwise, and (ii) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.  11 U.S.C. § 364(d).

27.    Here, as set forth in the Detillion Declaration and the Shepard Declaration due to their current financial condition, the Debtors have been unable to procure sufficient financing (i) in the form of unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code, (ii) as an administrative expense under section 364(a) or (b), (iii) in exchange for the grant of a superpriority administrative expense claim pursuant to section 364(c)(1) and/or (iv) without granting the proposed DIP Liens pursuant to section 364(d).  Further, the Debtors have been unable to obtain postpetition financing or other financial accommodations from any alternative prospective lender on more favorable terms and conditions than those for which approval is sought herein.

28.     The Debtors' financial advisors reached out to multiple prospective lenders regarding the prospect of providing the Debtors with postpetition financing without success.  The Bankruptcy Code does not require that a debtor seek alternative financing from every possible lender; rather, a debtor simply must demonstrate it made sufficient efforts to obtain financing without the need to grant a senior lien.  See Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986); In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 630-31 (Bankr. S.D.N.Y. 1992); In re Aqua Assocs., 123 B.R. 192, 195 (Bankr. E.D. Pa. 1991).  Instead, it is sufficient for a debtor to demonstrate that it made a good faith effort to seek credit from other sources without providing superpriority claims or priming liens.  See In re Utah 7000, LLC, 2008 WL 2654919, at *2 (Bankr. D. Utah 2008).  This is especially true when time is of the essence.  See In re Reading Tube Indus., 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987).  Here, no potential lender was willing to enter into a priming fight with the Prepetition Lenders and Noteholders and no lender was willing to lend amounts sufficient to avoid such a fight.

29.     Having determined that financing is available only under sections 364(c) and (d) of the Bankruptcy Code, and most likely from the Prepetition Lenders, the Debtors negotiated the DIP Credit Agreement with the DIP Lenders extensively and at arms' length.  The Debtors believe that the terms of the DIP Credit Agreement, including the interest and fees to be paid under the DIP Facility are comparable with the market for loans of this size and risk profile.  Additionally, as noted above, substantially all of the Debtors' assets are encumbered by the Prepetition Lenders' and Noteholders' prepetition liens and security interests.  As such, approval of the DIP Facility avoids any potential priming fight because the DIP Lenders are also the majority of the Prepetition Lenders and Prepetition Noteholders, and they consent to the terms of

the DIP Facility, including the priming liens provided thereunder. Given the time and liquidity constraints, the Debtors submit that the proposed DIP Facility is on the best terms available.

30. The purpose of the DIP Facility is to enable the Debtors to maintain the value of their estates while pursuing a sale of substantially all of their assets. The Debtors believe that, in their business judgment, entering into the DIP Credit Agreement is in their best interests. Given the foregoing considerations, as well as the Debtors' failure to obtain more favorable financing proposals during their prepetition marketing efforts, the Debtors determined that the proposed DIP Facility is the only reasonable prospect for the financing the Debtors need to preserve their going concern value while they implement a 363 Sale process.

31. Provided that a debtor's business judgment does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance therewith. See, e.g., In re Snowshoe Co., 789 F.2d at 1089; In re Trans World Airlines, Inc., 163 B.R. 964, 974 (Bankr. D. Del. 1994), rev'd on other grounds by 134 F.3d 188 (3d Cir. 1998) (approving interim loan, receivables facility and asset-based facility based on the debtor's business judgment); In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (stating, "[c]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties-in-interest"). The Debtors submit that, other than the DIP Facility, no adequate alternative financing exists under the circumstances.

32. Further, the DIP Facility does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers by restricting the

services for which professionals may be paid in these Chapter 11 Cases. See In re Tenney Village Co., Inc., 104 B.R. 562, 568-69 (Bankr. D.N.H. 1989) (denying approval of a financing facility that among other things, did not provide a carve-out for professional fees). The DIP Lenders have provided a Carve-Out for, among other things, professional and trustee fees in connection with winding down the Chapter 11 Cases after a 363 Sale. In particular, the proposed DIP Facility provides that the DIP Liens and DIP Superpriority Claims are subject to, among other items, a Carve-Out for (a) fees of the Office of the United States Trustee allowed by 28 U.S.C. § 1930, and (b) the allowed and reasonable fees and expenses of the Case Professionals in the amounts set forth in the Budget prior to the delivery of a Carve-Out Notice and accrued and unpaid fees and expenses of the Case Professionals up to $150,000 following the delivery of a Carve-Out Notice. In Ames Department Stores, the bankruptcy court found that such "carve-outs" are not only reasonable but are necessary to insure that official committees and debtors' estates are adequately assisted by counsel. Ames, 115 B.R. at 40. Accordingly, the Debtors' decision to enter into the DIP Credit Agreement represents an exercise of their sound business judgment.

**B.**     **The Court Should Approve the Roll-Up.**

33.     As stated above, the Debtors have concluded in their business judgment that the DIP Facility is the best financing option. The Debtors recognize the DIP Facility includes a Roll-Up of the Prepetition Working Capital Facility Obligations upon entry of the Final Order and such Roll-Up was required by the DIP Lenders. The Roll Up is appropriate under the circumstances and should be approved pursuant to sections 363 and 105(a) of the Bankruptcy Code. Section 363(b)(1) of the Bankruptcy Code provides, in relevant part: "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of

business, property of the estate." 11 U.S.C. § 363(b)(1). In addition, section 105(a) of the Bankruptcy Code provides that the Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

34. Entry into the DIP Facility, including the Roll-Up, is within the sound business judgment of the Debtors. Bankruptcy Courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless the decision is arbitrary and capricious. In re TM Carlton House Partners, LTD, 91 B.R. 349, 358 (Bankr. E.D. Pa. 1988) (holding that due to the debtor's distinct awareness of its own financial needs, the court would not second-guess its business judgment to put aside cash to effectuate a refinancing of its debts). To determine whether the business judgment test is met, "the court is required to examine whether a reasonable business person would make a similar decision under similar circumstances." In re Exide Techs., 340 B.R. 222, 239 (Bankr. D. Del. 2006). Additionally, pursuant to section 105 of the Bankruptcy Code, the Court has expansive equitable powers to fashion any order or decree which is in the interest of preserving or protecting the value of the Debtor's assets. See, e.g., Chinichian v. Campolongo (In re Chinichian), 784 F.2d 1440, 1443 (9th Cir. 1986). The Roll-Up is necessary as the DIP Lenders will not otherwise consent to providing the DIP Facility and extending credit to the Debtors thereunder. Accordingly, the Roll-Up is supported by the Debtors' sound business judgment.

35. Courts in this District have approved roll-ups under similar circumstances, where such relief was necessary and in the best interest of the estates. See, e.g., In re Urban Brands, Inc., No. 10-13005 (KJC) (Bankr. D. Del. Oct. 13, 2010) (rolling up $4,616,140.34 of prepetition debt into $6,000,000 of debtor in possession financing); In re Magic Brands, LLC,

No. 10-11310 (BLS) (Bankr. D. Del. May 17, 2010) (rolling up $9,749,534.21 of prepetition debt into $13,780,500 of debtor in possession financing); <u>In re deCODE Genetics, Inc.</u>, No. 09-14063 (PJW) (Bankr. D. Del. Dec. 11, 2009) (rolling up $3,055,262.20 of prepetition debt into $11,117,928 of debtor in possession financing); <u>In re Barzel Indus., Inc.</u>, No. 09-13204 (Bankr. D. Del. Oct. 6, 2009) (rolling up $18,439,000 of prepetition debt into $30,000,000 of debtor in possession financing); <u>In re Eddie Bauer, Inc.</u>, No. 09-12099 (MFW) (Bankr. D. Del. July 7, 2009) (rolling up $63,265,657.11 of prepetition debt into $100,000,000 of debtor in possession financing). Similarly, here the Roll-Up is a necessary component of the DIP Facility and is required for the Debtors to obtain the financing they to operate in chapter 11 pending a sale of substantially all of their assets. Accordingly, the Roll-Up should be approved upon entry of the Final Order.

**AUTHORITY TO USE CASH COLLATERAL AND THE**
**<u>GRANT OF ADEQUATE PROTECTION</u>**

36.     In connection with approving the DIP Facility, the Court should also authorize the Debtors to use Cash Collateral pending the Final Hearing and grant the adequate protection provisions set forth herein.

37.     As noted above, in addition to the DIP Facility, to fund its efforts in these Chapter 11 Cases, the Debtors also require the use of the Prepetition Secured Parties' Cash Collateral. The use of Cash Collateral will provide the Debtors with the additional necessary capital with which to operate their business, pay expenses, maximize value, and pursue a 363 Sale under chapter 11. In exchange for the Debtors' use of Cash Collateral, the Debtors have agreed to provide certain adequate protection to the Prepetition Secured Parties. The Prepetition Secured Parties have negotiated these protections, which are set forth in detail in paragraph 22 above. The Debtors request that the Court approve, as of the Petition Date, the adequate

protection provided to the Prepetition Secured Parties to protect them from diminution in the value of their collateral, including from the implementation of the loans under the DIP Facility and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code.

38.     Section 363(c)(2) of the Bankruptcy Code provides that the Debtors may not use Cash Collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of [section 363]." 11 U.S.C. § 363(c)(2). Here, the Prepetition Secured Parties, the entities with interests in Cash Collateral, have consented.

39.     Further, section 363(e) of the Bankruptcy Code provides that, upon request of an entity that has an interest in property to be used, sold or leased by a debtor, the court shall prohibit or condition such use as is necessary to provide adequate protection of such interest. 11 U.S.C. § 363(e). In addition, section 364(d) also requires that adequate protection be provided where a secured creditor's liens are being primed to secure the obligations under a debtor in possession financing facility, as is the case here. 11 U.S.C. § 363(e).

40.     The purpose of adequate protection is to protect a secured creditor from diminution in value of its interest in the particular collateral during the period of use. See In re Swedeland Dev. Group, Inc., 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (internal citation omitted). The Interim Order contemplates various protections for the Prepetition Secured Parties' respective interests in Cash Collateral, including, among other things, current payment of professional fees and expenses, replacement liens, stipulations, credit bid rights, and allowed super-priority claims. The Prepetition Secured Parties have agreed that that the adequate protection described herein is sufficient to allow the Debtors to use Cash

Collateral in connection with the Chapter 11 Cases. Accordingly, the Debtors believe that the proposed adequate protection is fair and reasonable and in accord with section 363(c)(2) of the Bankruptcy Code. <u>See, e.g.</u>, <u>In re Kain</u>, 86 B.R. 506 (Bankr. W.D. Mich. 1988); <u>In re Beker Indus. Corp.</u>, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986).

41. Based on the extent of the protections provided to the Prepetition Secured Parties for the use of their Cash Collateral, as well as the Prepetition Secured Parties' consent to the use of their Cash Collateral subject to the terms of the Budget and Interim Order, the Debtors submit that the Court should authorize the use of Cash Collateral pending the Final Hearing.

## GOOD FAITH

42. The Debtors submit that the terms and conditions of the DIP Facility and the DIP Documents are fair, reasonable, and the best available to the Debtors under the circumstances. As stated above, and as described more fully in the Detillion Declaration and the Shepard Declaration, the Debtors, the DIP Agent, the DIP Lenders and the Prepetition Secured Parties negotiated the terms and conditions of the DIP Credit Agreement and the use of Cash Collateral in good faith and at arms' length. Moreover, as set forth above, the Debtors decision to enter into the DIP Credit Agreement was an exercise of the Debtors' sound business judgment. Therefore the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties should receive the benefits of section 364(e) of the Bankruptcy Code to the extent any or all of the provisions of the DIP Financing Documents (or any interim or final order relating thereto) are hereafter vacated, stayed or terminated by subsequent order of this or any other court.

## THE AUTOMATIC STAY SHOULD BE MODIFIED ON A LIMITED BASIS

43. The relief requested in the Motion contemplates a modification of the automatic stay (to the extent applicable) to permit the Debtors to grant the liens, security interests

and superpriority claims described above and to perform such acts as may be reasonably required to assure the perfection and priority of such security interests and liens. The Debtors further request that the automatic stay be lifted and/or modified, to the extent necessary, to permit the DIP Lenders, upon the occurrence of any Event of Default, to exercise all rights and remedies in accordance with the DIP Financing Documents upon five (5) days' prior written notice to the Debtors (and their counsel) and counsel to any Creditors' Committee, the Prepetition Agent, the Prepetition Lenders, the Second Lien Trustee, the Noteholders, and the U.S. Trustee; provided, however, that the Debtors or another party-in-interest may, during such five (5) day notice period seek a determination of the Court that no Event of Default has occurred and the DIP Lenders shall not take any of the foregoing actions pending the determination of the Court. Immediately following the giving of notice by the DIP Agent of an occurrence of an Event of Default, any obligation otherwise imposed on the DIP Agent or the DIP Lenders to provide any loan or advance to the Debtors pursuant to the DIP Facility shall immediately be suspended.

44.      Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing facilities and, in the Debtors' business judgment, the stay modifications requested herein are reasonable and fair under the circumstances.

## INTERIM APPROVAL AND FINAL HEARING SHOULD BE GRANTED

45.      Pursuant to Bankruptcy Rules 4001(b) and (c), the Debtors request that the Court conduct an expedited preliminary hearing on the Motion and (a) authorize the Debtors to borrow up to $5,000,000 to be used in accordance with the DIP Credit Agreement and the Interim Order, pending entry of the Final Order, to (i) maintain and finance the Debtors' ongoing operations, and (ii) avoid immediate and irreparable harm to the Debtors' estates, business operations, employees and other parties in interest, and (b) schedule the Final Hearing.

46. Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to use cash collateral or obtain credit, respectively, may not be commenced earlier than fourteen (14) days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing. See Fed. R. Bankr. P. 4001.

47. Stated simply, the Debtors do not have sufficient funds to operate on an ongoing basis pending a final hearing. The Debtors have an urgent and immediate need for cash to continue their operations, and the amount of interim relief request is appropriate given such need. The availability of interim loans under the DIP Facility will provide necessary assurance of the Debtors' ability to meet their near-term obligations and will ensure that the Debtors are able to maintain their going concern value as they pursue a sale. Accordingly, interim relief is necessary to preserve and maintain the Debtors' operations for the benefit of the Debtors' estates and creditors.

48. The Debtors request the Court approve the interim relief requested and, pursuant to Bankruptcy Rule 4001(c)(2), set a date for the Final Hearing that is no later than 20 days following the Petition Date.

## WAIVER OF BANKRUPTCY RULES 6003(B), 6004(A), AND 6004(H)

49. To successfully implement the foregoing, the Debtors respectfully request that the Court waive the notice requirements provided in Bankruptcy Rule 6004(a), the twenty day stay provided in Bankruptcy Rule 6003(b) and the ten day stay provided for in Bankruptcy Rule 6004(h). The Debtors submit, for the reasons set forth above, that sufficient justification exists to waive these requirement.

## NOTICE

50.     Notice of this Motion has been provided to: (i) the Office of the United States Trustee; (ii) the United States Securities and Exchange Commission; (iii) the Office of the United States Attorney for the District of Delaware; (iv) the Internal Revenue Service; (v) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis; (vi) counsel to the administrative agent for the Debtors' prepetition lenders; (vii) counsel to the Prepetition Agent; (viii) the Second Lien Trustee; and (ix) the indenture trustee for the Debtors' prepetition unsecured noteholders.  Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m).  In light of the nature of the relief requested herein, the Debtors believe no other or further notice is necessary.

## NO PREVIOUS REQUEST

51.     No previous request for the relief sought herein has been made to this or any other Court.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter the Interim Order, substantially in the form attached hereto as **Exhibit A**, (a) approving the Debtors' postpetition financing, (b) authorizing the Debtors' use of Cash Collateral, (c) granting adequate protection (d) modifying the automatic stay, (e) scheduling a final hearing and (f) granting such other and further relief as the Court deems appropriate.

Dated:   Wilmington, Delaware
        April 1, 2011

Respectfully submitted,

RICHARDS, LAYTON & FINGER, P.A.

_____/s/ Daniel J. DeFranceschi_____
Daniel J. DeFranceschi (No. 2732)
Michael J. Merchant (No. 3854)
L. Katherine Good (No. 5101)
Amanda R. Steele (No. 5530)
One Rodney Square
920 North King Street
Wilmington, Delaware  19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

-and-

STROOCK & STROOCK & LAVAN LLP
Kristopher M. Hansen
Sayan Bhattacharyya
Marianne Mortimer
Matthew G. Garofalo
180 Maiden Lane
New York, New York 10038-4982
Telephone: (212) 806-5400
Facsimile: (212) 806-6006

Proposed Counsel to the
Debtors and Debtors-in-Possession

31