| In re: | | Chapter 11 |
|---|---|---|
| AMBASSADORS INTERNATIONAL, INC., <u>et al.</u>,[1] | | Case No. 11-_____ (___) |
| Debtors. | | Joint Administration Requested |

## DECLARATION OF MARK DETILLION IN SUPPORT
## OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

Mark Detillion, declares, pursuant to 28 U.S.C. § 1746, under penalty of perjury that:

1.      I am the Chief Financial Officer of Ambassadors International, Inc. ("<u>Ambassadors</u>") and the other above-captioned debtors and debtors-in-possession (collectively, the "<u>Debtors</u>,").  I hold a B.A. in Accounting from the University of Washington and have been the Chief Financial Officer of Ambassadors since April 1, 2009.  In such capacity, I am familiar with the day-today operations, business and financial affairs of the Debtors.

2.      On the date hereof (the "<u>Petition Date</u>"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "<u>Chapter 11 Cases</u>").  The Debtors intend to continue in the possession of their assets and the management of their businesses as debtors-in-possession during the pendency of these Chapter 11 Cases.  To enable the Debtors to operate effectively and to avoid the adverse effects of the chapter 11 filings, the Debtors have requested various types of relief in "first day" applications and motions (the "<u>First Day Motions</u>") filed with the Court concurrently herewith.  The First Day Motions seek relief, among other things, to:  (a) continue the Debtors' operations while in chapter 11 with

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Ambassadors International, Inc. (8605); Ambassadors Cruise Group, LLC (2448); Ambassadors, LLC (0860); EN Boat LLC (8982); AQ Boat, LLC (5018); MQ Boat, LLC (5095); DQ Boat, LLC (5064); QW Boat Company LLC  (0658); Contessa Boat, LLC (9452); CQ Boat, LLC (9511); American West Steamboat Company LLC (0656); and Ambassadors International Cruise Group (USA), LLC (7304).  The mailing address for each Debtor is 2101 4th Avenue, Suite 210, Seattle, WA  98121.

as little disruption as possible; (b) maintain the confidence and support of employees, customers and other key constituencies; and (c) establish procedures for the smooth and efficient administration of these Chapter 11 Cases. Gaining and maintaining the support of the Debtors' employees, customers and other key constituencies, as well as maintaining the day to day operations of the Debtors' business with minimal disruption, will be crucial to the success of the Debtors' efforts in these Chapter 11 Cases.

3.      I submit this Declaration on the Debtors' behalf in conjunction with their petitions and in support of the First Day Motions as well as to explain to the Court and other interested parties the circumstances that compelled the Debtors to seek relief under the Bankruptcy Code. A copy of the resolutions of the Board of Directors authorizing the filing of the Debtors' petitions is annexed to each Debtor's respective petition. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge and the knowledge I have acquired from those who report to me, my review of relevant documents, or my opinion based upon experience, knowledge and information concerning the Debtors' operations and financial condition. If called upon to testify, I could and would testify competently to the facts set forth herein. I am duly authorized to submit this Declaration.

## BACKGROUND

### A.      Overview of the Debtors' Business

4.      Headquartered in Seattle, Washington, Ambassadors was founded in 1967 as a travel services company. Following series of acquisitions in 2006 and 2007, and prior to 2009, Ambassadors operated in several business segments, including a domestic and international cruise business, a travel and events business, a marina design, management and development business, and a property and casualty reinsurance business. In early 2009, Ambassadors made the business decision to focus exclusively on the international luxury cruise business of its

Windstar Sail Cruises division ("Windstar") and has since sold or wound down its other businesses. Windstar, which is currently Ambassadors only operating division, maintains a fleet of three internationally-flagged luxury yachts that provide travel and cruise opportunities to treasured destinations with sailings in the Caribbean, Europe, the Americas and the Greek Isles. Ambassadors' common stock is listed on the NASDAQ Capital Market under the symbol "AMIE".[2] As of December 31, 2010, Ambassadors and its subsidiaries reported assets of approximately $86.4 million and liabilities of approximately $87.3 on a consolidated business. As of the Petition Date, Ambassadors and Windstar had a total of fifty-nine (59) employees located in the United States. A chart detailing the organizational structure of Ambassadors and its subsidiaries as of the Petition Date is attached hereto as Exhibit A.

5.      Ambassadors' cruise business is owned through its wholly-owned subsidiary Ambassadors Cruise Group, LLC ("ACG"). Historically, ACG operated in two major business segments—the Majestic America line ("Majestic") and Windstar. The Majestic line, which is no longer operating, was a domestic provider of overnight passenger cruises along inland rivers and the coastal waterways of North America. In April 2008, Ambassadors announced its intention to sell the Majestic line consisting of seven U.S. flagged cruise ships. Since that time, the Debtors have not operated any of the Majestic vessels and have sold or disposed of all but two of the Majestic ships: the *Delta Queen* and the *Columbia Queen*.[3]

---

[2]      Ambassadors currently has 3,321,384 shares of common stock outstanding. Trading in Ambassadors common stock was halted on the Petition Date, and as described further herein, Ambassadors believes that its common stock will likely be delisted from the NASDAQ Capital Market for failure to meet the minimum listing requirements.

[3]      The *Delta Queen* and the *Columbia Queen* are no longer operated by the Debtors. The *Delta Queen*, is leased under a bareboat charter agreement under which the lessee operates a fixed location boutique hotel, restaurant and bar on the ship in Chattanooga, Tennessee, and the *Columbia Queen*, which is no longer operating, has been pledged as collateral to one of the Debtors' credit card processors.

6.      Ambassadors acquired Windstar from Holland America Line, a unit of Carnival Corporation & plc, in April 2007.  Windstar's cruise business is operated through Ambassadors International Cruise Group (USA), LLC, a wholly owned, indirect subsidiary of ACG.  The Windstar fleet includes three luxury yachts: the 312-passenger *Wind Surf* (the largest stay-rigged schooner in the world), the 148-passenger *Wind Spirit*, and the 148-passenger *Wind Star*.  Each of these ships offer passengers a luxury vacation including state of the art accommodations, five-star dining options, spa facilities, casinos, guest lounges and other amenities.  All three of the ships operate in the Caribbean, Latin America and Europe (including Italy, the Mediterranean, Greece, Turkey and the Baltics), depending upon the time of year for that specific itinerary.

7.      Windstar's ships are unlike those of its competitors.  The smaller luxury ships allow access to ports and harbors not typically visited by larger ships due to size constraints. Windstar focuses its itineraries on unique, historically significant and "less traveled" destinations to appeal to its target customers.  Sailing under the banner "180 Degrees From Ordinary," Windstar Cruises is a 25 year old brand, well known within its niche market as an alternative to the typical cruise or resort vacations.

8.      The majority of Windstar's revenue is derived from individual passenger ticket sales whereby customers enjoy leisure travel and vacations.  These itineraries are generally available up to two years in advance.  Windstar's individual passenger tickets cost approximately $2,500 on average and are typically booked four (4) to six months (6) in advance of the sailing date.

9.      Windstar's cruise revenues are also derived from charter and incentive programs, which are utilized by large companies and organizations who typically reserve the entire ship.

These customers typically consist of companies that provide incentive and reward travel to their employees as well as organizations wishing to charter a private sailing ship for their employees.

10.     Approximately 360 officers and crewmembers, who are contracted through third party manning agencies, work on board the Windstar vessels at any given time.

**B.      Summary of Significant Prepetition Indebtedness**

11.     Debtors' significant outstanding prepetition debt includes, among other things, secured indebtedness under their prepetition credit facility and senior secured notes, and unsecured indebtedness in respect of Ambassadors' convertible notes, liabilities on account of passenger and charter deposits, and trade debt.

*Prepetition Credit Facility*

12.     On March 23, 2010, the Company entered into a term loan and revolving credit facility (the "Prepetition Credit Facility"), the terms of which are governed by a Credit and Guaranty Agreement, by and among Degrees Limited, Wind Spirit Limited, and Wind Star Limited as borrowers, Ambassadors as parent, the subsidiaries of Ambassadors party thereto as guarantors, certain funds and accounts managed by Whippoorwill Associates, Inc. ("Whippoorwill"), as lenders and Law Debenture Trust Company of New York, as administrative agent and collateral agent (the "First Lien Agent").

13.     The Prepetition Credit Facility provides for a $5 million revolving credit facility (the "Prepetition Revolver") and for a $10 million term loan facility (the "Prepetition Term Loan"), which could be drawn in two tranches, for the purposes of funding dry-dock costs for the Windstar vessels as well as working capital and other corporate purposes of Ambassadors and its subsidiaries.  As of the Petition Date, approximately $9.6 million is outstanding under the Prepetition Term Loan and no amounts are outstanding under the Prepetition Revolver.

14. Borrowings under the Prepetition Credit Facility are secured, with certain exceptions[4], on a first priority basis by substantially all the assets of Ambassadors and its subsidiaries and guaranteed by each of Ambassadors' wholly owned U.S. and foreign subsidiaries as of the Petition Date (other than those subsidiaries that are borrowers). The Credit Facility has a maturity of January 2, 2012.

*Second Lien Notes*

15. In connection with the consummation of an exchange offer relating to Ambassadors' uncured convertible notes (as described further below), on or about November 13, 2009, Ambassadors issued approximately $18 million 10% Senior Secured Notes due 2012 (the "Second Lien Notes") pursuant to an Indenture dated as of November 13, 2009 by and among Ambassadors, as issuer, the subsidiaries of Ambassadors party thereto as guarantors, and Wilmington Trust FSB as Trustee (the "Second Lien Trustee"). Interest on the Second Lien Notes is payable in kind (PIK) by default but may, at Ambassadors' option, be paid in whole or in part in cash. As of the Petition Date, as a result of the payment of PIK interest, approximately $19.7 million aggregate principal amount of Second Lien Notes is outstanding.

16. The Second Lien Notes are secured by substantially all of the assets of Ambassadors and its subsidiaries that secure the Prepetition Credit Facility. Each of Ambassadors' wholly owned U.S. and foreign subsidiaries as of the Petition Date is a guarantor of the Second Lien Notes. Pursuant to an Intercreditor Agreement, dated as of March 23, 2010, by and among the First Lien Agent, the Second Lien Trustee, Ambassadors, Wind Star Limited, Wind Spirit Limited, Degrees Limited and the other subsidiaries of Ambassadors party thereto,

---

[4] In particular, the Prepetition Credit Facility is not secured by the *Delta Queen* vessel and the Prepetition Credit Facility's preferred ship mortgage in the *Columbia Queen* is junior to the preferred ship mortgage in favor of American Express Travel Related Services Company, Inc. ("Amex"), which serves as collateral under the Debtors' credit card processing agreement with Amex.

the liens securing the Second Lien Notes are second in priority to the liens securing the Prepetition Credit Facility. The Second Lien Notes mature on January 15, 2012.

*Unsecured Notes and Exchange Offer*

17. In April 2007 Ambassadors issued $97.0 million aggregate principal amount of 3.75% Convertible Senior Notes due 2027 (the "Convertible Notes") pursuant to an indenture dated as of April 3, 2007 (the "Convertible Notes Indenture") by and among Ambassadors and Wells Fargo Bank, National Association as indenture trustee. The Convertible Notes were issued with an original issue discount of approximately $2.8 million. A portion of the proceeds from the sale of the Convertible Notes was used to retire $60 million in seller financing incurred in connection with the acquisition of Windstar.

18. The Convertible Notes are, subject to certain conditions, convertible into shares of Ambassadors' common stock. The Convertible Notes Indenture also provides that upon the occurrence of certain events constituting a "Fundamental Change" (as defined in the Convertible Notes Indenture) including a delisting of Ambassadors common stock, each holder of the Convertible Notes has the right to require Ambassadors to repurchase their notes at a purchase price equal to 100% of the principal amount thereof (the "Put Right").

19. The Convertible Notes are unsecured obligations of Ambassadors and holders of the Convertible Notes may require Ambassadors to purchase all or a portion of the Convertible Notes in Cash, on certain specified dates or upon the occurrence of specific events (including a de-listing of Ambassadors' stock, as described more fully below). The Convertible Notes are not guaranteed by any of Ambassadors' subsidiaries.

20. On November 13, 2009, Ambassadors completed an exchange offer (the "Exchange Offer") in which holders of approximately $65.8 million aggregate principal amount of the Convertible Notes exchanged their Convertible Notes for approximately $18 million

aggregate principal amount in newly issued senior secured notes and approximately 15.2 million shares of the Company's common stock. As of the Petition Date, approximately $31.2 million aggregate principal amount of the Convertible Notes remain outstanding.

*MARAD Note Obligations*

21.     In connection with the acquisition of certain assets from Delta Queen Steamboat Company, Inc. in April 2007, AQ Boat, LLC ("AQ Boat"), a wholly-owned subsidiary of ACG, assumed the sellers' obligations under certain government guaranteed ship financing bonds (the "American Queen Bonds") originally issued to finance the construction of the *American Queen* and a promissory note (the "American Queen Promissory Note" and, together with the American Queen Bonds, the "American Queen Obligations") in favor of the United States of America acting though the Maritime Administration of the Department of Transportation ("MARAD") in a principal amount equal to the obligations under the American Queen Bonds. AQ Boat's obligations under the American Queen Promissory Note were secured by a first preferred ship mortgage in the *American Queen* in favor of MARAD.

22.     In connection with the assumption of the American Queen Obligations by AQ Boat, Ambassadors executed a Limited Guaranty dated as of April 25, 2006 in favor of MARAD (the "Limited Guaranty"). Pursuant to the Limited Guaranty, Ambassadors initially guaranteed, on an unsecured basis, up to $7,257,095 of AQ Boat's obligations under the American Queen Promissory Note, which was reduced dollar-for-dollar by the amount of the payments made by AQ Boat under the American Queen Promissory Note.

23.     AQ Boat was ultimately unable to make the required debt service payments under the American Queen Obligations and surrendered control of the *American Queen* to MARAD in a foreclosure proceeding before the United States District Court for the Eastern District of Texas

in late 2008.[5]  In March 2009, MARAD initiated an action in the United States District Court for the Eastern District of Louisiana[6] seeking a deficiency judgment against AQ Boat on the American Queen Promissory Note and against Ambassadors under the Limited Guaranty.  In December 2009, the district court entered a default judgment against AQ Boat on account of amounts due under the American Queen Promissory Note in the amount of $12,980,496.22 and in August 2010, the district court entered a judgment against Ambassadors on account of amounts due under the Limited Guaranty in the amount of $958,142, plus pre-judgment interest (together, the "Marad Judgments").  As of the Petition Date, Ambassadors and AQ Boat have made no payments on account of the Marad Judgments.

*Passenger and Charter Deposits*

24.     In the ordinary course of business, the Debtors collect deposits from customers who book cruises.  Customers purchasing individual passenger tickets are required to place a $500-$750 deposit per person within three days of booking, with the balance of the ticket price to be paid 90 days prior to departure.  Additionally, the Debtors collect deposits in the ordinary course from its charter and incentive program customers.[7]  Windstar's Charter agreements typically require a deposit equal to 10% of the charter price with the balance due 60 to 90 days prior to departure.  The Debtors record the aggregate amount of individual passenger and charter deposits as a liability on its consolidated balance sheet until the completion of the relevant cruise.

25.     As of the Petition Date, the Debtors had accrued liabilities of approximately $16.1 million on account of customer deposits.  As described further below, the Debtors are seeking authority pursuant to their first day motions to honor their prepetition obligations under

---

[5]     *United States v. American Queen, C/A* No. 2008-cv-00198.
[6]     *United States of America v. AQ Boat LLC, et al.*, No. 09-03044.
[7]     Charter customers in some cases may provide a letter of credit in lieu of providing a cash deposit.

individual passenger tickets and charter agreements and, subject to approval of the Court, anticipate sailing all Windstar cruises as scheduled during the Chapter 11 Cases.

### *Trade Debt*

26.     The Debtors obtain goods and services from numerous vendors and suppliers in the ordinary course of business, including fuel and other supplies for their cruise ships, airline ticketing services, technology and marketing services, and services provided by port agents, among others.  The Debtors estimate that their aggregate trade debt as of the Petition Date is approximately $3.9 million.

## C.     Events Leading to Chapter 11

27.     The Debtors operate their businesses in a highly competitive and challenging environment.  The global recessionary environment of the past several years has negatively impacted consumer discretionary spending on vacation and travel activities.  Additionally, the Debtors face competition from a variety of other cruise operators, as well as other vacation operators that provide other leisure options, including hotels, resorts, package holidays and tours. Overcapacity in the vacation and cruise industry resulting from a decline in demand has placed significant pricing pressure on the Debtors and their competitors alike.  Furthermore, the Debtors' businesses have high fixed operating costs, including fuel and repair and maintenance for their cruise ships, and are sensitive to fluctuations in commodity prices, particularly oil prices.  These and other economic factors, combined with the Debtors' over-leveraged position have left Ambassadors and its subsidiaries struggling for the past several years to maintain adequate liquidity to maintain their ongoing operations.

28.     After suffering operating losses of approximately $33 million in 2007 and approximately $12 million in 2008 associated with the operations of the Majestic America line, the Debtors ceased operating the *Contessa* and the *Mississippi Queen* in 2007 and curtailed the

operations of their remaining domestic cruise ships in 2008. In April 2008, the Debtors announced their intention to sell their Majestic America line, but were unsuccessful in obtaining a bidder for that business. In connection with the wind down of the Majestic America business, the Debtors surrendered both the *American Queen* and the *Empress of the North* vessels to MARAD in the fall of 2008. Over the course of 2009 and 2010, the Debtors sold three of their Majestic America vessels—the *Mississippi Queen*, the *Queen of the West* and the *Contessa*. As of the Petition Date, the Debtors own only two of the original seven Majestic America vessels, which they do not operate—the *Delta Queen*, which is operated as a hotel by a third party under a bareboat charter with DQ Boat, LLC and the *Columbia Queen*.

29. Beginning in early 2009, in order to address an increasingly constrained liquidity position, Ambassadors made the decision to substantially realign its business operations to focus exclusively on the international luxury cruise business of its Windstar division. During the course of 2009, Ambassadors sold or wound down all of its remaining non-Windstar operations, including its travel and events business, its reinsurance business, its marina business and its domestic cruise business. The divestiture of these underperforming businesses reduced considerable liabilities that had been incurred in connection with these businesses and the proceeds of the sales provided liquidity for the ongoing operations of Ambassadors and Windstar. Ambassadors additionally commenced a number of restructuring and cost-cutting initiatives to streamline its operations, including a significant reduction in its workforce, a relocation of its headquarters to a lower cost location in Seattle, Washington, and moving its ship operations away from third-party operators.

30. Notwithstanding the substantial restructuring of its operations in 2008 and 2009, Ambassadors' balance sheet continued to be highly leveraged, including indebtedness under its

then $97 million aggregate outstanding principal amount of Convertible Notes. In an effort to reduce its outstanding indebtedness and interest expense, in the third quarter of 2009, Ambassadors commenced discussions with holders of its Convertible Notes regarding a restructuring of its obligations thereunder.

31. On September 25, 2009 Ambassadors commenced the Exchange Offer, pursuant to which all holders of the Convertible Notes was given the opportunity to exchange its notes for shares of common stock and Second Lien Notes. As described above, holders of approximately $65.8 million aggregate principal amount (approximately 70% of the then aggregate outstanding principal amount) of the Convertible Notes elected to exchange their notes in the Exchange Offer for an aggregate of approximately 15.2 million shares of common stock and approximately $18 million principal amount of Second Lien Notes. Holders of approximately $31.2 million aggregate principal amount of Convertible Notes did not to participate in the Exchange Offer.

32. Prior to commencing the Exchange Offer, Ambassadors executed agreements with holders of approximately 59.5% of its then outstanding Convertible Notes, including Whippoorwill, Highbridge Capital Management, LLC ("Highbridge") and Polygon Global Opportunities Master Fund ("Polygon"), pursuant to which Whippoorwill, Highbridge and Polygon agreed, among other things, to exchange their notes in the Exchange Offer.

33. Following the consummation of the Exchange Offer, Ambassadors and its subsidiaries began soliciting proposals from lenders for a new senior credit facility. The Debtors reached out to numerous potential lenders and ultimately received proposals from only two potential lenders, including Whippoorwill. Ambassadors and its subsidiaries entered into the Prepetition Working Capital Facility with Whippoorwill in March 2010 due to the fact that Whippoorwill's proposal offered superior pricing and covenants. The Debtors' entry into the

Prepetition Working Capital Facility provided much needed additional capital to fund ongoing working capital and to pay necessary repair and dry dock costs for the company's Windstar vessels. In light of the adverse economic climate and difficulty in the financing markets at that time, Ambassadors and its subsidiaries would likely have been unable to obtain the necessary financing provided by the Prepetition Working Facility absent the substantial reduction in Ambassadors' outstanding indebtedness resulting from the Exchange Offer.

34. After reducing their outstanding indebtedness and obtaining new capital under the Prepetition Credit Facility, the Debtors continued to focus on their operational restructuring initiatives and maintaining adequate liquidity throughout 2010. However, notwithstanding a modest recovery in the economy, the Debtors' businesses continued to face many challenges a consequence of the continued softness in the economy and the resulting adverse effect on discretionary spending and consumer confidence. Additionally, despite the reduction in its outstanding indebtedness through the Exchange Offer, the Debtors' balance sheet continued to be highly leveraged.

35. In May 2010 and again in August 2010, Ambassadors received delisting notices from the Nasdaq Listing Qualifications staff (the "Nasdaq Staff") for, respectively, failing to satisfy the minimum bid requirement and minimum stockholders' equity requirements for continued listing on the NASDAQ National Market, on which Ambassadors common stock was listed at that time. As noted above, the delisting of Ambassadors' common stock is among the circumstances triggering the Put Right under the company's Convertible Notes. In the event that the Put Right was triggered, the Debtors determined that they would not have sufficient liquidity to satisfy their potential obligations thereunder.

36.     In an effort to maintain the continued listing of its common stock, Ambassadors appealed the Nasdaq Staff determinations and on August 26, 2010, the Nasdaq Hearings Panel granted the company's request for continued listing subject to (1) the transfer of the listing of Ambassadors common stock from the NASDAQ Global Market to the small-cap NASDAQ Global Market and (2) achieving compliance with the $1 minimum bid requirement, which the company satisfied through an 8:1 reverse stock split.

37.     During the course of 2010, in an effort to free up additional liquidity to satisfy its ongoing operational needs, the Debtors also entered into negotiations with their credit card processors (the "Processors"), regarding a release of restricted cash held by the Processors, which the Processors hold as collateral principally to offset potential credit card chargebacks.  As a result of these negotiations, the Debtors were successfully able to obtain a release of approximately $8 million of restricted cash by, among other things, providing them with substitute collateral.[8]

38.     In November and December of 2010, in the course of preparing their annual financial statement, the Debtors determined that they would have a negative shareholder equity position on their consolidated balance sheet for the year ended December 31, 2010.  Due to their negative shareholder equity position, the Debtors also determined that they would not be in compliance with the applicable listing requirements for continued listing on the NASDAQ Global Market and would likely once again face delisting shortly following the filing of their 2010 form 10-K, which was due to be filed on March 31, 2010.[9]

---

[8]     As noted above, Amex was granted a first preferred ship mortgage in the *Columbia Queen* in connection with their agreement to release restricted cash to the Debtors.

[9]     On the Petition Date, Ambassadors filed a form 12b-25 announcing that Ambassadors was unable to timely file their form 10-K for the period ended December 31, 2010 due to, among other things, the negotiation and commencement of their Chapter 11 Cases.

39.     As a result of the likely delisting of their common stock, the Debtors once more faced the potential that the Put Right under the Convertible Notes would be triggered.  In the course of discussions with their auditors, the Debtors were informed that as a result of their likely delisting and their inability to satisfy their obligations with respect to the Put Right, the audit opinion for their 2010 financials would contain a going concern qualification.

40.     The Debtors believe that the existence of a going concern opinion with respect to their financial statements would have a significant adverse impact on their relationships with customers, vendors, suppliers and particularly their financial partners—including their lenders and Processors.  During this time, the Debtors also determined that they would likely be in default of the consolidated adjusted EBITDA covenant under the Prepetition Credit Agreement as of June 30, 2011 as well as the minimum cash balance covenant under the Second Lien Notes, and would ultimately require additional capital to fund their operations through 2011.

41.     While the Debtors' businesses have continued to improve with the economy, faced with these challenges to their liquidity position, the Debtors, engaged Imperial Capital, LLC ("Imperial") to seek potential investors and financing sources and commenced discussions with Whippoorwill as lender under their Prepetition Credit Facility regarding a restructuring of their business and indebtedness.  In the weeks prior to the Petition Date, the Debtors, through Imperial, also reached out once again to the holders of their remaining Convertible Notes in an effort to determine whether it would be possible to effectuate a comprehensive restructuring of their indebtedness, and ultimately executed confidentiality agreements with an *ad hoc* group of holders of approximately 66% of the aggregate outstanding principal amount of the Convertible Notes.

42.     Over the course of their discussions with their creditors, the Debtors, with the assistance of their advisors, explored numerous restructuring alternatives including out of court deleveraging transactions and a potential sale of their assets. In consultation with their advisors and board of directors, the Debtors determined that their out of court alternatives were not viable and that an extended restructuring process, and the resulting uncertainty to their businesses, would likely cause irreparable harm to their operations.  In particular, a drawn out restructuring process would have both a near term impact on their revenues due to the potential loss of existing customers and decreases in bookings during such a process, as well as a long term negative impact due to the erosion of the Debtors' customer base.

43.     Furthermore, the Debtors' businesses are highly dependent not only on their relationships with their customers, but also with their vendors, suppliers and financial partners. Without certainty as to the viability of the Debtors' businesses as a going concern, the Debtors' business and financial partners would likely not extend credit or be willing to provide the goods and services that the Debtors need to operate their businesses.  As a result, the Debtors ultimately concluded, in their business judgment, that an expeditious sale of their assets and their Windstar business as a going concern was their only viable alternative.

44.     As discussed more fully in the Declaration of Christopher Shepard filed on the Petition Date, on February 22, 2011, Imperial commenced a process of marketing the Debtors' assets and business, reaching out to numerous potential strategic and financial purchasers. Simultaneously, the Debtors and their advisors engaged in discussions with Whippoorwill and its advisors about acting as a stalking horse bidder in an auction of their assets pursuant to section 363 of the Bankruptcy Code, as well as providing the Debtors with additional capital under a debtor-in-possession financing facility (as described more fully below).

45.     As of the Petition Date, the marketing process undertaken by Imperial has resulted in only one potential bidder, other than Whippoorwill, for the Debtors' assets and business, who has indicated a purchase price for the Debtors' assets that is less than the amount of the Debtors' secured indebtedness.  Accordingly, the Debtors determined that Whippoorwill should act as the stalking horse bidder and, as more fully set forth in the Motion of the Debtors for Entry of Orders (I) Approving Bidding Procedures for the Sale of Certain of the Debtors' Assets Free and Clear of All Liens, Claims and Encumbrances; (II) Approving the Form and Manner of Notice of the Sale and Assumption and Assignment of Executory Contracts and Unexpired Leases; (III) Scheduling an Auction and Sale Hearing; (IV) Approving Such Sale and (V) Dismissing the Chapter 11 Bankruptcy Case of Ambassadors International Cruise Group (USA) LLC. filed on the Petition Date, the Debtors have executed an agreement with Whippoorwill to act as a stalking horse bidder in a sale process pursuant to section 363 of the Bankruptcy Code.

46.     The Debtors believe that a sale to Whippoorwill, subject to higher and better offers, is the best method to protect the going concern value of their operating business and preserve a 25 year-old stalwart in the cruise industry, and will maximize the value of their estates for the benefit of their customers, vendors, suppliers, employees and other creditors.

### FIRST DAY MOTIONS

**A.      Facts in Support of First Day Motions**

47.     To enable the Debtors to operate effectively and to avoid the adverse effects of the chapter 11 filings, all or certain of the Debtors have filed, or intend to file, the motions and applications described below.

48.     In connection with the preparation for these bankruptcy cases, I have reviewed each of the First Day Motions referenced below. The First Day Motions were prepared with my

input and assistance, or the input and assistance of employees or designees working under my supervision. I believe the information contained in the First Day Motions is accurate and correct. As set forth more fully below, I believe that the entry of orders granting the relief requested in these motions and applications is critical to the Debtors' ability to preserve the value of their estates and assist in their sale efforts.

**B.      Motions Related to Case Management**

*Motion of the Debtors for an Order Directing Joint Administration of*
*Their Related Chapter 11 Cases*

49.      The Debtors seek the joint administration of their Chapter 11 Cases for procedural purposes only.  I believe that it would be far more practical and expedient for the administration of these Chapter 11 Cases if this Court were to authorize their joint administration.   Joint administration will reduce costs and facilitate the administrative process by avoiding the need for duplicative notices, applications and orders. It is my understanding that no prejudice will befall any party by the joint administration of the Debtors' cases as the relief sought therein is solely procedural and is not intended to affect substantive rights.

**C.      Motions Related to Financing of Operations**

*Motion of the Debtors for an Order (I) Approving Cash Management System, (II) Authorizing Use of Prepetition Bank Accounts and Business Forms, (III) Waiving the Requirements of 11 U.S.C. § 345(b) on an Interim Basis, and (IV) Granting Administrative Expense Status to Postpetition Intercompany Transactions ("Cash Management Motion")*

50.      The Debtors seek approval to continue their cash management system.  In the ordinary course of their businesses, the Debtors maintain a centralized cash management and disbursement system to collect funds for their operations and to pay operating and administrative expenses in connection therewith (the "Cash Management System").  The Cash Management System is similar to those utilized by other large, diversified companies to collect, concentrate, and disburse funds in a cost-effective and efficient manner.

51.      The Cash Management System is carefully managed through oversight procedures implemented by the Debtors' financial personnel.  Through their control over the Cash Management System, the Debtors are able to facilitate cash forecasting and reporting, monitor collection and disbursement of funds, and maintain control over the administration of various bank accounts required to effect the collection, disbursement, and movement of cash.

52.      The Cash Management System currently consists of eight (8) bank accounts, each of which is maintained with Bank of America.  The Debtors maintain a primary depository and disbursement account (the "Operating Account"), which is located in Seattle, Washington and owned by Ambassadors International Cruise Group (USA), LLC ("Ambassadors Cruise Group USA").  As set forth below, the majority of the Debtors' deposits and payments are made to and from the Operating Account.  The Operating Account is subject to a deposit account control agreement in favor of the Debtors' prepetition secured lenders.

53.      The Operating Account is the primary account for the Debtors' Windstar cruise business, which is the largest source of revenue for the Cash Management System.  The

Windstar cruise business is primarily funded by payments from customers, who typically pay the Debtors by credit card or check when they book a cruise, book an excursion or spend money on board the cruise ships. Substantially all of checks and electronic payments (including credit card receipts) from customers are deposited directly into the Operating Account.

54. Similarly, the Debtors' payment obligations are generally funded directly or indirectly through the Operating Account. For payments directly related to the Windstar cruise business (including payables owed by the Debtors' non-debtor foreign subsidiaries), the Debtors make such payments directly from the Operating Account. As a general matter, Ambassadors Cruise Group USA acts as a paying agent for the Debtors' non-debtor subsidiaries, and makes payments on account of those subsidiaries in the ordinary course. Such payments include food and fuel for the cruise ships, crewmembers' compensation, and other cruise-related payables. The majority of the Debtors' payments from the Operating Account are check or wire transfer. Every week, however, Airlines Reporting Corporation ("ARC"), a travel technology firm, ACH debits approximately $50,000 from the Operating Account on account of and air ticketing for both crew and customer travel.

55. In addition to the Operating Account, the Debtors maintain a depository for deposits unrelated to the Windstar cruise business (the "Ambassadors/Majestic Depository Account"), and four (4) disbursement accounts for payroll, employee flexible spending, and payables related to the Majestic line or Ambassador's International (the "Disbursement Accounts"). The Disbursement Accounts are funded as needed from the Operating Account and disbursements are typically made shortly thereafter. The Ambassadors/Majestic Depository Account and the Disbursement Accounts are described more fully below. In addition, the Majestic Disbursement Account periodically receives wire deposits from insurance proceeds.

56.     The Debtors' accounts are not electronically linked and transfers between accounts are made manually by the Debtors' personnel.  The Debtors do not maintain any zero balance accounts and although the Debtors typically concentrate cash in the Operating Account, there are no nightly cash sweeps.

57.     Although the majority of the Debtors' payments are made from the Operating Account, certain payables are made from the Disbursement Accounts for particular purposes.  One such purpose is payroll.  The Debtors use Automatic Data Processing, Inc. ("ADP"), a third-party processor, to make their payroll.  Instead of having ADP take funds directly from the Operating Account, the Debtors fund from the Operating Account an account at Bank of America (the "Payroll Account") prior to a scheduled pay date with the amounts needed for payroll.  ADP then debits the Payroll Account on the 3rd and 18th of every month (or if these days fall on a weekend, the Friday before) and pays the Debtors' employees, and remits any related taxes to the appropriate taxing authorities two business days later.

58.     Additionally, some of the Debtors' employees participate in a flexible spending program, whereby the Debtors withhold funds from employees' paycheck and turn the funds over to a plan administrator.  Again, instead of having the plan administrator take funds directly from the Operating Account, the Debtors fund from the Operating Account an account at Bank of America (the "FSA Account") with the amounts needed for the flexible spending program.  Then the Debtors' flexible spending account plan administrator, ACH, debits the FSA Account to reimburse the Debtors' employees for eligible expenses.

59.     Further, the Debtors occasionally need to make payments unrelated to the Windstar cruise business.  In such instances, the Debtors will fund, on an as needed basis from the Operating Account , one of two bank accounts at Bank of America for payables related to

either (i) the Debtors' domestic non-operating cruise business, Majestic (the "Majestic Disbursement Account"), or (ii) the Debtors' ultimate parent, Ambassadors International, Inc. (the "Ambassadors Disbursement Account"). Payments from the Majestic Disbursement Account primarily include moorage, maintenance and insurance payments, while payments from the Ambassadors Disbursement Account include professional fees and other corporate level payments.

60.     Occasionally, the Debtors will receive funds from other sources unrelated to the Windstar cruise business and not deposited directly into the Operating Account. In such instances, those funds will typically be deposited into the Ambassadors/Majestic Depository Account or the Majestic Disbursement Account. To the extent any deposits are made into the Ambassadors/Majestic Depository Account or the Majestic Disbursement Account, such funds are typically on account of consolidated tax refunds, insurance proceeds, or other receivables related to the Majestic domestic cruise business. As the majestic cruise business is no longer operational, deposits into the Ambassadors/Majestic Depository Account are rare. Following the receipt of such funds, the Debtors will typically transfer any such funds to the Operating Account.

61.     Additionally, the Debtors accept American Express, Visa and MasterCard, credit and debit cards on board the cruise ships and on-line through their websites. The Debtors have entered into arrangements with various credit card companies (the "Credit Card Processors") to process and settle these credit card transactions. Once processing and settlement has been completed  (typically a 2-3-day process), the Credit Card Processors remit the cash proceeds of the credit or debit card transactions to the Debtors by transferring any such funds to the Operating Account. The Credit Card Processors also hold certain funds back in holdback

accounts on account of potential chargebacks from customers as well as a pre-negotiated percentage based on the dollar value of future cruises.

62.     The Debtors also maintain two certificates of deposit (the "CD Accounts") as security for certain obligations.  The CD Accounts are each maintained at Bank of America.  One CD Account contains approximately $70,182 and is held to secure a line of credit for an air ticketing program in which the Debtors participate with ARC.  As of the Petition Date, the letter of credit was undrawn.  The other CD Account contains approximately $500,000 and is held as collateral to secure the account control agreement on the Operating Account.  The funds in the CD Accounts are included in the Debtors' books as restricted cash.

63.     Finally, in the normal course of their businesses, the Debtors engage in various intercompany transactions due to their centralized cash administration system.  As of the Petition Date, there are numerous intercompany claims (the "Intercompany Claims") that reflect intercompany receivables and payables made in the ordinary course between and among the Debtors (the "Intercompany Transactions").   Such receivables and payables are generally generated for, among other things, purchases required for normal operations, miscellaneous consolidated payments by a parent entity which represent obligations of a subsidiary entity (e.g., tax payments), and services provided by one Debtor to another Debtor.  The Debtors maintain records of all Intercompany Transactions and can ascertain, trace and account for all Intercompany Transactions between and among the Debtors.

64.     I understand that the U.S. Trustee Guidelines require chapter 11 debtors to, among other things, close all existing bank accounts and open new accounts which must be designated debtor in possession bank accounts and utilize new checks for all debtor in possession accounts, which bear the designation "Debtor in Possession."  The Debtors believe that it would

be costly and disruptive to cease using all existing forms and to purchase and begin using new stationery, checks and business forms, and appropriate care can be taken to assure the proper use of the existing forms. In the event the Debtors need to purchase new check stock or business forms during the pendency of these Chapter 11 Cases, such check stock will include a legend referring to the Debtors as "Debtors in Possession" or "DIP."

65.     I also understand that the Bankruptcy Code has certain requirements that deposits be conservative and guaranteed by the federal government or agency. The Debtors do not maintain any investments, cash or otherwise, except as described above with regard to the Cash Management System. All of the Debtors' funds are held in cash or certificates of deposit in the Bank Accounts. As of the Petition Date, the Debtors held approximately $1.32 million in the Bank Accounts (including the CD Accounts). The Debtors do not invest any other funds. The majority of the Bank Accounts have deposits of less than $250,000, thus clearly satisfying the requirements of section 345 of the Bankruptcy Code. As of the Petition Date, two (2) Bank Accounts contain deposits in excess of $250,000: the Operating Account and one of the CD Accounts. Both of these accounts are maintained with Bank of America.

66.     I believe that the Debtors' existing Cash Management System is essential to the orderly operation of the Debtors' businesses. The cost and expense of changing bank accounts and creating a new cash management system would force the Debtors to incur significant and unnecessary costs and expenses, and may introduce inefficiency when efficiency is most essential. Additionally, I believe that granting the Cash Management Motion, and allowing the Debtors to move forward with their Cash Management System, including granting administrative expense priority for intercompany transfers, allowing the Debtors to use their existing checks, would be in the best interests of the Debtors and their estates.

*Motion of the Debtors for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (i) Approving Postpetition Financing and Repayment of Certain Prepetition Obligations, (ii) Authorizing Use of Cash Collateral, (iii) Granting Liens and Providing Superpriority Administrative Expense Status, (iv) Granting Adequate Protection, (v) Modifying the Automatic Stay and (vi) Scheduling a Final Hearing (the "DIP Motion")*

67.     Pursuant to the DIP Motion, the Debtors seek authority to, among other things, enter a senior secured, superpriority post-petition financing agreement (the "DIP Credit Agreement"), with certain of the Prepetition Lenders and Noteholders, as lenders (the "DIP Lenders") and Law Debenture Trust Company of New York as administrative agent and collateral agent (the "DIP Agent,"), which provides for borrowing under a multiple draw term loan facility (the "DIP Facility") in an interim amount of $5,000,000 (the "Interim New Money DIP Loans") and a final amount of (i) $10,000,000 less any amounts advanced under the Interim Order as Interim New Money DIP Loans, and (ii) a roll-up of all outstanding Prepetition Working Capital Facility Obligations into the DIP Facility. The DIP Lenders have provided the Debtors with a commitment letter, pursuant to which the DIP Lenders have agreed to provide the financing contemplated by the DIP Credit Agreement, subject to the terms and conditions set forth therein. I understand the DIP Facility includes a roll-up all outstanding obligations under the Prepetition Working Capital Facility into the DIP Facility.

68.     The Debtors do not have sufficient sources of working capital to operate their business while they implement a section 363 sale process without the financing requested in the DIP Motion. The Debtors' ability to obtain sufficient working capital to operate through an auction and closing is critical to preserving the Debtors' going concern value and maximizing the value of the Debtors' assets for the benefit of the Debtors' estates. The DIP Facility will provide the Debtors with additional liquidity to fund operations during the Chapter 11 Cases up to $10,000,000, which is necessary for the continuation of the Debtors as a going concern.

69.     Stated simply, the Debtors do not have sufficient funds to operate on an ongoing basis pending a final hearing.  The Debtors have an urgent and immediate need for cash to continue their operations, and the amount of interim relief request is appropriate given such need.  The availability of interim loans under the DIP Facility will provide necessary assurance of the Debtors' ability to meet their near-term obligations and will ensure that the Debtors are able to maintain their going concern value as they pursue a sale.  Accordingly, interim relief is necessary to preserve and maintain the Debtors' operations for the benefit of the Debtors' estates and creditors.

70.     In addition to the proceeds of the DIP Facility, the Debtors must also be able to continue to use their cash on hand to maintain their business operations.  The Debtors' obligations to the Prepetition Lenders and Noteholders, however, are secured by first and second priority liens and security interests (subject to the Prepetition Intercreditor Agreement) in substantially all of the Debtors' assets, including Cash Collateral.  As such, the Debtors do not have much, if any, unencumbered cash with which to operate their business and thus have an immediate need for additional liquidity.  Moreover, the Prepetition Lenders and Noteholders are unwilling to lend additional funds in excess of the Prepetition Secured Debt.  Although the use of Cash Collateral is necessary to the operation of the Debtors' business, the use of Cash Collateral alone is insufficient to operate the Debtors' business successfully.  Therefore, the Debtors' immediate need for additional liquidity, in conjunction with their use of Cash Collateral, can only be obtained through entry into the proposed postpetition financing.

71.     In the ordinary course of their business, the Debtors generate cash from the use of prepetition collateral.  The Debtors need the use of this collateral, including Cash Collateral, to maintain their assets, pay employees, taxes,  vendors, overhead and other necessary expenses.

The Debtors need to supplement their use of Cash Collateral with the funding being provided by the DIP Facility to continue to operate their business and to maximize the value of their estates. It is imperative that the Debtors obtain the authority to use Cash Collateral to avoid immediate and irreparable harm to their business operations and their estates.

72.     Due to their current financial condition, the Debtors have been unable to procure sufficient financing (i) in the form of unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code, (ii) as an administrative expense under section 364(a) or (b), (iii) in exchange for the grant of a superpriority administrative expense claim pursuant to section 364(c)(1) and/or (iv) without granting the proposed DIP Liens pursuant to section 364(d).  Further, the Debtors have been unable to obtain postpetition financing or other financial accommodations from any alternative prospective lender on more favorable terms and conditions than those for which approval is sought in the DIP Motion.

73.     I understand that, Imperial Capital, LLC ("Imperial"), the Debtors' proposed financial advisors, reached out to multiple prospective lenders regarding the prospect of providing the Debtors with postpetition financing without success.  Having determined that financing is available only under sections 364(c) and (d) of the Bankruptcy Code, and most likely from the Prepetition Lenders, the Debtors negotiated the DIP Credit Agreement with the DIP Lenders extensively and at arms' length.  The Debtors believe that the terms of the DIP Credit Agreement, including the interest and fees to be paid under the DIP Facility are comparable with the market for loans of this size and risk profile.  Additionally, substantially all of the Debtors' assets are encumbered by the Prepetition Lenders' and Noteholders' prepetition liens and security interests.  As such, approval of the DIP Facility avoids any potential priming fight because the DIP Lenders are also the majority of the Prepetition Lenders and Prepetition

Noteholders, and they consent to the terms of the DIP Facility, including the priming liens provided thereunder. Given the time and liquidity constraints, the Debtors submit that the proposed DIP Facility is on the best terms available.

74. The Debtors believe that each of the provisions contained in the DIP Credit Agreement and the Interim and Final Orders are reasonable under the circumstances and necessary to enable the Debtors to obtain the financing they require to pursue a sale of their assets as a going concern and thereby maximize the value of their estates. In particular, the Roll-Up is a necessary component of the DIP Facility and is required for the Debtors to obtain the financing they to operate in chapter 11 pending a sale of substantially all of their assets. The DIP Lenders required, among other things, the stipulations contained in the Interim Order, the wavier of rights under section 506(c) of the Bankruptcy Code, the liens on Avoidance Actions, and the Roll-Up, as a condition to entering the DIP Credit Agreement, and the Debtors do not believe that the DIP Lenders will extend the proposed DIP Facility if any of the foregoing provisions are not approved.

75. The Debtors believe that, in their business judgment, entering into the DIP Credit Agreement is in their best interests. Given the foregoing considerations, as well as the Debtors' failure to obtain more favorable financing proposals during their prepetition marketing efforts, the Debtors determined that the proposed DIP Facility is the only reasonable prospect for the financing the Debtors need to preserve their going concern value while they implement a section 363 sale process.

**D.     Motions Related to Operations**

*Motion of the Debtors for an Order (I) Authorizing: (A) Payment of Prepetition Employee Wages, Salaries, and Other Compensation; (B) Payment of Prepetition Compensation Owed to Crewmembers; (C) Continue to Implement and Make Payments Under the Bonus Plans; (D) Reimbursement of Prepetition Employee Business Expenses; (E) Payments for Which Prepetition Payroll and Tax Deductions Were Made; (F)  Contributions to Prepetition Employee Benefit Programs and Continuation of Such Programs in the Ordinary Course; (G) Payment of Workers' Compensation Obligations; and (H) Payment to Third Parties of All Costs and Expenses Incident to the Foregoing Payments and Contributions; and (II) Authorizing and Directing Applicable Banks and Other Financial Institutions to Honor and Pay All Checks and Transfers Drawn on the Debtors' Payroll Accounts to Make the Foregoing Payments ("Wages Motion")*

76.     The Debtors currently employ approximately fifty-nine (59) employees in the United States (the "Employees").  Forty-two (42) of the Employees are salaried and seventeen (17) are paid hourly, and a majority of the Employees are located at the Debtors' headquarters in Seattle, Washington, with others located in North Dakota, New York, Louisiana, Mississippi, and Florida.  The Employees perform a variety of critical functions for the Debtors, including customer service, management, marketing and sales, operations, administration and finance.  No Employees are subject to collective bargaining agreements ("CBA") or represented by unions.  The Employees' skills as well as their knowledge and understanding of the Debtors' operations and infrastructure are essential to the effective operation of the Debtors' business.  Without the continued services of the Employees, the Debtors continued operation pending a sale will not be possible.

77.     The Debtors typically pay their Employees (via check or direct deposit) on the 5th and 20th of every month.  Most Employees are paid via direct deposit through electronic transfer of funds:  Some of the Employees, however, are paid by check.  The Debtors' average gross monthly compensation for their Employees' wages (the "Wages") is approximately $280,000.  The Debtors utilize the services of a third-party payroll processor, Automatic Data Processing, Inc. ("ADP").  The Debtors fund their payroll account (the "Payroll Account") with amounts

necessary to satisfy the Debtors' payroll obligations two to three days ahead of scheduled payments. ADP then receives the funds by ACH debiting the Payroll Account and processes direct deposit transfers to Employees or issues payroll checks to Employees, as appropriate. The services provided by ADP are crucial to the smooth functioning of the Debtors' payroll system, and therefore to the Debtors' operations generally. The Debtors pay ADP approximately $1,300 per month on account of payroll administration and certain other payroll related services (the "Payroll Processing Services"). As of the Petition Date, the Debtors owed approximately $1,300 in connection with the Payroll Processing Services.

78. Because most of the Debtors' Employees are paid in arrears, as of the Petition Date, some of the Debtors' Employees have not been paid all of their prepetition wages. Additionally, compensation may be due and owing as of the Petition Date because some payroll checks issued to Employees prior to the Petition Date may not have been presented for payment or cleared the banking system and, accordingly, have not been honored and paid as of the Petition Date. The Debtors' made their last payroll shortly prior to the Petition Date, and therefore, the Debtors expect most Employees will be owed limited amounts of prepetition Wages. As of the Petition Date, the aggregate amount of accrued Wages (excluding the Payroll Taxes and Deductions) earned prior to the Petition Date that remains unpaid to the Debtors' Employees is approximately $30,000 (the "Unpaid Wages").

79. In addition to the Seattle-based Employees, the officers and crew members (the "Crewmembers") on board the Windstar cruise ships are contracted through three (3) third-party manning agencies (the "Agencies"). Approximately 360 Crewmembers work on board the cruise ships at time. Crewmembers are primarily from Europe, the Philippines and Indonesia. All of the Crewmembers are represented by unions and there are three (3) CBAs governing the

Crewmembers' employment (one with respect to each country). The Crewmembers provide all necessary services aboard the cruise ships, including administration, engineering, maintenance, food services, customer relations, and medical assistance. The Crewmembers are the people the Debtors' customers interact with while on board the ships and are an indispensible part of the Debtors' business.

80.     The Debtors pay the Crewmembers at the end of every month, in arrears, and while the amount of compensation varies because of, among other things, occupancy rate, the gross monthly compensation paid to the Crewmembers is approximately $850,000 to $900,000. Unlike with respect to the Employees, the Debtors do not use ADP or any third-party processor to pay the Crewmembers. Instead, the Debtors wire the necessary funds for payroll to the Agencies and the Agencies send the money to the Crewmembers, as applicable. The Debtors typically send the necessary funds to the Agencies a week before payments are made. Additionally, Crewmembers are eligible to take advances on their wages onboard the cruise ships. The Debtors fund these advances directly (with cash onboard the ships) and deduct these amounts from the payments made to the Agencies. The CBAs govern the rates for base wages for Indonesian and Filipino Crewmembers and the Crewmembers' participation in the pools of service fees and gratuities collected at the end of each cruise. The European Crewmembers have individual contracts that specify wages for each Crewmember. Additionally, the CBAs provide that certain Crewmembers accrue vacation time in addition to wages. As of the Petition Date, the Debtors estimate that they owe approximately $80,000 for the unpaid and accrued services (including gratuities and unused vacation) of the Crewmembers (the "Crewmember Compensation"). Additionally, six (6) of the Crewmembers are entitled to medical and life insurance benefits paid by the Debtors.

81.     The Debtors pay monthly fees to the Agencies who provide the services of the Crewmembers.  The Agencies are paid monthly, separate from the payment made for the Crewmember Compensation.  Without the Agencies, the Debtors would not be able to staff their ships.  The Debtors pay approximately $54,000 per month to the Agencies for the services of the Crewmembers ("Agency Fees"), and, as of the Petition Date, owe approximately $55,000 to the Agencies.

82.     Prior to the Petition Date, to reward certain Employees for achieving certain performance-driven benchmarks, the Debtors designed and implemented bonus plans pursuant to which certain Employees are eligible to receive bonuses in addition to their regular compensation.  The programs include incentive plans for sales personnel ("Sales Incentives") and commissions paid to reservations agents ("Reservations Commissions", together with the Sales Incentives, the "Bonus Plans").

83.     Sales Incentives are intended to reward sales Employees who have met certain sales targets and the amount of such incentives are determined on an individualized basis and based upon several factors, including seniority, level of performance, and the overall performance of the Debtors' business.  Sales Incentives are paid quarterly, with an average aggregate Sales Incentives of $25,000 paid per quarter.  In 2010, the Debtors paid eight (8) employees, $70,000 in Sales Incentives, with no Sales Incentive exceeding $27,000 to any one person for the 2010 year.  As of the Petition Date, the aggregate amount of accrued but unpaid Sales Incentives is $14,000, with the next scheduled payments to be made in April 2011.

84.     Reservations Commissions are intended to reward reservations staff who have met certain volume and call targets, and the amounts of such commissions and the amount of such incentives are determined on an individualized basis and based upon several factors,

including seniority, level of performance, and the overall performance of the Debtors' business. Reservations Commissions are paid monthly, with the average aggregate Reservations Commission of $5,800 paid per month. In 2010, the Debtors paid thirteen (13) Employees, $53,935 in Reservations Commissions, with no Reservations Commissions exceeding $11,000. As of the Petition Date, the aggregate amount of unpaid Reservations Commissions is $5,460, with the next scheduled payments to be made in April 2011.

85. The Bonus Plans have been implemented exclusively for non-management Employees and key components of the compensation paid to such Employees. Further, no insiders participate in the Bonus Plans. The Debtors believe the Bonus Plans are crucial to the Employees' morale and critical to the Debtors' business.

86. Prior to the Petition Date, and in the ordinary course of their business, the Debtors directly or indirectly reimburse Employees for certain expenses incurred on behalf of the Debtors in the scope of their employment (the "Reimbursable Expenses"). The Reimbursable Expenses are expenses for air travel, lodging, ground transportation, meals, material and supply purchases, and other business-related expenses. While Reimbursable Expenses vary based on Employee expenses, the Debtors' Employees incur (and the Debtors reimburse) approximately $15,000 per month of Reimbursable Expenses.

87. Because Employees do not submit expense reports with perfect regularity, it is difficult to determine with precision the aggregate amount of outstanding Reimbursable Expenses. However, the Debtors estimate that as of the Petition Date, approximately $15,000 in Reimbursable Expenses have been incurred but remain unpaid.

88. In addition, the Debtors maintain a corporate credit card program with Bank of America under which sixteen (16) of the Debtors' Employees were each issued a credit card in

their own names for payment of regularly incurred Reimbursable Expenses (the "Corporate Credit Cards"). Two Employees, the Debtors' Chief Executive Officer and Chief Financial Officer, maintain Corporate Credit Cards that are used to purchase large ticket items from vendors who do not accept checks or cash (in particular, advertising). The Debtors remit payment on account of the Corporate Credit Cards directly to Bank of America. Payments under the Corporate Credit Cards are direct obligations of the Debtors, but the Employees in possession of these Corporate Credit Cards are secondarily liable.

89.     The Debtors are required by law to withhold from an Employee's wages amounts related to, among other things, federal, state and local income taxes, and social security and Medicare taxes (collectively, the "Withheld Amounts") for remittance to the appropriate federal, state or local taxing authorities. The Debtors must then match from their own funds for social security and Medicare taxes and pay, based upon a percentage of gross payroll, additional amounts for state and federal unemployment insurance (the "Employer Payroll Taxes," and together with the Withheld Amounts, the "Payroll Taxes"). The Debtors' current monthly Payroll Taxes total approximately $45,000. The Debtors' Payroll Taxes are generally processed and forwarded to the appropriate federal, state, or local taxing authorities at the same time Employee payroll checks are administered. The Debtors provide the total amount necessary to satisfy their obligations in connection with the Payroll Taxes to ADP, which then processes and remits the Payroll Taxes to the appropriate federal, state or local taxing authorities. As of the Petition Date, the Debtors estimate that the amount of accrued and outstanding prepetition obligations with respect to the Payroll Taxes to be approximately $3,000.

90.     Additionally, during each applicable pay period, the Debtors routinely deduct certain amounts from Employees' paychecks, including, without limitation, certain pre-tax and

after-tax deductions payable pursuant to certain of the Employee benefit plans discussed herein (such as an Employee's share of health care benefits or insurance premiums, 401(k) contributions, garnishments and child support payments) (collectively, the "Deductions") and forward those amounts to various third-party recipients. On average, the Debtors have historically deducted approximately $31,000 in Deductions from the Employees' paychecks per month. As of the Petition Date, the Debtors estimate that the amount of accrued and outstanding Deductions was approximately $2,000.

91. The Debtors offer several programs to eligible full time Employees for health, prescription drug, dental, and vision care coverage (the "Health Care Programs"). Generally, Employees that work at least thirty-five (35) hours per week are eligible to participate in the Health Care Programs. The Debtors' Health Care Programs are provided through fully-insured programs with a variety of health care insurers. The Debtors provide eligible employees with medical and prescription drug coverage ("Health Coverage") through a fully insured program administered through Premera Blue Cross. Employees contribute to the cost of Health Coverage through direct payroll. The Debtors' average monthly obligations with respect to Health Coverage is $33,155. The Debtors also provide eligible employees with dental coverage ("Dental Coverage") through a fully insured program administered through Delta Dental. Employees contribute to the cost of Dental Coverage through direct payroll deductions. The Debtors' average monthly obligations with respect to Dental Coverage is $4,434. Finally, the Debtors provide eligible employees with vision coverage ("Vision Coverage") through a fully insured program administered through Vision Service Plan (VSP). Employees contribute to the cost of Vision Coverage through direct payroll deductions. The Debtors' average monthly obligations with respect to Vision Coverage is $509.

92. Additionally, although the Debtors do not typically pay for benefits of the Crewmembers, six (6) Crewmembers are entitled to medical coverage and thirty-seven (37) to life benefits through fully funded plans administered by Aetna Global Benefits (for medical coverage) and the Unum Group ("Unum") (for life insurance coverage) (together, the "Crewmember Coverage"). The Crewmembers receiving these benefits contribute to a portion of the costs, and the cost on account of Crewmember Coverage is approximately $4,600 per month. On average, the Debtors pay approximately $45,000 per month in the aggregate, in advance at the beginning of each month, on account of the Health Care Programs. As such, as of the Petition Date, the Debtors estimate that there will be no accrued and outstanding prepetition obligations with respect to the Health Care Programs.

93. In addition to Health Care Programs, the Debtors provide paid time off for sick, vacation and personal days paid time off ("PTO") to their Employees. The amount of PTO is based on each Employee's amount of time employed by the Debtors, and Employees are generally paid for PTO at their regular hourly or salaried rates when such time is used. Accrued but unused PTO carries over to the following calendar year, but Employees may only accrue a maximum of 120 hours of total accrued PTO.

94. The costs of PTO that accrued prepetition will be honored through the payroll process by the continuation of pay during the Employees' applicable leave. Further, Employees are not permitted to receive payment in lieu of PTO, and therefore do not receive a cash outlay from the Debtors. Thus, the costs of PTO are included in the "Unpaid Wages" total set forth above. The Debtors estimate that as of the Petition Date, approximately $142,000 remains outstanding with respect to PTO.

95.     In the ordinary course of business, the Debtors maintain a 401(k) defined contribution plan for the benefit of all eligible Employees (the "401(k) Plan").  The 401(k) Plan generally provides for pre-tax salary deductions of eligible compensation, which amounts are generally deducted automatically from each participating Employee's paycheck.  Approximately eighteen (18) Employees currently participate in the 401(k) Plan, and the approximate monthly amount withheld from Employee paychecks on account of such 401(k) Plan is $12,400.  The Debtors make varying contributions, which are indexed to time served with the Debtors (up to $500 annually per Employee), to the 401(k) Plan for participating Employees.  As of the Petition Date, approximately $6,000 remains outstanding on account of 401(k) Plan matching.

96.     The Debtors currently provide eligible Employees with company-paid long-term disability benefits (the "Long-Term Disability Benefits") through a fully insured program administered by Unum.  Generally, full-time Employees may receive Long-Term Disability Benefits ninety (90) days after becoming disabled.  The Long-Term Disability Benefits are generally paid at a rate of 60% of a participating Employee's base salary, with a maximum monthly benefit of $10,000.

97.     The Debtors' monthly premium associated with the Long-Term Disability Benefits is approximately $4000.  As of the Petition Date, no amounts remain outstanding with respect to such premiums.  The Debtors request authority to pay all prepetition amounts owed on account of Long-Term Disability Benefits and to continue to provide Long-Term Disability Benefits in the ordinary course of their business post-petition.

98.     The Debtors provide company-paid basic life insurance coverage ("Life Insurance") for eligible Employees through a fully insured program administered by Unum. Benefit amounts and other terms and conditions of the Life Insurance vary depending on a

number of factors. The Debtors spend approximately $2,250 per month on Life Insurance. As of the Petition Date, the Debtors believe that no amounts are owed to Unum in connection with the Life Insurance program.

99.     In addition, Employees can elect to participate in additional voluntary long-term life insurance and financial protection group plans (the "<u>Supplemental Life Insurance</u>") through Unum. As participating Employees pay all premiums in connection with the Supplemental Life Insurance, the Debtors anticipate that all amounts outstanding with respect to the Supplemental Life Insurance program will be offset by payroll deductions.

100.    Employees can elect to purchase accidental death and dismemberment coverage (the "<u>AD&D Insurance</u>") through Unum. As with Supplemental Life Insurance, participating Employees pay all premiums in connection with the AD&D Insurance program, and the Debtors anticipate that all amounts outstanding with respect to the AD&D Insurance program will be offset by payroll deductions.

101.    The Debtors offer their Employees the ability to contribute a portion of their compensation, which amounts are generally deducted automatically from each participating Employee's paycheck, into flexible spending accounts for health and dependent care (the "<u>Flexible Spending Program</u>"). As the Debtors simply pass the funds collected under the Flexible Spending Program over to a third-party administrator, the Debtors anticipate that all outstanding amounts will be offset by payroll deductions.

102.    To assist certain Employees in the performance of their duties in support of the Debtors' business, the Debtors provide and pay for cell phones and/or blackberries (the "<u>Cell Phone Program</u>") for approximately sixteen (16) Employees. The cell phones and blackberries operate on the T-Mobile network and the cell phone bills are paid directly by the Debtors. The

Debtors spend approximately $6,000 per month on account of the Cell Phone Program. As of the Petition Date, the Debtors believe that there is approximately $6,000 outstanding on account of the Cell Phone Program.

103.     Under the laws of the State of Washington, the Debtors are required to maintain workers' compensation policies and programs to provide their Employees with compensation for injuries arising in connection with or related to their employment with the Debtors. In Washington, workers' compensation insurance is provided through a direct payment of claims (self-insurance) or through a state-run fund. The Debtors participate in the state-run fund (the "Workers' Compensation Program"). The Debtors pay approximately $4,000 per quarter on account of the Workers' Compensation Program. As of the Petition Date, Debtors owed approximately $4,000 on account of the Workers' Compensation Program. As of the Petition Date, there are no pending workers' compensation claims filed against the Debtors alleging injuries incurred by Employees during the course of their employment with the Debtors.

104.     If there is an interruption in the payment of the Employee Wages and Benefits, the Debtors' Employees and Crewmembers will suffer personal hardship and may be unable to meet their living expenses or continue health benefits. The inevitable consequences would be employee attrition, staff distraction and turnover, loss of goodwill and disintegration of Employee morale. Some Employees or Crewmembers may even be forced to seek alternative employment immediately. Such results would have a materially adverse effect on the Debtors' operations and could threaten their ability to continue their business as a going concern. In fact, the stalking horse bidder for the Debtors' assets has indicated its intent to honor certain employee obligations to demonstrate its dedication to Employee morale and the preservation of

the Debtors' business.  For these reasons, it is essential that any undue hardship to the Employees and Crewmembers be minimized.

105.    Many Employees and Crewmembers live from paycheck to paycheck and rely exclusively on receiving their full compensation or reimbursement of their expenses in order to continue to pay their daily living expenses.  Further, these Employees and Crewmembers will be exposed to significant financial and health-related issues if the Debtors are not permitted to pay the Employee Wages and Benefits.  Indeed, if the Debtors are not authorized to pay for the Specified Employee Benefits, such as medical, dental and vision benefits, then many of the Employees may not be reimbursed or otherwise have their health benefit claims paid.  In addition, certain Employees may become primarily obligated for the payment of these claims in cases where health care providers have not been reimbursed, and may face having their health care services terminated.  The Debtors believe that such uncertainty will cause significant anxiety at precisely the time the Debtors need their Employees to perform their jobs at peak efficiency, and should be avoided at all costs.

106.    The Employees and Crewmembers are essential to the orderly and successful sale process.  They have an intimate knowledge of the operation of the Debtors' business, and any deterioration in morale and welfare at this critical time undoubtedly would adversely impact the Debtors, the value of their assets and business, and ultimately their ability to survive as a going concern.  Furthermore, the vast majority of the Debtors' Employees and Crewmembers relies exclusively on their full compensation or reimbursement of their expenses to continue to pay their daily living expenses, and these Employees and Crewmembers will be exposed to significant financial difficulties if the Debtors are not permitted to pay the unpaid Employee

Wages and Benefits. Moreover, the Debtors believe that if the Debtors are unable to honor such obligations, morale and loyalty will be jeopardized at a time when such support is critical.

107. Maintaining access to the services of the Crewmembers supplied by the Agencies is absolutely critical and in the best interests of the Debtors' estates. Unless the Debtors' prepetition obligations to the Crewmembers and Agencies are satisfied, the Debtors believe it is highly unlikely the Crewmembers and Agencies will be willing to continue to provide services to the Debtors. Moreover, it would be extremely difficult, expensive and inefficient to replace the Crewmembers. If the Debtors were to lose the services of the Crewmembers, even for a short period of time, they may not even be able to operate their ships, which would also severely damage the Debtors' customer relations. Many of the Crewmembers have unique skills which would make them difficult, if not impossible, to replace. Even if the Crewmembers were replaceable, the Debtors believe that the damage to and disruption of their business would be substantial and far exceed the cost of paying any prepetition amounts due and owing to the Crewmembers and the Agencies.

*Motion of the Debtors For an Order Authorizing the Debtors to Honor Their Prepetition Obligations to Customers and to Otherwise Continue Prepetition Customer Programs and Practices in the Ordinary Course of Business ("Customer Programs Motion")*

108. Prior to the Petition Date, and in the ordinary course of their business operations, the Debtors offered and engaged in certain programs and practices to develop and sustain a positive reputation in the marketplace and to engender customer loyalty (collectively, the "Customer Programs"), certain of which are described in greater detail below. The Customer Programs include advance ticket sales, refunds, travel credit programs, barter arrangements, corporate incentive programs, on-board spending credits and customer loyalty programs. The Customer Programs are designed to allow the Debtors to successfully compete in a highly

competitive marketplace by ensuring customer satisfaction and generating loyalty and goodwill for the Debtors, thereby allowing the Debtors to retain current customers, attract new ones, and ultimately enhance their revenues and profitability.

109.    The Debtors need to continue during the postpetition period those Customer Programs that are beneficial and cost-effective to their business.  Such relief is necessary to preserve the Debtors' critical business relationships and customer goodwill for the benefit of their estates.  The revenue generated by the Customer Programs exceeds the operational and administrative cost to implement and maintain them, and for this and the other reasons set forth herein, it is essential and in the best interests of the Debtors, their estates and their creditors that the Debtors be permitted to honor their prepetition obligations in connection with the Customer Programs and to continue the Customer Programs in the ordinary course of their business.

110.    Cruise companies operate in a highly competitive business.  This competition makes retaining loyal customers and attracting new customers critically important.  Without obtaining and preserving the loyalty of their customers, the Debtors' business could not be maintained.  It is essential, therefore, that the Debtors maintain their current customers through this difficult period and position themselves to attract new customers.  The Customer Programs accomplish this goal by generating valuable goodwill, repeat business and net revenue increases.

111.    Customers are the most valuable assets of these estates, and the filing of these Chapter 11 Cases is likely to negatively affect customers' attitudes and behavior toward the Debtors' services unless, among other things, the Debtors can take the measures requested by this Customer Programs Motion.  In particular, the Debtors' goodwill and ongoing business relationships may erode if their customers perceive that the Debtors are unable or unwilling to fulfill the prepetition promises they have made through the Customer Programs.  The same

would be true if customers perceived that the Debtors would no longer be offering the types of services or quality of services they have come to expect and upon which they likely relied when purchasing the Debtors' services. Further, the Debtors' competitors will likely increase their efforts during the pendency of these Chapter 11 Cases to lure away the Debtors' customers and to create doubts as to the Debtors' ability to successfully sell their business and obtain maximum value for their assets.

112. The Debtors generate the majority of their revenue from ticket sales to individuals, including direct sales and sales through travel agents. The Debtors' customers typically purchase tickets four (4) to six (6) months in advance of travel. The Debtors seek authority to honor all tickets and other contracts for travel, including airfare, hotel, and ground transportation that is associated with the cruise reservations, that were purchased prepetition but have not yet been used (collectively, the "Prepetition Tickets") by providing the cruise and other services purchased. Tickets cost an average of $2,500 and customers are required to place a $500-$750 deposit per person within three (3) days of booking, with the balance to be paid ninety (90) days prior to departure. The Debtors have approximately 8,400 Prepetition Tickets that have already been purchased (either paid in full or for which deposits have been paid) for travel that will not commence until after the Petition Date. the Debtors have collected approximately $12.2 million in deposits. The value of the cruises to be provided after the Petition Date on account of Prepetition Tickets is approximately $22.0 million.

113. The failure to honor Prepetition Tickets presented by customers in the hours and days following the commencement of these cases would be severely damaging to the sale efforts of the Debtors. If hundreds of the Debtors' passengers were stranded during the early days of these Chapter 11 Cases, not only would the Debtors immediately lose customers, but the ensuing

publicity of such an event would all but foreclose any prospect of a meaningful recovery through a sale of their business as a going concern. Customer confidence and goodwill will be severely harmed if the Debtors are prevented from honoring Prepetition Tickets.

114. In addition to individual ticket sales, the Debtors also offer charter cruises and corporate incentive programs (the "Charter Program") to certain corporations, organizations, or other groups looking to charter entire ships for a limited period of time. These groups pay the Debtors for the cruise in advance and either use the entire ship themselves or sell rooms to the members of the general public. Additionally, groups have the ability to block of rooms on ships without chartering the entire ship (the "Corporate Incentive Program" and, together with the Charter Program, the "Charter and Corporate Incentive Programs"). Companies often take advantage of the Corporate Incentive Program by purchasing blocks of rooms on a cruise and providing incentive and/or reward travel to their employees. There are currently fifty-one (51) cruises booked under the Charter and Corporate Incentive Programs that will not sail until after the Petition Date, for which the Debtors have collected approximately $3,697,000 in deposits. The value of the cruises to be provided after the Petition Date on account of prepetition Charter and Corporate Incentive Programs obligations is approximately $12.5 million.

115. Groups participating in the Charter and Corporate Incentive Programs typically schedule their charter cruises in advance and advertise to their members (or the public) the dates and times of the chartered cruise. The Debtors' inability to honor the Charter and Corporate Incentive Program obligations would be devastating to the groups who would now need to cancel the cruises and find replacements (which may not be for the same time or rate). Further, any disruption in the Charter and Corporate Incentive Programs would erode confidence in the Debtors, resulting in a substantial diminution in ticket purchases and harm to the estates.

116. In addition, those customers who have purchased Prepetition Tickets or who have booked through the Charter and Corporate Incentive Programs may also purchase shore excursions (the "Shore Excursions") offered by the Debtors from the Windstar website. Similar to the Charter and Corporate Incentive Programs, these customers pay the Debtors in advance for the Shore Excursions. The Debtors use certain third-party tour operators in connection with the various Shore Excursions. The amount of deposit of the Shore Excursions to be provided after the Petition Date on account of obligations to the Debtors' customers is approximately $204,000.

117. The Shore Excursions are an integral part of the services the Debtors provide to their customers. While provided by third parties, customers who book Shore Excursions through the Windstar website will undoubtedly equate the Shore Excursions with their overall cruise package and their view of the Debtors business reputation. As with the Prepetition Tickets and Charter and Incentive Programs, any in ability on the part of the Debtors to deliver Shore Excursions would erode confidence in the Debtors, resulting in a substantial harm to the estates.

118. The Debtors' customers typically pay a portion of the fares with a deposit and balance due in advance of travel, subject to a refund (the "Ticket Refund") in accordance with the Debtors' prepetition Ticket Refund policy. As a general matter, customers may obtain a full refund if they cancel at any time prior to the ninetieth (90th) day before travel. Customers who cancel 60-90 days prior to their scheduled departure lose their deposit and customers who cancel 30-59 days prior to departure receive a 50% refund of the total fare paid. Customers are not eligible for a Ticket Refund if they cancel less than 30 days prior to their scheduled departure. Notwithstanding the foregoing, customers may obtain a Ticket Refund if they purchase a cancellation protection plan, for which the Debtors' charge between $79 and $739. As of the Petition Date, only *de minimis* amount of Ticket Refunds have been asserted against the Debtors.

The vast majority of the Debtors' customers purchasing individual tickets make such purchases on credit cards. In such cases, the Debtors issue Ticket Refunds through their credit card processors who refund the Debtors' customers and, in turn, net the refunded amount against any credit card settlements to be paid to the Debtors. Accordingly, in the ordinary course of the Debtors' business, honoring such refunds do not result in an actual disbursement of cash by the Debtors.

119. Maintaining the refundability of tickets purchased prepetition is essential to preserving the public confidence in the Debtors' continued reliability and operations. Authorizing these payments will demonstrate to the travel agents, the traveling public and customers that, although the Debtors are operating under the protection of the Bankruptcy Code, they continue to offer competitive and reliable cruise services.

120. The Debtors strive to provide the best cruise service to their customers, however, as in any travel business, as a matter of customer service the Debtors provide travel credits (the "Travel Credits") to customers who feel they have suffered losses because of a deficiency in prepetition service. Additionally, the Debtors issues on-board spending credits (the "Shipboard Credits" and, together with the Travel Credits, the "Customer Credits") as incentives or packaged with ticket sales as a way to increase customers without increasing fares. The Customer Credits are issued in the Debtors' discretion and in the ordinary course of their businesses. As of the Petition Date, the Debtors have issued approximately $1,176,000 in unused Customer Credits.

121. In a highly competitive industry such as the Debtors' the failure to continue to issue Customer Credits would place the Debtors' business at a severe disadvantage. Further, once Customer Credits have been issued, customers assume that the credit obligations will be

honored and any failure to honor such obligations will severely erode customer confidence in the Debtors' ability to provide cruise service.

122.    Occasionally, Travel Credits are insufficient, and the Debtors make payments to passengers for service deficiencies, including claims for lost, damaged, or stolen baggage. Passengers expect to be made whole if there are deficiencies in service, and the Debtors seek to include any such payments in their Travel Credits.   The Debtors have issued a *de minimis* amount of payments or credits in respect of such passenger claims.

123.    If the Debtors are unable to continue these Customer Programs, the Debtors risk alienating a large segment of their customers and encouraging them to select competitors, to the detriment of the Debtors and their estates.  For the foregoing reasons, the Debtors seek authority to honor prepetition obligations related to the Customer Programs involving Prepetition Tickets, the Charter Corporate Incentive Programs (including the Shore Excursions), Ticket Refunds, and Customer Credits and to continue honoring such Customer Programs in the ordinary course of business.

124.    The Debtors maintain a repeat cruiser program, Foremast Club (the "Foremast Club").  Customers are automatically enrolled in Foremast Club after their first Windstar cruise and members are entitled to receive special discounted rates on cruises.  Additionally, Foremast members can take part in exclusive onboard activities, including, a private cocktail reception with an officer or captain, invitations to dine with the captain, advanced information about new destinations and itineraries, members-only onboard events and private receptions.  As a general matter, honoring Foremast Club obligations does not involve any appreciable cash expense to the Debtors' estates.

125.     Return cruiser programs like Foremast Club have been adopted by most cruise companies and are considered an important marketing tool for developing brand loyalty among travelers.  Such programs are essential to building and maintaining a loyal customer base.  The Debtors simply would not be able to compete successfully against other cruise companies were they unable to maintain the integrity of the Foremast Club.  Further, failure to honor the obligations of the Foremast Club (which do not require significant cash) will alienate the Debtors' most loyal and valuable customers, an act that would severely harm, if not destroy, the Debtors' competitive position and their sale efforts.

126.     The majority of the Debtors' individual ticket sales are through travel agents and national accounts.  The Debtors maintain arrangements with travel agents (the "Travel Agent Programs").     Under the Travel Agent Programs, the Debtors provide travel agents with commissions in exchange for being included in the travel agents books for recommended travel. Commission payments under the Travel Agent Programs are paid in the same week of the cruise sailings.  Therefore, some payments would be deferred until 2012.  Commissions are paid on a weekly basis and correlate to amounts due for the same embarkation date.  Obligations vary based, among other things, on occupancy and number of tickets sold.  On average, the Debtors' weekly payments on account of the Travel Agent Programs total approximately $50,000.  The Debtors estimate that the amount of unredeemed obligations related to Travel Agent Programs as of the Petition Date is approximately $950,000.

127.     The Travel Agent Programs are an important and profitable component of the Debtors' operations.  The travel agents are as essential as the Debtors' individual customers, and without the Travel Agent Programs, the Debtors would lose potentially the largest part of their customer base.  The Travel Agent Programs represent minimal cash outlay for the Debtors as

compared to the revenues created, but allow the Debtors access to customers, which are the lifeblood of their business.

128.    Finally, the Debtors maintain barter arrangements (the "<u>Barter Arrangements</u>") with an organization that provides an electronic marketplace where varied goods and services are traded.    The range of services provided to the Debtors primarily includes advertising.    In exchange for the desired services to be purchased with barter credits, the Debtors provide cruise services.    The Barter Arrangements represent no cash outlay for the Debtors.

129.    While the Barter Arrangements are a minimal part of the Debtors overall businesses, they have issued approximately $188,400 cruise value that have not yet sailed as of the Petition Date.    If the Debtors are unable to honor these Barter Agreements, passengers booked on cruises will be unable to sail, which would damage the Debtors' reputation and customer base.    For the foregoing reasons, the Debtors request authority to honor their prepetition obligations related to the Barter Arrangements and to continue to honor the Barter Arrangements in the ordinary course of business.

130.    Maintaining and continuing the Debtors' Customer Programs is crucial to their long-term success and profitability, to the benefit of all of the Debtors' constituencies.    The Debtors' success in selling their businesses depends significantly on their reputations as reliable and high-end cruise providers and on retaining the goodwill of their customers.    As described above, the damage to the Debtors' prospects for a meaningful sale recovery if they were put in a position where their Customer Programs could no longer be honored is clearly disproportionate to the relatively small cost of maintaining the Customer Programs.    The Debtors' inability to honor their Customer Programs would place them at a serious disadvantage relative to their competitors in the marketplace.    The commencement of these Chapter 11 Cases will no doubt

create apprehension on the part of customers or potential customers regarding their willingness to continue or commence doing business with the Debtors.  Failing to continue the Customer Programs described in the Customer Programs Motion will irreparably harm the Debtors' reputation and influence current and potential customers to do business with one of the Debtors' competitors.

*Motion of The Debtors for an Order Authorizing the Debtors*
*(I) To Pay Prepetition Claims of Certain Critical Vendors and Foreign Vendors; and (II) To*
*Authorize and Direct Banks To Receive, Process, Honor, and Pay Checks and Transfer*
*<u>Requests in Connection with the Foregoing ("Critical Vendor Motion")</u>*

131.    In light of the size, complexity, and global nature of their business, the Debtors, in the ordinary course of their business, rely heavily on the goods and services of certain critical trade vendors (the "<u>Critical Vendors</u>").  These Critical Vendors, who are essential to the Debtors' operations, supply goods or services to the Debtors that cannot be obtained from other sources or cannot be obtained from other sources in sufficient quantity or quality or without resulting in significant delays to the Debtors' ability to service their customers going forward.  Furthermore, in many cases, the Debtors have short-term contracts by and between the Critical Vendors or obtain their contracted goods and services by purchase order.  As such, finding any substitute or replacement vendor for the critical goods and services on short notice so as to avoid interference of the Debtors' operations would prove to be unfeasible.  Consequently, failure to maintain these critical relationships would cause irreparable damage to the Debtors' efforts to preserve the value of their business and their reputation in the cruise industry.  Accordingly, to avoid any disruption that could lead to a significant loss of customers, erosion of goodwill, and deterioration in the value of the Debtors' business, the Debtors stress that it is necessary to maintain their relationships with their Critical Vendors.

132.    Additionally, the Debtors rely on and regularly transact with certain foreign vendors, service providers, and regulatory agencies located in foreign jurisdictions (each a "Foreign Vendor" and, together with the Critical Vendors, the "Essential Vendors").    The Foreign Vendors with which the Debtors regularly transact business are located in Europe and the Caribbean.  Similar to Critical Vendors, these Foreign Vendors offer goods or services that are essential for the Debtors to continue to maintain business operations and provide quality products at the level of service the Debtors' customers expect.  Furthermore, it is the case that Foreign Vendors are the only supplier of a particular good or service on which the Debtors rely.

133.    Foreign Vendors often have wary reactions to the U.S. bankruptcy process because many of them are unfamiliar with the debtor-in-possession mechanism that is part of chapter 11 proceedings.  Even if the Foreign Vendors do not immediately exercise remedies, nonpayment of prepetition claims may cause the Foreign Vendors to adopt a "wait-and-see" approach in future business transactions with the Debtors.  The Debtors believe that there is a significant risk that nonpayment of a single invoice of a Foreign Vendor could provoke that Foreign Vendor to stop shipping goods or providing services to the Debtors on a timely basis or to sever their business relationship with the Debtors altogether.  Given the integral role played by the Foreign Vendors in the Debtors' business operations, it is necessary for this Court to intervene so as to assure that the Debtors can maintain their Foreign Vendor relationships and continue the Debtors' cruise business.

134.    As discussed more fully below, Essential Vendor services can generally be divided into the following categories, and include: (i) fuel providers; (ii) cruise ship operations; (iii) port-related services; and (iv) marketing and sales services.

135.     The Debtors need fuel to operate their business.  The cruise ships involved in the Debtors' business require substantial amounts of fuel and the Debtors rely on their fuel supplier to supply the requisite amount and certain quality of this good.  Without fuel, the Debtors' business would be unable to function at the most basic level.  Even short term interruptions in availability or drastic increases in price of this commodity could reduce the Debtors' profits drastically.  The severe disruption that would result from replacing the current fuel vendor would hamper the Debtors' efforts to maintain their business as a going concern because, among other things, such disruption would likely result in delayed and/or canceled cruise services.  Consequently, an uninterrupted supply of fuel to the Debtors' cruise ships is necessary for the success of the Debtors in their chapter 11 efforts, as it will prevent the reduction of the value of their assets and ensure their continued operation as a going concern.  Fuel charges are the Debtors' single largest operating expense, and the Debtors anticipate that as of the Petition Date, there are approximately $750,000 of outstanding amounts that would constitute these Essential Vendor Claims.

136.     In addition to fuel, the Debtors' cruise ships rely on service providers who provide goods and services on the ships as well as those who repair the ships themselves.  With respect to onboard services, the Debtors' business has a reputation for providing high quality food and beverages and a variety of cuisine on a 24-hour basis to its customers.  Additionally, the Debtors' customers have come to expect luxury accommodations and items while onboard.  These particular services start with the Debtors' food and beverage supplier, who specializes in tailoring its services to the specific needs of the Debtors and acts as the Debtors' sole purchasing agent, and who can customize volume-handling and put together any combination of products in any given quantities with maximum flexibility.  Equally important are the service providers

behind the scenes, who repair the engines and other critical parts of the ships and arrange all logistics for loading the ships on a weekly basis. These vendors know the intricacies and technical specifications of the Debtors' cruise ships in such detail that finding an alternative supplier would be time-consuming and expensive. Even the slightest disruption of the Debtors' relationships with these providers will have a crippling effect upon the Debtors' ability to provide the quality cruises that their customers have come to expect. Consequently, maintaining these relationships is necessary for the Debtors to maintain their business operations as a going concern pending a sale. The Debtors anticipate that as of the Petition Date, there are approximately $500,000 of outstanding amounts on account of cruise ship operations that would constitute these Essential Vendor Claims.

137. Additionally, the Debtors are dependent on certain port agents that provide services when the Debtors' ships enter various ports of call. From facilitating payment to local port authorities for port clearance, to providing equipment so that the cruise ships can be safely moored, and to providing services to safely load or unload cargo from the ships, the Debtors rely on these services so that they can maintain their ability to complete the logistics of quick turnaround travel schedules and the delivery of goods on and off board. Due to the tight schedules of cruises and necessity that the delivery of goods remains uninterrupted, combined with the uniqueness of the services provided, it would be a great hardship for the Debtors to find replacements for these Essential Vendors. Finally, the Debtors' have relationships with land tour operators at their various ports of call. These operators may cancel tours if not paid, even for customers who have booked tours in advance. These port-related services are critical to the continuation of the Debtors' business operations and their chapter 11 efforts. In particular, if some of the port authorities are not paid, the Debtors' ships could be detained. The Debtors are

only seeking payment of Essential Vendors at ports where they intend to sail following the Petition Date. The Debtors anticipate that as of the Petition Date, there are approximately $300,000 of outstanding amounts of port-related services that would constitute these Essential Vendor Claims.

138.     The Debtors have developed significant relationships with Essential Vendors specializing in marketing and sales services specifically tailored to promote the Debtors' Windstar cruise offerings and business developments to prospective customers. These Essential Vendors have developed an integrated marketing process whereby they assist the Debtors in facilitating and generating bookings for Windstar cruises for the Debtors' prospective and existing customers. Further, most of the Debtors' marketing and sales efforts take place online. The Debtors' providers for such services provide the Debtors with the tools to reach millions of potential customers. Additionally, suppliers provide the Debtors with cost-effective support for the maintenance of the their website, which is a crucial interface between the Debtors and their customers. By building strong customer relationships and helping the Debtors secure the maximum number of bookings for their cruises, these marketing and sales service providers create value both for the Debtors' customers and their estates. As such, most of the Debtors' success lies in the proficiency of these Essential Vendors, as the Debtors rely on the efforts and knowledge of the marketing and sales service providers to result in higher sales and revenues and increased brand name recognition. The cancellation of these services or any interruption in the Debtors' website would result in a significant reduction of business and revenue, as in the highly competitive cruise industry, if prospective customers are unaware of the Debtors' offerings, these customers would likely turn to other cruise companies offering similar services rather than purchase a Windstar cruise. This is particularly true where, as here, the Debtors a operate in a

high fixed cost structure business. Accordingly, it is imperative to the Debtors' reputation and the success of the Debtors' business that these Essential Vendors' services continue. The Debtors anticipate that as of the Petition Date, there are approximately $150,000 of outstanding amounts of marketing and sales services that would constitute Critical Vendor Claims.

139. The Debtors believe that payment of the Essential Vendor Claims is vital to the Debtors' chapter 11 efforts because, in several instances, the Essential Vendors are the only source from which the Debtors can procure certain goods and services at the volume, within a timeframe, and at a price that will permit the Debtors to continue operating their businesses. A failure to pay the Essential Vendor Claims would likely result in many of the Essential Vendors refusing to provide goods and services to the Debtors postpetition, and may force the Debtors to obtain such goods and services elsewhere at a higher price or in a quantity or quality that is insufficient to satisfy the Debtors' requirements.

140. The Debtors have examined whether the payment of Essential Vendor Claims is necessary and will ensure that the Debtors have access to adequate amounts of trade credit on a postpetition basis. Specifically, the Debtors have reviewed their accounts payable and have undertaken a process to identify those vendors who are critical to the Debtors' operations. The Debtors have further developed certain procedures (for which they seek this Court's approval) that, when implemented, will ensure that vendors receiving payment of Essential Vendor Claims will continue to supply trade credit necessary to the Debtors' operations on a postpetition basis and in accordance with the terms of the parties' prepetition dealings.

141. The Debtors consulted with appropriate members of their management team to identify those vendors that are most likely essential to the Debtors' operations using the following criteria: (a) whether the vendor in question is a "sole-source" provider, (b) whether

certain customizations, specifications, or volume requirements prevent the Debtors from obtaining a vendor's goods or services from alternative sources within a reasonable timeframe, (c) if a vendor is not a sole-source provider, whether the Debtors have sufficient goods in inventory to continue operations while a replacement vendor is secured, and (d) whether a vendor meeting the standards of (a) or (b) is likely to refuse to continue providing goods or services to the Debtors postpetition if its prepetition outstanding balances are not paid. After carefully assessing the universe of vendors under the foregoing criteria, the Debtors estimated the total payments that would be necessary to ensure the continued supply of critical goods and services to the Debtors following the Petition Date in calculating the Essential Vendor Cap.

*Motion of the Debtors for an Order Authorizing the Debtors to (I) Continue Prepetition Insurance Policies, (II) Pay Installments Under Prepetition Insurance Premium Finance <u>Agreement, and (III) Pay all Prepetition Obligations In Respect Thereof ("Insurance Motion")</u>*

142.    In the ordinary course of the Debtors' business operations, the Debtors maintain various insurance policies through several different insurance providers (the "<u>Insurance Providers</u>") providing coverage for, among other things: general liability, directors' and officers' liability, fiduciary liability, property, hull and machinery, war risk, port risk, trade disruption, employment practices, and professional liability, among others (the "<u>Policies</u>").

143.    The Debtors are required to pay premiums for the Policies based on a fixed amount established and billed by each Insurance Provider. Depending on the particular Policy, premiums are typically paid in monthly installments or pre-paid at a policy's inception or renewal. The aggregate annual premiums under the Policies, excluding the Financed Policies (as defined below) are approximately $1,282,176. As of the Petition Date, the amount of unpaid obligations under the Policies, excluding the Financed Policies is approximately $25,000.

144.    The Debtors have determined in their business judgment that it is not economically advantageous for the Debtors to pay the premiums for certain of their Policies on

an annualized basis. Accordingly, in the ordinary course of the Debtors' business operations, the Debtors finance the premiums on their hull and machinery, increased value, war risk and trade disruption (collectively, the "Financed Policies") pursuant to a premium finance agreement (the "Premium Finance Agreement") with Flatiron Capital ("Flatiron"), a third-party lender. The total premium under the Financed Policies is $494,940.38 and the amount financed under the Premium Finance Agreement is $371,205.28. Under the Premium Finance Agreement, the Debtors will pay ten (10) monthly installments of $37,579.73 at an annual rate of interest of 2.69%. As of the Petition Date, $150,319 is outstanding under the Premium Finance Agreement.

145. The Debtors sought and negotiated with Flatiron to obtain the best possible terms with the Premium Finance Agreement. Generally, lenders are unwilling to finance insurance premiums on an unsecured basis. Here, the Debtors are providing Flatiron with liens on the amounts payable under the Premium Finance Agreement in exchange for premium funding at considerably lower interest rates than what the Debtors can otherwise obtain. In the Debtors' business judgment, the terms of the Premium Finance Agreement represent the best possible terms for financing the premiums related to the Financed Policies.

146. The insurance coverage provided under the Debtors' Policies are essential for preserving the Debtors' businesses, property, and assets. Such coverage is required by the credit agreement with the Debtors' postpetition lender and in many cases, is also required by various regulations, laws, and contracts that govern the Debtors' business. Even a temporary suspension of the Debtors' ability to pay premiums and installments for their Policies would create a significant risk of the Debtors voiding or otherwise losing their insurance coverage. Disruption of their insurance coverage would expose the Debtors to serious risks, including: (a) the possible incurrence of direct liability for the payment of claims that otherwise would have been payable

by the Insurance Providers under the Policies; (b) the possible incurrence of material costs and other losses that otherwise would have been reimbursed by the Insurance Providers under the Policies; (c) the possible loss of good-standing certification to conduct business in jurisdictions that require the Debtors to maintain certain levels of insurance coverage; (d) the possible inability to obtain similar types of insurance coverage; and (e) the possible incurrence of higher costs for re-establishing lapsed policies or obtaining new insurance coverage.[10] Any or all of these consequences would be seriously harmful to the Debtors' business and sale efforts, as they would expose the Debtors to higher costs and increased risks of loss at a minimum. Any other alternative would likely require considerable cash expenditures, result in the Debtors obtaining insurance coverage on less desirable terms than their current coverage, and would be detrimental to the Debtors' sale efforts.

*Motion of the Debtors for an Interim Order and a Final Order (I) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Providers Adequately Assured of Future Performance, and (III) Establishing* Procedures for Determining Adequate Assurance of Payment ("Utilities Motion")

147.    In the ordinary course of their business, the Debtors incur utility expenses for, among other things, telephone, internet, cellular, satellite and other telecommunications services (the "Utility Services"). These Utility Services are provided by three (3) utility providers (the "Utility Providers"). On a monthly basis, the Debtors spend approximately $29,000 for the Utility Services.

148.    Uninterrupted Utility Services are essential to the Debtors' ongoing operations and the success of the Debtors' sale efforts. If the Utility Providers were to alter, refuse or discontinue service, the Debtors would be forced from the outset of these Chapter 11 Cases to

---

[10]    Nothing contained herein is intended or should be construed as: (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any claim; or (c) an approval or assumption of any executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code.

focus on finding replacement Utility Providers and services, rather than focusing on the operation and sale of their businesses. The Debtors operate in a services industry where relationships and communication with customers are paramount and any disruption of the Utility Services would be costly to the Debtors and harmful to their businesses. Any such disruption would certainly damage the Debtors' customer relationships, revenues, and profits and would adversely affect the Debtors' estates, creditors, and employees. It is therefore critical that Utility Services to the Debtors continue uninterrupted.

149.     Based on the cash flow from operations and the borrowings under their proposed postpetition credit facility, the Debtors intend to pay all postpetition obligations owed to the Utility Providers in a timely manner, consistent with the ordinary course of operating their businesses after the Petition Date. Nevertheless, to provide adequate assurance of payment for future services to the Utility Providers, the Debtors propose to submit a deposit of 50% of each Utility Provider's average monthly invoice to the Debtors, directly to each Utility Provider to be held as an adequate assurance deposit, (collectively, the "Utility Deposits"), within twenty (20) days following the Petition Date, pending further order of this Court. This aggregate amount of Utility Deposits will be $14,500, which represents fifty percent (50%) of the Debtors' average monthly cost of Utility Services.

150.     The Debtors submit that the Utility Deposits, taken together with the facts and circumstances of the Debtors' Chapter 11 Cases (together, the "Proposed Adequate Assurance"), constitutes sufficient adequate assurance to the Utility Providers. Notwithstanding the Proposed Adequate Assurance, if any Utility Provider believes adequate assurance is required beyond the protections described herein, the Debtors submit that such provider must request assurance pursuant to the procedures described in the Utilities Motion. These protections will ensure that

all Utility Providers will have adequate assurance of payment throughout these Chapter 11 Cases, and the Debtors believe that no other or further assurance is necessary.

**E.     Claims Agent Retention**

*Debtors' Application to Employ and Retain Phase Eleven Consultants, LLC, as Notice, Claims and Balloting Agent to the Debtors*

151.     The Debtors will seek to retain Phase Eleven Consultants ("PEC") as the Court's notice, claims and balloting agent for the Debtors' chapter 11 cases. Pursuant to Local Rule 2002-1(f), the Court may authorize the retention of a notice, claims, and balloting agent without the need to provide notice to any other parties. The retention of PEC is critical because of the large number of creditors in these cases.

152.     I understand that PEC has substantial experience in noticing, claims processing, balloting, and other administrative tasks in chapter 11 cases.  Given the need for the services described above and PEC's expertise and experience in providing such services, I believe that retaining PEC will expedite service of notices, streamline the claims administration and balloting processes and permit the Debtors to focus on their attempted sale.

[The remainder of this page is intentionally left blank.]

## CONCLUSION

In furtherance of their chapter 11 efforts, for the reasons stated herein and in each of the First Day Motions, the Debtors respectfully request that the relief sought in the First Day Motions be approved.

Dated: April 1, 2011

Ambassadors International, Inc., et al.
Debtors and Debtors-in-Possession

Mark Detillion
Chief Financial Officer
Ambassadors International, Inc.