# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AMBASSADORS INTERNATIONAL, INC., et al.,[1] | Case No. 11-_____ (___) |
| Debtors. | Joint Administration Requested |

**Bidding Procedures Objection Deadline (Requested)
4/13/11**

**Bidding Procedures Hearing Date (Requested)
4/13/11**

**Sale Objection Deadline (Requested)
5/4/11**

**Sale Hearing (Requested)
5/6/11**

**MOTION OF THE DEBTORS FOR ENTRY OF ORDERS (I) APPROVING BIDDING PROCEDURES FOR THE SALE OF CERTAIN OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES; (II) APPROVING THE FORM AND MANNER OF NOTICE OF THE SALE AND ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (III) SCHEDULING AN AUCTION AND SALE HEARING; (IV) APPROVING SUCH SALE; AND (V) DISMISSING THE CHAPTER 11 BANKRUPTCY CASE OF AMBASSADORS INTERNATIONAL CRUISE GROUP (USA), LLC**

Ambassadors International, Inc., Ambassadors Cruise Group, LLC, Ambassadors, LLC,

EN Boat LLC, AQ Boat, LLC, MQ Boat, LLC, DQ Boat, LLC, QW Boat Company LLC,

Contessa Boat. LLC, CQ Boat, LLC and American West Steamboat Company LLC (collectively,

the "Sellers"), and Ambassadors International Cruise Group (USA), LLC ("Cruise Group", with

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Ambassadors International, Inc. (8605); Ambassadors Cruise Group, LLC (2448); Ambassadors, LLC (0860); EN Boat LLC (8982); AQ Boat, LLC (5018); MQ Boat, LLC (5095); DQ Boat, LLC (5064); QW Boat Company LLC (0658); Contessa Boat, LLC (9452); CQ Boat, LLC (9511); American West Steamboat Company LLC (0656); and Ambassadors International Cruise Group (USA), LLC (7304). The mailing address for each Debtor is 2101 4th Avenue, Suite 210, Seattle, WA 98121.

the Sellers, the "<u>Debtors</u>"), by and through their undersigned counsel, hereby move this Court (the "<u>Motion</u>"), pursuant to sections 105, 363, 365, 503 and 1112(b) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), Rules 1017(a), 2002, 6004, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") and Rules 2002-1 and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>") for entry of: (i) an order substantially in the form attached hereto as <u>Exhibit A</u> (the "<u>Bidding Procedures Order</u>") (a) approving the proposed bidding procedures (the "<u>Bidding Procedures</u>") attached as <u>Exhibit 1</u> to the Bidding Procedures Order, in connection with the sale (the "<u>Sale</u>") of substantially all of the Sellers' assets (the "<u>Acquired Assets</u>") as more fully described in the form Asset Purchase Agreement (the "<u>Stalking Horse Agreement</u>")[2] by and among the Sellers and a newly created designee of Whippoorwill Associates, Inc. ("<u>Whippoorwill</u>"), to be created prior to consummation of the Sale (the "<u>Stalking Horse Bidder</u>"); (b) approving the Sellers' execution of the Stalking Horse Agreement; (c) scheduling an auction (the "<u>Auction</u>") and a hearing to consider approval of the Sale (the "<u>Sale Hearing</u>"); and (d) approving the form and manner of notice of the Auction, including the form and manner of service of the notice of the Auction (the "<u>Auction Notice</u>") attached as <u>Exhibit 2</u> to the Bidding Procedures Order, and the notice of the proposed assumption and assignment of executory contracts and unexpired leases in the form attached to the Bidding Procedures Order as <u>Exhibit 3</u> (the "<u>Assumption and Assignment Notice</u>"); and (ii) an order substantially in the form attached hereto as <u>Exhibit B</u> (the "<u>Sale Order</u>") (a) approving the form of Stalking Horse Agreement attached as <u>Exhibit 1</u> to the Sale Order and the Sale of the

---

[2] Although the Stalking Horse Agreement is only in "form of" as annexed hereto, the Sellers and Whippoorwill have entered into a side commitment letter dated as of March 31, 2011 (the "<u>Commitment Letter</u>"), attached hereto as <u>Exhibit C</u>. Pursuant to the Commitment Letter, Whippoorwill has agreed to commit to the purchase of the Acquired Assets, at the Purchase Price, on terms substantially in conformity with the Stalking Horse Agreement.

Acquired Assets free and clear of all liens, claims and encumbrances, other than certain Permitted Encumbrances (each as defined in the Stalking Horse Agreement) to the Stalking Horse Bidder or such other party that is the Successful Bidder (as defined in the Bidding Procedures) at the Auction; and (b) dismissing the Chapter 11 Case of Cruise Group in connection with the Sale.  The facts and circumstances supporting this Motion are set forth in the concurrently filed Declaration of Mark Detillion in Support of Chapter 11 Petitions and First Day Motions (the "Detillion Declaration").  In support of this Motion, the Sellers respectfully state as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2).

2.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief requested herein are sections 105, 363, 365, 503 and 1112(b) of the Bankruptcy Code, Bankruptcy Rules 1017(a), 2002, 6004, 9007 and 9014 and Local Rules 2002-1 and 6004-1.

## BACKGROUND

4.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases").  The Debtors are continuing in the possession of their assets and the management of their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  The Debtors have requested that these Chapter 11 Cases be consolidated for procedural purposes.  As of the date hereof, no official committee of unsecured creditors has been appointed.

5.     A description of the Debtors' business operations, capital structure, the events leading up to the commencement of the Chapter 11 Cases and the facts and circumstances supporting the relief requested herein is set forth in the Detillion Declaration filed contemporaneously herewith and which is incorporated herein by reference.

## THE SALE TRANSACTION

6.     As mentioned above and in the Detillion Declaration and the Declaration of Christopher Shepard in Further Support of a Sale of Substantially All Assets of Certain of the Debtors and Related Debtor-in-Possession Financing (the "Shepard Declaration"), to be filed contemporaneously herewith, while the Debtors' businesses show signs of improvement, their high-fixed-cost nature and high leverage has left them with little liquidity going forward and a further anticipated need that exceeds current cash on hand plus availability under the revolving credit agreement.  In light of these circumstances, the Debtors have determined that a drawn out and lengthy restructuring process, and the resultant uncertainty caused by such a process, would have a significant negative impact on their businesses.  This is particularly true with respect to the Debtors' customer, vendor, supplier and financial partner relationships.  Any increased uncertainty in the Debtors' businesses caused by the Debtors' filing will likely lead to a decrease in customer bookings (both direct sales and sales through travel agents), and/or an increase in requests for customer refunds, which in turn will lead to a further decrease in the Debtors' revenue base and future projections.  Similarly, increased uncertainty will leave the Debtors' relations with its vendors, suppliers and (most importantly) financial parties (such as its lenders and credit card processors) in a precarious position as such entities will want assurance that the Debtors' businesses will continue as a going concern.  In order to counteract such effects of a bankruptcy process on the Debtors' businesses, the Sellers have entered into the Stalking Horse

Agreement with the Stalking Horse Bidder for the Sale of the Acquired Assets and seek to effectuate the proposed sale in the most timely manner possible.

7.      The Stalking Horse Bidder is a newly created designee of Whippoorwill. Whippoorwill, through certain of its discretionary funds and accounts, is currently the sole lender under the Prepetition Working Capital Facility (as defined in the Stalking Horse Agreement), the beneficial owner of approximately 88% of the Senior Secured Notes (as defined herein) and a significant shareholder of Ambassadors International, Inc.  Given this relationship, the Sellers believe that the Stalking Horse Bidder is an "insider" as such term is used pursuant to Bankruptcy Code section 101(41A).  Notwithstanding this insider status, the Stalking Horse Bidder represents the most logical purchaser for the Acquired Assets.  Not only is the Stalking Horse Bidder the only viable bidder for the Acquired Assets that has arisen to date, but the Stalking Horse Bidder also has a substantial amount of knowledge of the Sellers' businesses as well as a strong interest and incentive (particularly as Whippoorwill will be providing post-petition financing to ensure the Sellers' viability through these Chapter 11 Cases) in maintaining the strength and continued success of the Sellers' businesses.  Moreover, to ensure that the Sale process is a fair and arms-length process, the Sellers, along with the Sellers' financial advisor, Imperial Capital, LLC ("Imperial"), have been aggressively marketing the Sellers' assets to potential third-party purchasers of the Sellers' businesses and/or assets and, to date, have approached over sixty (60) parties.  These efforts will continue following the Petition Date in diligent efforts to secure one or more topping bids at auction as an alternative to the Stalking Horse Agreement.

8.      At present, without the Stalking Horse Bidders' bid or an alternative bid (which, as of yet, has not arisen), the Sellers would have no other option for consummating the Sale of

the Acquired Assets; and, importantly, would lack the financial resources and access to capital required for continued operations. The Stalking Horse Bidders' proposal, therefore, offers a lifeline for the Sellers' businesses that the Sellers, despite a robust marketing process, have been unable to obtain elsewhere. In light of this situation, the Sellers have focused their efforts on entering into the Sale transaction with the Stalking Horse Bidder and negotiating the Stalking Horse Agreement – but at the same time have spent a considerable amount of time and effort on developing the Bidding Procedures and Auction process to "market test" the Stalking Horse Bidders' bid.

9. The Stalking Horse Bidder's bid as set forth in the Stalking Horse Agreement sets a "floor" on bids for the Acquired Assets by providing for purchase price consideration of approximately $40,000,000 (the "Purchase Price") payable in the form of (i) the payment in full in cash and/or assumption by the Stalking Horse Bidder of the obligations of the Sellers under the Prepetition Working Capital Facility and the DIP Facility (each as defined in the Stalking Horse Agreement) (the "Assumed Credit Agreement Obligations"); (ii) a credit bid and release (the "Credit Bid") of the Sellers' obligations under the 10% senior secured notes due 2010 issued by Ambassadors International, Inc. (the "Senior Secured Notes"), in an amount of not less than nineteen million dollars ($19,000,000)[3] and (iii) assumption of the other Assumed Liabilities (as set forth in the Stalking Horse Agreement). Although the Stalking Horse Agreement annexed hereto as Exhibit 1 to the Sale Order is in form only, to reflect Whippoorwill's commitment to the Sale transaction, Whippoorwill has executed with the Sellers a Commitment Letter (as defined herein) which commits Whippoorwill (through a newly created designee to be formed

---

[3] For the avoidance of doubt, the Credit Bid may be on account of less than 100% of the outstanding Senior Secured Notes.

prior to the consummation of the Sale) to pay the Purchase Price and execute the Stalking Horse Agreement.

10.     The Credit Bid shall be allocated on a pro rata basis among all holders of Senior Secured Notes.  Upon consummation of the Sale, holders of Senior Secured Notes shall receive a pro rata distribution of 100% of the ownership interests in the Stalking Horse Bidder.

11.     Given the exigencies of the Debtors' circumstances in light of its liquidity position, the results of pre-petition marketing efforts and the expected impact on operations (primarily sales, vendor and payment-processor relationships) of a chapter 11 filing, the Stalking Horse Agreement proposes a relatively quick timeline for the Sale – seeking to obtain entry of the Bidding Procedures Order within fifteen (15) days of the Petition Date and the entry of the Sale Order within forty (40) days of the Petition Date.  While such a timeline is somewhat compressed, it is appropriate under the circumstances in light of the Sellers' need to sell the businesses and obtain the greatest value possible for the Sellers' stakeholders and constituents. A compressed sale timeline will help to ensure the continued viability of the Sellers' businesses going forward.

12.     Moreover, the Sellers have been marketing their assets and businesses since the early part of this year.  As set forth in the Shepard Declaration, these efforts have included researching and contacting over sixty (60) prospective bidders (both targets interested in a financial investment as well as strategic targets), sending teaser mailings to certain interested bidders and sending more substantial marketing materials to those potential bidders who have entered into a confidentiality agreement.  The Sellers expect to resume their pre-petition marketing efforts following the Petition Date by continuing to approach potential purchasers and distributing marketing materials developed by Imperial for the pre-petition marketing of the

Sellers' assets.  The Sellers believe that these efforts will help to ensure that information concerning the Auction reaches as wide an audience of potential bidders as possible, in the most useful format available.

## A.  <u>The Bidding Procedures</u>[4]

13.  Pursuant to this Motion, the Sellers are requesting approval of the Bidding Procedures and entry of the Bidding Procedures Order.  The following is a summary, pursuant to Rule 6004-1 of the Local Rules, of the Sellers' proposed Bidding Procedures.

a) **<u>The Bidding Process</u>**.  These Bidding Procedures specify the manner in which bidders and bids become Qualified Bidders and Qualified Bids (as defined in the Bidding Procedures), the receipt, evaluation and negotiation of bids received, the conduct of any Auction, the ultimate selection of the Successful Bidder(s) and Back-Up Bidder (as defined below), and Court approval of same.  Any party who wishes to participate in the bidding process must submit a bid in accordance with the Bidding Procedures.

b) **<u>Provisions Governing Qualified Bidder Status</u>**.  (Local Rule 6004-1(c)(i)(A))

    a.  **<u>Financial Information</u>**. (Local Rule 6004-1(c)(i)(A)(1))  All bids must be accompanied by adequate assurance information (the "<u>Adequate Assurance Information</u>"), including (i) information about the financial condition of a Potential Bidder (as such term is defined in the Bidding Procedures), such as federal tax returns for two years, a current financial statement, or bank account statements; and (ii) information demonstrating (in the Sellers' reasonable business judgment) that the Potential Bidder has the financial capacity to consummate the proposed Sale.

    b.  **<u>Financial Wherewithal</u>**. (Local Rule 6004-1(c)(i)(A)(2))  A Bid must be accompanied by written evidence, documented to the Sellers' reasonable satisfaction, that demonstrates the Potential Bidder has available cash, a commitment for financing or the ability to timely obtain a satisfactory commitment if selected as the Successful Bidder (<u>provided</u>, <u>however</u>, that the closing of the Sale shall not be contingent in any way on the Successful Bidder's financing) and such other evidence of ability to consummate the

---

[4] This summary of the Bidding Procedures is for descriptive purposes only.  To the extent there are any discrepancies between this summary and the Bidding Procedures annexed to the Bidding Procedures Order, the Bidding Procedures shall control.

transaction as the Sellers may reasonably request, including proof that such funding commitments or other financing are not subject to any internal approvals, syndication requirements, diligence or credit committee approvals (underlined, that such commitments may have covenants and conditions reasonably acceptable to the Sellers).

c. **Confidentiality and Non-Binding Expressions of Interest**. (Local Rule 6004-1(c)(i)(A)(3); 6004-1(c)(i)(A)(4)) Unless otherwise ordered by the Bankruptcy Court for cause shown, to participate in the bidding process, each person or entity must deliver (unless previously delivered) to the Sellers, on or before the Bid Deadline (as defined below), (i) an executed confidentiality agreement in form and substance satisfactory to the Sellers; and (ii) a *bona fide*, non-binding letter of intent or expression of interest with respect to a purchase of the Acquired Assets.

c) **Provisions Governing Qualified Bids**. (Local Rule 6004-1(c)(i)(B))

a. **No Qualified Bids**. If the Sellers do not receive any Qualified Bids other than the Stalking Horse Agreement: (i) the Sellers will not hold an Auction; (ii) the Stalking Horse Agreement will be the Successful Bid (as defined below) and (iii) the Stalking Horse Bidder will named the Successful Bidder.

b. **Deadlines for Submitting Qualified Bids**. (Local Rule 6004-1(c)(i)(B)(1)) The deadline to submit a bid is April 29, 2011 at 4:00 p.m. (prevailing Eastern Time) (the "Bid Deadline").

c. **Form of Qualified Bid**. (Local Rule 6004-1(c)(i)(B)(2)) All bids must be accompanied by a letter (i) offering to acquire the Acquired Assets and assume the Assumed Liabilities (as set forth in the Stalking Horse Agreement); (ii) accompanied by a duly executed agreement and a Marked Agreement (as set forth in the Bidding Procedures); (iii) specifying bid terms substantially the same or better than those in the Stalking Horse Agreement; (iv) agreeing to be bound by the offer until the earlier of the Closing Date (as defined herein) or twenty (20) days after the Sale Hearing; (v) offering to pay in full, in cash, as part of the Purchase Price, the Sellers obligations under the Prepetition Working Capital Facility and the DIP Facility plus a cash component equal to or greater than the Credit Bid Consideration (as defined in the Stalking Horse Agreement); (vi) offering to pay a purchase price greater than the Purchase Price plus an initial overbid of $250,000; (v) providing that such Bid is not subject to any due diligence or financing contingency; (vi) agreeing not to request or assert entitlement to any transaction or break-up fee, expense reimbursement or similar

type of payment; and (vii) agreeing to serve as the Back-Up Bidder in accordance with the Bidding Procedures. Potential bidders may make one or more credit bids of some or all of their claims pursuant to section 363(k) of the Bankruptcy Code.

d. **Good Faith Deposit**. (Local Rule 6004-1(c)(i)(B)(3)) A Bid must be accompanied by (i) a certified check or wire transfer, payable to the order of the Sellers, in the amount of 10% of the Bid, which funds will be deposited into an interest bearing escrow account to be identified and established by the Sellers (a "Good Faith Deposit"). The Good Faith Deposit will be retained by the Sellers until three (3) business days after the earlier of (i) the Closing Date, or (ii) twenty (20) days following the Sale Hearing. The Sellers shall retain indefinitely any Good Faith Deposit submitted by the Successful Bidder who, other than the Stalking Horse Bidder, will be entitled to a credit for the amount of its Good Faith Deposit to the extent a Good Faith Deposit was provided.

e. **Other Conditions**. (Local Rule 6004-1(c)(i)(B)(4)) Each Qualified Bidder participating in the Auction will be required to confirm, in writing, that (i) it has not engaged in any collusion with respect to the Bidding Process, and (ii) its Qualified Bid is a good faith *bona fide* offer that it intends to consummate if selected as the Successful Bidder.

d) **Provisions for the Stalking Horse Bidder**. (Local Rule 6004-1(c)(i)(C))

a. **Bidding Increments**. (Local Rule 6004-1(c)(i)(C)(3)) If a Qualified Bid other than the Stalking Horse Agreement is selected as the Highest and Best Bid (as defined in the Bidding Procedures), then the bidding will start at the aggregate consideration for the Acquired Assets and on the terms proposed in such Highest and Best Bid, plus $100,000 (the "Overbid Amount"). Bidding at the Auction will continue in increments of at least the Overbid Amount (each successive bid, an "Overbid"), which such increments may be made in the form of a credit bid pursuant to section 363(k) of the Bankruptcy Code.

e) **Auction**.

a. **Date and Time of Auction**. (Local Rule 6004-1(c)(ii)(A)) The Sellers are requesting that the Court approve the scheduling of the Auction for on or about May 2, 2011 at 10:00 a.m. (prevailing Eastern Time).

b. **Provisions Governing the Auction**. (Local Rule 6004-1(c)(ii)) The Auction will commence if at least one (1) Qualified Bid is

received by the Sellers other than the Stalking Horse Agreement. At least one (1) business day prior to the Auction, each Qualified Bidder must inform the Sellers in writing of their intention to participate in the Auction. All bidders at the Auction will be deemed to have consented to the core jurisdiction of the Bankruptcy Court and waived any right to jury trial in connection with any disputes relating to the Auction, the Sale and the construction and enforcement of the Stalking Horse Agreement.

c. **Modification of Bidding and Auction Procedures**. (Local Rule 6004-1(c)(i)(D)) The Sellers may, in consultation with any Committee, and without authorization of this Court, announce at the Auction additional procedural rules (*e.g.*, the amount of time to make subsequent Overbids) for conducting the Auction so long as the rules are not inconsistent with the Bidding Procedures. The bidding at the Auction shall be transcribed or videotaped, and the Sellers shall maintain a transcript of all Bids made and announced at the Auction, including all Overbids and the Successful Bid.

d. **Notice of the Auction**. Upon approval of the Bidding Procedures Order, the Sellers will serve the Auction Notice on (i) all parties provided with the notice of this Motion; (ii) all parties identified by the Sellers and Imperial as potentially interested purchasers; and (iii) all parties on the Debtors' consolidated list of creditors

f) **Selection of Successful Bidder**. The Sellers may (i) determine, in their reasonable business judgment, in consultation with any official committee of unsecured creditors appointed in the Chapter 11 Cases (the "Committee") (as applicable), which Qualified Bid is the Successful Bid and the next best Qualified Bid (the "Back-Up Bid"), provided, however, that the extent to which the Stalking Horse Agreement may be selected as the Back-Up Bid shall be subject to the terms and conditions of the Stalking Horse Agreement; and (ii) reject at any time, before entry of an order of the Bankruptcy Court approving the Sale, any bid (other than the Stalking Horse Agreement) that, in the Sellers' reasonable judgment, after consultation with the Committee (as applicable), is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures or the terms and conditions of the Sale or (c) contrary to the best interests of the Sellers and their estates.

g) **Back-Up Bidder**. (Local Rule 6004-1(c)(i)(E)) If the Successful Bidder does not close the Sale by the Closing Date, then the Sellers will be authorized, but not required, to close with the party that submitted the Back-Up Bid (the "Back-Up Bidder"), without a further court order, and such Back-Up Bidder shall thereafter be deemed to be the Successful Bidder. If the Sellers decide to close with the Back-Up Bidder as the Successful Bidder, the Closing Date will be extended by up to an

additional fifteen (15) days; provided, that in no event shall the Closing Date occur later than forty-five (45) days after the filing of the Sellers of a voluntary petition for chapter 11 bankruptcy pursuant to the Bankruptcy Code.

h) **The Sale Hearing**.  The Sellers are requesting that the Court approve the scheduling of the Sale Hearing for on or about May 6, 2011.

i) **Marketing**.  In order to increase the opportunity for the Sellers to receive competitive bids for the purchase of the Acquired Assets at the Auction, the Sellers will solicit competing bids following the Petition Date.  During the Sellers' marketing period, Imperial will distribute, upon approval of the Bidding Procedures and the Expense Reimbursement, its pre-petition marketing materials to a wide list of potentially interested purchasers of the Sellers' Acquired Assets.  Such efforts are designed to ensure that information concerning the Sellers, their businesses and the Acquired Assets reaches as wide an audience of Potential Bidders as possible.

**B.  The Stalking Horse Agreement[5]**

14.  The Sellers are also requesting, pursuant to this Motion, that the Court approve the Stalking Horse Agreement and the Sellers' execution of the Stalking Horse Agreement.  The following is a summary, pursuant to Rule 6004-1 of the Local Rules, of the pertinent terms of the Stalking Horse Agreement.

a) **Sale to Insider**. (Local Rule 6004-1(b)(iv)(A))  As noted above, the Sellers believe that the Stalking Horse Bidder is an "insider" as such term is defined in Bankruptcy Code section 101(31).  Notwithstanding this relationship, in order to ensure that the Sale is fair and at arms-length, both the Sellers and the Stalking Horse Bidder have at all times retained (and will continue to retain) separate counsel and advisors, and the Sellers have been aggressively marketing the Acquired Assets to third parties over the past month.  In addition, the Sellers have proposed the Bidding Procedures which incorporate the Auction process to obtain the highest and best bid for the Acquired Assets (all as more fully described above).

b) **The Acquired Assets**. (Local Rule 6004-1(b)(iv)(K))  Section 1.1 of the Stalking Horse Agreement provides that the Acquired Assets include, among other things, (i) all of the membership interests or other equity interests in

---

[5] This summary of the Stalking Horse Agreement is for descriptive purposes only.  To the extent there are any discrepancies between this summary and the Stalking Horse Agreement, the Stalking Horse Agreement shall control.  Capitalized terms in this summary of the Stalking Horse Agreement not otherwise defined herein shall have the meanings ascribed to such terms in the Stalking Horse Agreement.

Ambassadors International Marshall Islands, LLC that are owned by Ambassadors Cruise Group, LLC; (ii) the vessel known as the "Delta Queen" paddlewheel riverboat and the vessel known as the "Columbia Queen" paddlewheel riverboat, unless such vessels are sold to a third party prior to the Closing Date pursuant to the Stalking Horse Bidder; (iii) certain cash and Cash Equivalents; (v) accounts receivable and Credit Card receivables; and (vi) all rights, claims, credits, causes of action or rights of set off against third parties relating to the Acquired Assets or Assumed Liabilities (*__including all rights and avoidance claims of the Sellers arising under Chapter 5 of the Bankruptcy Code__*).

c) **__Wind Down Budget/Payment of Professional Fees__**.  Pursuant to section 1.2(i) of the Stalking Horse Agreement, the Stalking Horse Bidder will leave behind with the Sellers (as an Excluded Asset), in connection with the Sale, cash equal to (i) the amount set forth in the Budget (as defined in the DIP Facility) to satisfy accrued and unpaid professional fees, plus (ii) $250,000 to be used to fund a wind-down of the Sellers.

d) **__Personally Identifiable Information__**. (11 U.S.C. §§ 101(41A), 363(b)(1)) No personally identifiable information, as such term is used in Bankruptcy Code sections 101(41A) and 363(b)(1), will be transferred pursuant to the Sale.  If any personally identifiable information is to be transferred pursuant to the Sale, it will be done consistent with any policy prohibiting the transfer of personally identifiable information.

e) **__Purchase Price/Credit Bid__**. (Local Rule 6004-1(b)(iv)(C); 6004-1(b)(iv)(N)) Section 2.1(a) of the Stalking Horse Agreement provides that the purchase price for the Acquired Assets (the "Purchase Price") shall be approximately $40,000,000 payable in the form of (i) the Assumed Credit Agreement Obligations, (ii) the Credit Bid in an amount of not less than $19,000,000 and (iii) the other Assumed Liabilities.

f) **__Conditions to Closing/Timelines__**. (Local Rule 6004-1(b)(iv)(E))  The Stalking Horse Agreement contains several conditions to closing of the Sale transactions.  These conditions include the requirement that (i) the Bankruptcy Court enters the Bidding Procedures Order within fifteen (15) days of the Petition Date (see sections 3.4(g) and 9.3(b) of the Stalking Horse Agreement), (ii) the Bankruptcy Court enters the Sale Order by no later than forty (40) days after the Petition Date (see sections 3.4(f) and 9.3(c) of the Stalking Horse Agreement), (iii) the Closing Date of the Sale occur no later than forty-five (45) days after the Petition Date (see section 3.4(c) of the Stalking Horse Agreement), and (iv) the Stalking Horse Bidder shall have completed its due diligence of the Acquired Assets and Assumed Liabilities to its satisfaction (see section 9.3(o) of the Stalking Horse Agreement).

g) **__Assigned Contracts__**.  Section 1.1 of the Stalking Horse Agreement provides that the Sellers on closing will assume and assign to the Stalking Horse

Bidder, and the Stalking Horse Bidder will assume and fulfill all obligations and liabilities owing under, the Assigned Contracts. The Stalking Horse Bidder's obligations will include the payment of all "cure payments" due and owing thereunder (the "Cure Costs"), which are to be listed on a schedule annexed as an exhibit to the Stalking Horse Agreement (the "Cure Schedule"), subject to amendment in the sole discretion of the Stalking Horse Bidder up until five (5) business days prior to the Sale Hearing. Such Assigned Contracts and any cure amounts payable in relation thereto will be set forth in a notice (the "Assumption and Assignment Notice"), the form of which is set forth on Exhibit 3 annexed to the Bidding Procedures Order. The Cure Costs will be assumed by the Stalking Horse Bidder pursuant to the Stalking Horse Agreement (see section 1.3(a) of the Stalking Horse Agreement).

h) **Successor Liability**. (Local Rule 6004-1(b)(iv)(L)) Pursuant to section 7.2 of the Stalking Horse Agreement, the Sale Order will find that the Stalking Horse Bidder is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code and not a successor to the Sellers and grant the Stalking Horse Bidder the protections of section 363(m) of the Bankruptcy Code.

i) **Good Faith Deposit**. (Local Rule 6004-1(b)(iv)(F)) The Stalking Horse Bidder will not submit a deposit of any kind pursuant to the Stalking Horse Agreement.

j) **Access to Records**. (Local Rule 6004-1(b)(iv)(J)) Pursuant to section 8.2(c) of the Stalking Horse Agreement, and following the Closing Date of the Sale, the Stalking Horse Bidder will allow the Sellers access to books and records pertaining to the conduct of the business or ownership of the Acquired Assets prior to the Closing Date, or the Excluded Assets and Excluded Liabilities (as such terms are defined in the Stalking Horse Agreement).

k) **Governing Law**. The Stalking Horse Agreement shall be governed under the substantive laws of the state of New York.

l) **Relief from Bankruptcy Rule 6004(h)**. (Local Rule 6004-1(b)(iv)(O)) As set forth more fully below, by this Motion, the Sellers will seek relief from the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h).

## RELIEF REQUESTED

### A.    The Bidding Procedures Order

15.    By this Motion, the Sellers request entry of the Bidding Procedures Order, substantially in the form attached hereto as Exhibit A:

a)    Approving (i) the Sellers' proposed Bidding Procedures for marketing the Acquired Assets, which procedures are attached as Exhibit 1 to the Bidding Procedures Order

annexed hereto; (ii) the Auction Notice, which notice is attached as <u>Exhibit 2</u> to the Bidding Procedures Order annexed hereto; and (iii) the Assumption and Assignment Notice, which notice is attached as <u>Exhibit 3</u> to the Bidding Procedures Order annexed hereto;

b)      Approving the form and manner of notice of the Auction;

c)      Establishing April 29, 2011 at 4:00 p.m. (prevailing Eastern Time) as the deadline for the submission of Potential Bids (the "<u>Bid Deadline</u>");

d)      Scheduling the Auction, if necessary, on May 2, 2011 at 10:00 a.m. (prevailing Eastern Time) at the offices of Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, New York 10018;

e)      Authorizing the Sellers to execute the Stalking Horse Agreement;

f)      Scheduling the Sale Hearing on May 6, 2011, or at such other time as the parties may be heard, to consider the Sale of the Acquired Assets to the Stalking Horse Bidder or such other party that is the Successful Bidder at the Auction; and

g)      Granting such other and further relief as the Court deems necessary or appropriate.

**B.      <u>The Sale Order</u>**

16.      By this Motion the Sellers also seek entry of the Sale Order, substantially in the form attached hereto as <u>Exhibit B</u>:

a)      Approving the Sale of the Acquired Assets free and clear of all liens, claims and encumbrances (other than Permitted Encumbrances) to the Stalking Horse Bidder or such other party that is the Successful Bidder at the Auction;

b)      Approving the assumption and assignment of the Assigned Contracts (as defined below);

c)        Dismissing the Chapter 11 Case of Cruise Group in connection with the Sale; and

d)        Granting such other and further relief as the Court deems necessary or appropriate.

## BASIS FOR RELIEF

### A.    The Bid Procedures and the Auction

17.    Pursuant to Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be by private sale or by public auction. The Sellers believe a sale of the Acquired Assets pursuant to a public auction governed by the proposed Bidding Procedures will maximize the sale proceeds received by the Sellers' estates, which is the paramount goal in any proposed sale of property of the estate. See In re Dura Automotive Sys., Inc., No. 06-11202 (KJC), 2007 Bankr. LEXIS 2764, *253 (Bankr. D. Del. Aug. 15, 2007).

18.    The Bidding Procedures allow the Sellers to conduct the Auction in a controlled, fair and open fashion that will encourage participation by financially capable bidders, thereby increasing the likelihood that the Sellers will receive the best possible consideration for the Acquired Assets. Such Bidding Procedures should be approved when they provide a benefit to the estate by maximizing the value of the assets and enhance competitive bidding. Id. at *253-54 (citing Calpine Corp. v. O'Brien Envtl. Energy, Inc., 181 F.3d 527, 535-37 (3d Cir. 1999)) (detailing situations where bidding incentives are appropriate in bankruptcy because they provide a benefit to the estate). The Sellers believe that the Bidding Procedures are consistent with, and indeed more favorable than, other procedures previously approved in this District and other bankruptcy courts.

19.    Although the Sellers believe that the value to be provided pursuant to the terms set forth in the Stalking Horse Agreement is fair and reasonable, the Sellers submit that the

Bidding Procedures and the Auction will ensure that the Sellers' estates receive the highest or best value available by allowing the market to test the Purchase Price of the Acquired Assets. The Sellers hereby request this Court's approval of the process and procedures set forth in the Bidding Procedures for the submission and consideration of competing bids from other interested parties for the Acquired Assets.

**B.**     <u>**Proposed Notice of the Auction and the Sale Hearing**</u>

20.    As part of the Bidding Procedures Order, the Sellers will be seeking approval of the Auction Notice. The Auction Notice will include, among other things, the date, time and place of the Auction and the Sale Hearing, as well as the deadline for filing any objections to the relief requested in this Motion once they are set by the Court. By this Motion, the Sellers propose that the Bankruptcy Court set (i) 4:00 p.m. (prevailing Eastern Time) on May 4, 2011[6] as the deadline for objecting to approval of the proposed Sale (the "<u>Objection Deadline</u>"); (ii) May 6, 2011 as the date for the Sale Hearing; and (iii) 10:00 a.m. (prevailing Eastern Time) on May 2, 2011 as the date for the Auction. The Sellers propose that such a timeline is warranted and necessary given these exigent circumstances and the Sellers' need to sell the Acquired Assets in a timely fashion. Moreover, the Sellers propose that such a timeline is appropriate, as set forth in the Shepard Declaration, and will have little impact on the Sellers' ability to market the Acquired Assets in light of the Sellers' marketing efforts prior to the Petition Date, as well as the marketing efforts the Sellers and Imperial will continue to undertake.

21.    The Sellers further submit that parties in interest will be provided with sufficient notice of the timelines proposed in this Motion. The Sellers have to date provided notice of this Motion by facsimile and/or overnight mail to: (i) the Office of the United States Trustee for the

---

[6] Objections to adequate assurance of future performance by a bidder other than the Stalking Horse Bidder may be made at the Sale Hearing.

District of Delaware; (ii) the United States Securities and Exchange Commission; (iii) the Office of the United States Attorney for the District of Delaware; (iv) the Internal Revenue Service; (v) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis; (vi) counsel to the administrative agent for the Debtors' prepetition lenders; (vii) counsel to the administrative agent for the proposed post-petition lenders; (viii) counsel to the indenture trustee for the Debtors' prepetition secured noteholders; (ix) the indenture trustee for the Debtors' prepetition unsecured noteholders; (x) counsel to the Debtors' controlling shareholder(s); (xi) counsel to the Stalking Horse Bidder; (xii) counsel to Whippoorwill; (xiii) all potential Assigned Contract counterparties; (xiv) all parties known or reasonably believed to have expressed an interest in the Acquired Assets; (xv) the United States Coast Guard; (xvi) all parties who are known to possess or assert a secured claim against the Acquired Assets; and (xvii) the relevant taxing authorities having jurisdiction over any of the Acquired Assets. In addition, upon this Court's entry of the Bidding Procedures Order (which will establish the Sale Hearing, Auction and Objection Deadline), the Sellers propose to serve the Auction Notice on (i) all parties provided with the notice of this Motion; (ii) all parties identified by the Sellers and Imperial as potentially interested purchasers; and (iii) all parties on the Debtors' consolidated list of creditors. The Auction Notice will also include instructions on how to obtain a copy of the Motion and the Stalking Horse Agreement.

22.     The Sellers submit that the methods of notice described herein comply fully with Bankruptcy Rule 2002 and Local Rule 2002-1 and constitute good and adequate notice of the proposed Bidding Procedures and the sale of the Acquired Assets. Therefore, the Sellers respectfully request that this Court approve the notice procedures proposed above.

**C.    The Proposed Notice of the Assumption and
Assignment of Executory Contracts and Unexpired Leases**

23.    Additionally, as noted above, the Sellers, as part of the Sale, are seeking to assume and assign certain executory contracts and unexpired leases (collectively, the "Assigned Contracts").  With respect to the cure of all Assigned Contracts, as soon as practicable, the Sellers will file the Cure Schedule.  The Cure Schedule will include a description of each Assigned Contract potentially to be assumed and assigned under the Stalking Horse Agreement or Marked Agreement (as set forth in the Bidding Procedures, as applicable), and the Cure Costs. A copy of the Cure Schedule, together with the Assumption and Assignment Notice, will be served on each of the non-debtor parties listed on the Cure Schedule by first-class mail on the date that the Cure Schedule is filed with the Court.  The Sellers propose that any objections to the assumption and assignment of any executory contract or unexpired lease identified on the Cure Schedule, including, but not limited to, objections relating to adequate assurance of future performance by the Stalking Horse Bidder (or any Successful Bidder, as appropriate) or to the Cure Costs set forth on such schedule, must be in writing, filed with the Court, and be actually received on or before the Objection Deadline by (i) proposed co-counsel to the Sellers, Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, New York 10038-4982, Attn: Kristopher M. Hansen, Fax: (212) 806-6006, E-mail: khansen@stroock.com; (ii) proposed co-counsel to the Sellers, Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801, Attn: Daniel J. DeFranceschi, Fax: (302) 498-7816, E-mail: defranceschi@rlf.com; (iii) proposed financial advisor to the Sellers, Imperial Capital, LLC, 2000 Avenue of the Stars, 9th Floor, South Tower, Los Angeles, California 90067, Attn: Chris Shepard, Fax: (310) 777-3052, Email: cshepard@imperialcapital.com; (iv) counsel for any official committee of unsecured creditors appointed in these Chapter 11 Cases; (v) counsel to

Whippoorwill, Gibson Dunn & Crutcher LLP, 200 Park Avenue, New York, New York 10166, Attn: Matt Williams, Fax: (212) 351-5232, Email: mjwilliams@gibsondunn.com; and (vi) counsel to (a) the Stalking Horse Bidder; or (b) the Successful Bidder, as applicable (collectively, the "Notice Parties"), provided, however, that in the event the Auction results in a Successful Bidder other than the Stalking Horse Bidder, the deadline for objecting to the assumption and assignment of the Assigned Contracts to such Successful Bidder on the basis of adequate assurance of future performance will be the commencement of the Sale Hearing. Any objection to the Cure Costs shall set forth a specific default in any Assigned Contract and claim a specific monetary amount that differs from the amount, if any, specified by the Sellers in the Cure Schedule.

24.     If no objections are received, then the Cure Costs set forth in the Cure Schedule will be binding upon the non-debtor parties to the Assigned Contracts for all purposes in these Chapter 11 Cases and will constitute a final determination of the total Cure Costs required to be paid by the Stalking Horse Bidder, or Successful Bidder (as applicable), in connection with the assumption and assignment of the Assigned Contracts. In addition, all counterparties to the Assigned Contracts will (i) be forever barred from asserting any additional cure or other amounts with respect to the Assigned Contracts, and the Sellers and the Successful Bidder will be entitled to rely solely upon the Cure Costs set forth in the Assumption and Assignment Notice; (ii) be deemed to have consented to the assumption and assignment; and (iii) be forever barred and estopped from asserting or claiming against the Sellers or the Successful Bidder that any additional amounts are due or other defaults exist, that conditions to assignment must be satisfied under such Assigned Contracts, or that there is any objection or defense to the assumption and assignment of such Assigned Contracts.

25.     Where a non-debtor counterparty to an Assigned Contract files an objection asserting a cure amount higher than the proposed Cure Costs (the "Disputed Cure Amount"), then (i) to the extent that the parties are able to consensually resolve the Disputed Cure Amount prior to the Sale Hearing, and subject to the Successful Bidder's consent to such consensual resolution, the Sellers shall promptly provide the Successful Bidder notice and opportunity to object to such proposed resolution or (ii) to the extent the parties are unable to consensually resolve the dispute prior to the Sale Hearing, then the amount to be paid under section 365 of the Bankruptcy Code with respect to such Disputed Cure Amount will be determined at the Sale Hearing or at a hearing at such other date and time as may be fixed by this Court.  All other objections to the proposed assumption and assignment of an Assigned Contract will be heard at the Sale Hearing.  The Sellers intend to cooperate with counterparties to Assigned Contracts to attempt to reconcile any differences in a particular cure amount.

26.     The Sellers request that any party failing to object to the proposed transactions be deemed to consent to the treatment of its executory contract and/or unexpired lease under section 365 of the Bankruptcy Code.  See In re Decora Indus., 2002 WL 32332377, at *4 (Bankr. D. Del. May 17, 2002) (parties in interest who did not object to sale were deemed to accept the sale pursuant to sections 362(f) and 365 of the Bankruptcy Code); Hargrave v. Twp. of Pemberton (In re Tabone, Inc.), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); Pelican Homestead v. Wooten (In re Gabel), 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).  Moreover, the Sellers request that each such party be deemed to consent to the assumption and assignment of its executory contract and/or unexpired lease notwithstanding any anti-alienation provision or other restriction on assignment.  See 11 U.S.C. §§ 365(c)(1)(B), (e)(2)(A)(ii) and (f).

**D.     The Sale of the Acquired Assets Pursuant to the Stalking Horse
Agreement, and the Sellers' Execution of the Stalking Horse Agreement, Is
Authorized by Section 363 as a Sound Exercise of the Sellers' Business Judgment**

27.     Section 363 of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).  Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, courts have required that such use, sale or lease be based upon the sound business judgment of the debtor.  See e.g., Official Comm. of Unsecured Creditors v. The LTV Corp. (In re Chateaugay Corp.), 973 F.2d 141, 143 (2d Cir. 1992); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983) (requiring "some articulated business justification" to approve the use, sale or lease of property outside the ordinary course of business).  In that regard, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."  Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).  In this District, once a court is satisfied that there is a sound business justification for the proposed sale, the court must then determine whether (i) the debtor in possession has provided the interested parties with adequate and reasonable notice; (ii) the sale price is fair and reasonable; and (iii) the purchaser is proceeding in good faith.  See, e.g., In re Delaware and Hudson Ry. Co., 124 B.R. 169, 176 (Bankr. D. Del. 1991); accord In re Decora Indus., Inc., No. 00-4459, 2002 WL 32332749, at * 2 (D. Del. May 20, 2002).

28.     The Sellers submit that the decision to sell the Acquired Assets to the Stalking Horse Bidder, or Successful Bidder, at the Auction is based upon their sound business judgment and should be approved.  In light of a dearth of alternative bidders for the Acquired Assets, the

Sellers propose that the Purchase Price represents a fair and reasonable price for the Sellers' assets – particularly given the Sellers' and Imperial's diligent efforts to explore alternatives to a sale of some or all of the Sellers' assets. As such, the Sellers believe that their prepetition marketing efforts, arms-length negotiations with the Stalking Horse Bidder, and the proposed Bidding Procedures will achieve the best results for their estates and maximize value for all constituents. Furthermore, the Bidding Procedures, which contemplate an open auction process, are designed to ensure that all interested parties receive notice of the Sale and are provided with an opportunity to bid at the Auction (thereby increasing the likelihood that the Sellers are able to obtain a greater price for the Acquired Assets). Thus, the Sellers submit that the sale of the Acquired Assets is fair, reasonable and a sound exercise of their business judgment. Accordingly, the Sellers also request this Court's authorization to execute the Stalking Horse Bidder following the Petition Date, but prior to the Auction.

**E.     The Sale of the Acquired Assets Free and Clear of**
**Liens and Other Interests Is Authorized By Section 363(f)**

29.     The Sellers further submit that it is appropriate to sell the Acquired Assets free and clear of liens pursuant to section 363(f) of the Bankruptcy Code. Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests and encumbrances if:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interests; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

30.     Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Acquired Assets "free and clear" of liens and interests.  See In re Dundee Equity Corp., 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. Mar. 6, 1992) ("[S]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); In re Bygaph, Inc., 56 B.R. at 606 n.8 (same); Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.), 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that section 363(f) of the Bankruptcy Code is written in the disjunctive, and holding that the court may approve the sale "free and clear" provided at least one of the subsections of section 363(f) of the Bankruptcy Code is met).

31.     The Sellers believe that one or more of the tests of section 363(f) are satisfied with respect to the transfer of the Acquired Assets pursuant to the Stalking Horse Agreement.  In particular, the Sellers believe that at least section 363(f)(3) of the Bankruptcy Code will be met in connection with the transactions proposed under the Stalking Horse Agreement because the liens on the Acquired Assets will either be maintained or released as part of the Purchase Price. In addition, given the consideration to be provided in the Purchase Price, the Sellers believe that each party holding a lien on the Acquired Assets will either be consenting or be deemed to be consenting to the Sale pursuant to section 363(f)(2) of the Bankruptcy Code.  Accordingly, the Sellers propose that section 363(f) authorizes the transfer and conveyance of the Acquired Assets free and clear of any such claims, interests, liabilities or liens.

32.     Although section 363(f) of the Bankruptcy Code provides for the sale of assets "free and clear of any interests," the term "any interest" is not defined in the Bankruptcy Code. Folger Adam Sec. v. DeMatteis/MacGregor JV, 209 F.3d 252, 257 (3d Cir. 2000).  In the case of

In re Trans World Airlines, Inc., 322 F.3d 283, 288-89 (3d Cir. 2003), the Third Circuit specifically addressed the scope of the term "any interest." The Third Circuit observed that while some courts have "narrowly interpreted that phrase to mean only in rem interests in property," the trend in modern cases is towards "a more expansive reading of 'interests in property' which 'encompasses other obligations that may flow from ownership of the property.'" Id. at 289 (citing 3 Collier on Bankruptcy 363.06[l]). As determined by the Fourth Circuit in In re Leckie Smokeless Coal Co., 99 F.3d 573, 581-82 (4th Cir. 1996), a case cited extensively and with approval by the Third Circuit in Folger, supra, the scope of Bankruptcy Code section 363(f) is not limited to in rem interests. Thus, the Third Circuit in Folger stated that Leckie held that the debtors "could sell their assets under § 363(f) free and clear of successor liability that otherwise would have arisen under federal statute." Folger, 209 F.3d at 258.

33.     Moreover, courts have consistently held that a buyer of a debtor's assets pursuant to a section 363 sale takes free from successor liability resulting from pre-existing claims. See The Ninth Avenue Remedial Group v. Allis-Chalmers Corp., 195 B.R. 716, 732 (Bankr. N.D. Ind. 1996) (stating that a bankruptcy court has the power to sell assets free and clear of any interest that could be brought against the bankruptcy estate during the bankruptcy); MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.), 837 F.2d 89, 93-94 (2d Cir. 1988) (channeling of claims to proceeds consistent with intent of sale free and clear under section 363(f) of the Bankruptcy Code); Rubinstein v. Alaska Pac. Consortium (In re New Eng. Fish Co., 19 B.R. 323, 329 (Bankr. W.D. Wash. 1982) (transfer of property in free and clear sale included free and clear of Title VII employment discrimination and civil rights claims of debtor's employees); In re Hoffman, 53 B.R. 874, 876 (Bankr. D.R.I. 1985) (transfer of liquor license free and clear of any interest permissible even though the estate had unpaid taxes); Am. Living Sys.

v. Bonapfel (In re All Am. Of Ashburn, Inc.), 56 B.R. 186, 190 (Bankr. N.D. Ga. 1986) (product

liability claims precluded on successor doctrine in a sale of assets free and clear); WBQ P'ship v.

Virginia Dept. of Med. Assistance Servs. (In re WBQ P'ship), 189 B.R. 97, 104-05 (Bankr. E.D.

Va. 1995) (Commonwealth of Virginia's right to recapture depreciation is an "interest" as used

in section 363(f)).[7]  The purpose of an order purporting to authorize the transfer of assets free

and clear of all "interests" would be frustrated if claimants could thereafter use the transfer as a

basis to assert claims against the Successful Bidder arising from the Sellers' pre-sale conduct.

Under section 363(f) of the Bankruptcy Code, the Successful Bidder is entitled to know that the

Acquired Assets are not subject to latent claims that will be asserted against the Successful

Bidder after the proposed transaction is completed.  Accordingly, consistent with the above-cited

case law, the order approving the sale of the Acquired Assets should state that the Successful

Bidder is not liable as a successor under any theory of successor liability, for claims that

encumber or relate to the Acquired Assets.

F.      **The Stalking Horse Bidder/Successful Bidder is a Good Faith Purchaser
        and is Entitled to the Full Protection of Bankruptcy Code Section 363(m)**

        34.     The Sellers request that the Court find that the Stalking Horse Bidder (or the

Successful Bidder, as appropriate) is entitled to the full protections of section 363(m) of the

Bankruptcy Code.  Several courts have indicated that a party would have to show fraud or

collusion between the buyer and the debtor-in-possession or trustee or other bidders in order to

demonstrate a lack of good faith.  See Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs.

(In re Colony Hill Assocs.) 111 F.3d 269, 276 (2d Cir. 1997) ("[t]ypically, the misconduct that

_____

[7]  Some courts, concluding that section 363(f) of the Bankruptcy Code does not empower them to convey assets free
and clear of claims, have nevertheless found that section 105(a) of the Bankruptcy Code provides such authority.
See Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.), 75 B.R. 944, 948
(Bankr. N.D. Ohio 1987) (stating that the absence of specific authority to sell assets free and clear of claims poses
no impediment to such a sale, as such authority is implicit in the court's equitable powers when necessary to carry
out the provisions of title 11).

would destroy a [buyer]'s good faith status at a judicial sale involves fraud, collusion between the [buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders"); see also In re Angelika Films, 57th, Inc., 1997 WL 283412, at *7 (S.D.N.Y. 1997); In re Bakalis, 220 B.R. 525, 537 (Bankr. E.D.N.Y. 1998).

35.     In the present case, although the Stalking Horse Bidder is an "insider" as such term is defined under the Bankruptcy Code, the proposed Sale and the Stalking Horse Agreement has been negotiated at arms-length and following a long and transparent marketing process.  As set forth in the Shepard Declaration, the Stalking Horse Agreement was an intensely negotiated, arms-length transaction, in which the Stalking Horse Bidder acted in good faith.  Throughout the process, the Sellers and the Stalking Horse Bidder had separate legal counsel to negotiate the transaction, and the Sellers' financial advisor in the transaction was an independent investment firm retained for the sole purpose of helping the Sellers to explore their strategic alternatives, market their businesses and assets and negotiate the Sale.  Moreover, the transaction was unanimously approved and authorized by the participating members of the Sellers' Board of Directors, which includes a majority of independent members.  Accordingly, the Sellers request that the Court make a finding that the Stalking Horse Bidder (or Successful Bidder, as applicable) has purchased the Acquired Assets in good faith within the meaning of section 363(m) of the Bankruptcy Code.

## G.     The Transfer of the Acquired Assets Does Not Violate Section 363(n)

36.     Pursuant to Bankruptcy Code section 363(n), a sale may be avoided (and/or certain amounts may be recovered from parties to a sale) if the sale price was controlled by an agreement among potential bidders at such sale.  See 11 U.S.C. § 363(n).  The Sellers propose that such is not the case with respect to the present Sale.  As noted also in the Shepard Declaration, the Sale is not the result of any kind of collusive process or negotiation between the

Stalking Horse Bidder and (i) any other Potential Bidder or (ii) the Sellers. Rather, the Purchase Price was developed based upon a market-tested valuation of the Acquired Assets gauged against the amount of secured debt of the Sellers. In light of the fact that no other potential purchaser for the Acquired Assets has yet appeared, and given that the Purchase Price includes the assumption of the Assumed Liabilities, the assumption of certain debt obligations of the Sellers and the forgiveness (in the form of a credit bid) of a significant amount of the Sellers' debt, the Sellers and their professionals believe that the Purchase Price is fair and appropriate. Accordingly, the Sellers propose that the Sale and the Purchase Price provided for the Acquired Assets is compliant with Bankruptcy Code section 363(n).

**H.    Assignment and Assumption of the Assigned Contracts
is an Appropriate Exercise of the Sellers' Business Judgment**

37.    Pursuant to the Motion, the Sellers also seek to assume and assign the Assigned Contracts. Under section 365(a) of the Bankruptcy Code, a debtor "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). In addition, section 365(b)(1) of the Bankruptcy Code codifies the requirements for assuming an unexpired lease or executory contract of a debtor. This subsection provides:

> (b)(1)   If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee -
>
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default … ;
>
> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

> (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

38.     Further, Bankruptcy Code section 365(f)(2) provides the requirements by which assignment of an executory contract or unexpired lease to an assignee can be made.  In pertinent part, Bankruptcy Code section 365(f)(2) provides:

> The trustee may assign an executory contract or unexpired lease of the debtor only if –
>
> (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

39.     A debtor's decision to assume or reject an executory contract under section 365 is governed by the business judgment standard.  In re HQ Global Holdings, Inc., 290 B.R. 507, 511 (Bankr. D. Del. 2003) (citing Group of Inst. Investors v. Chicago, Milwaukee, St. Paul, and Pac. R.R. Co., 318 U.S. 523, 550 (1943)); In re Federal Mogul Global, Inc., 293 B.R. 124, 126 (D. Del. 2003).  Typically, a determination to assume or reject an executory contract or unexpired lease can only be overturned if the decision was the product of "bad faith, whim or caprice."  HQ Global, 290 B.R. at 511 (citing In re Trans World Airlines, Inc., 261 B.R. 103, 121 (Bankr. D. Del. 2001)); Wheeling-Pittsburgh Steel Corp. v. W. Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.), 72 B.R. 845, 849-50 (Bankr. W.D. Pa. 1987); see also Summit Land Co. v. Allen, 13 B.R. 310, 315 (Bankr. D. Utah 1981) (absent extraordinary circumstances, court approval of a debtor's decision to assume or reject an executory contract "should be granted as a matter of course").

40.     In the present case, the assumption and assignment of the Assigned Contracts is an integral part of the Sale and a requirement of the Stalking Horse Agreement, and such assumption and assignment is a part of the Sellers' efforts to maximize the value of the Sellers' estates.  Moreover, the Sellers propose that there are no incurable defaults under any of the Assigned Contracts.  The Sellers do believe, however, that there are certain amounts due under some of these agreements, and consistent with the Stalking Horse Agreement, any such defaults will be cured by the Sellers as part of any assumption and assignment (with such Cure Costs to be assumed by the Stalking Horse Bidder).

41.     Moreover, the Sellers submit that the Sale provides all parties to the Assigned Contracts with adequate assurance of future performance.  The words "adequate assurance of future performance" must be given a "practical, pragmatic construction" in light of the "proposed assumption." In re Fleming Cos., 499 F.3d 300, 307 (3d Cir. 2007) (quoting Cinicola, 248 F.3d at 120, n.10).  See also Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (same); In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); In re Bon Ton Rest. & Pastry Shop, Inc., 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  See In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of a lease from debtor has financial resources and has expressed a willingness to devote sufficient funding to business in order to give it strong likelihood of

succeeding; chief determinant of adequate assurance is whether rent will be paid); see also In re Vitanza, No. 98-19611 (DWS), 1998 WL 808629, at *26 (Bankr. E.D. Pa. 1998) ("The test is not one of guaranty but simply whether it appears that the rent will be paid and other lease obligations met.").

42.     As set forth above, to submit a Qualified Bid, a bidder must provide the Sellers with sufficient and adequate information to demonstrate that such bidder has the financial wherewithal and ability to consummate the transactions contemplated in the Stalking Horse Agreement, which includes future performance of any Assigned Contracts.  In this regard, the Sellers believe that the Stalking Horse Bidder (as well as the Successful Bidder, if other than the Stalking Horse Bidder) will have sufficient capital and financing commitments (and has given sufficient proof of same to the Sellers) to provide adequate assurance of future performance of any Assigned Contracts.

43.     At the Sale hearing, to the extent necessary, the Debtors will be prepared to proffer testimony or present evidence to demonstrate the ability of the Successful Bidder to perform under the Assigned Contracts.  The Sale Hearing will therefore provide the Court and other interested parties with the appropriate opportunity to evaluate the ability of the Successful Bidder to provide adequate assurance of performance under the Assigned Contracts, as required by section 365(b)(1)(C) of the Bankruptcy Code.

**I.      The Stalking Horse Bidder Credit Bid is a Fair and Arms-Length Transaction**

44.     The Sellers also seek confirmation of the Stalking Horse Bidder's right to credit bid an amount of the Senior Secured Notes of not less than $19,000,000 (the "Credit Bid Amount") in connection with the Purchase Price for the Acquired Assets.  Confirmation of the Stalking Horse Bidder's right to credit bid is consistent with Bankruptcy Code section 363(k). That section of the Bankruptcy Code provides as follows:

At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

11 U.S.C. § 363(k).

45.     Under section 363(k), a secured creditor is entitled to bid an amount up to its entire claim; the "offset" (*i. e.*, credit) is not limited to the value of the collateral.  See, e.g., In re SubMicron Sys. Corp., 432 F.3d 448, 459 (3d Cir. 2006) ("It is well settled among district and bankruptcy courts that creditors can bid the full face value of their secured claims under § 363(k)"); In re SunCruz Casinos, LLC, 298 B.R. 833, 839 (Bankr. S.D. Fla. 2003) ("The plain language of [section 363(k)] makes clear that the secured creditor may credit bid its entire claim, including any unsecured deficiency portion thereof.") (emphasis in original); In re Morgan House Gen. P'Ship, 1997 U.S. Dist. LEXIS 1306, at *1 (E.D. Pa. Feb. 7, 1997) (holding that an unsecured creditor could bid the full value of its claim at a foreclosure sale); In re Realty Invs., Ltd. V, 72 B.R. 143, 146 (Bankr. C.D. Cal. 1987) (recognizing "the secured party's right to bid in the full amount of his allowed claim at any sale of collateral under section 363(k)"); Criimi Mae Servs. Ltd. P'ship v. WDH Howell, LLC (In re WDH Howell, LLC), 298 B.R. 527, 532 n.8 (D.N.J. 2003) (stating that section 363(k) "provides a secured creditor the right to bid the amount of [its] debt to prevent a sale for less than that amount.").

46.     Moreover, the right to credit bid is not affected by any prior valuation of an allowed claim under section 506(a) of the Bankruptcy Code.  See, e.g., In re SubMicron Sys. Corp., 432 F.3d at 461 ("[Section] 363 speaks to the full face value of a secured creditor's claim, not to the portion of that claim that is actually collateralized as described in § 506."); In re Morgan House Gen. P'ship, 1997 U.S. Dist. LEXIS 1306, at *5 (holding that a creditor may bid

"to the extent of its claim" under § 363(k)); <u>In re Midway Invs., Ltd.</u>, 187 B.R. 382, 391 n.12 (Bankr. S.D. Fla. 1995) ("[A] secured creditor may bid in the full amount of the creditor's allowed claim, including the secured portion and any unsecured portion thereof") (citing legislative history).

47.     Here, the Stalking Horse Bidder seeks to credit bid up to the Credit Bid Amount of the Senior Secured Notes.  This represents a significant, and fully-secured, obligation of the Sellers' estates.  Permitting the Stalking Horse Bidder to credit bid these amounts will release such obligations from the Sellers' estates – while simultaneously permitting the Stalking Horse Bidder to enforce a right to which it is entitled under the Bankruptcy Code.  Accordingly, the Sellers seek this Court's approval of the Stalking Horse Bidder's credit bid component of the Stalking Horse Agreement.

## J.      Relief Under Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate

48.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . .  is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."   Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . .  is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  The Sellers request that any order approving the Stalking Horse Agreement be effective immediately by providing that the 14-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

49.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  <u>See</u> Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).  Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay period, Collier suggests that the 14-

day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 <u>Collier on Bankruptcy</u> 15th Ed. Rev., ¶ 6064.09 (L. King, 15th rev. ed. 1988). Furthermore, Collier provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. <u>Id.</u>

50. As described above, time is clearly of the essence as the Sellers face a potential liquidity crisis. A prompt closing of the Sale is therefore of critical importance and the Sellers request that the Court waive the fourteen (14) day stay period under Bankruptcy Rules 6004(h) and 6006(d). For these reasons the Sellers submit that the relief requested in this Motion is in the best interests of the Sellers and their estates and should therefore be granted.

## K.    Dismissal of the Cruise Group Chapter 11 Case in Connection with the Sale is Warranted

51. Section 105(a) of the Bankruptcy Code provides, in pertinent part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [chapter 11 of the Bankruptcy Code]." 11 U.S.C. § 105(a). In respect of this broad discretion provided under the Bankruptcy Code, section 1112(b) of the Bankruptcy Code provides that "on request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested . . . dismissal is not in the best interests of creditors and the estate, the court shall . . . dismiss a case under [chapter 11 of the Bankruptcy Code] . . . if the movant establishes cause." <u>Id.</u> at § 1112(b)(1). The determination of cause and the decision to dismiss a chapter 11 bankruptcy case pursuant to section 1112(b) rests within the sound discretion of the court. <u>See</u> <u>In re Nugelt, Inc.</u>, 142 B.R. 661, 665 (Bankr. D. Del. 1992) (stating that "[c]ourts have wide latitude in determining whether

cause exists to convert or dismiss" a chapter 11 bankruptcy case); In re Young, 76 B.R. 376, 378 (Bankr. D. Del. 1987).

52.    "Cause" is delineated in section 1112(b)(4) of the Bankruptcy Code which provides a litany of statutory examples of "cause" for dismissal or conversion of a chapter 11 case.  See 11 U.S.C. §1112(b)(4).  Included among the list of "cause" factors is the "absence of a reasonable likelihood of rehabilitation."  11 U.S.C. § 1112(b)(4).  However, a bankruptcy court is not constrained by those enumerated examples and may find "cause" based on the facts and circumstances of the particular chapter 11 case.  See In re Nugelt, Inc., 142 B.R. at 665.  The legislative history of section 1112(b) of the Bankruptcy Code also indicates that the list provided in sections 1112(b)(4)(A)-(P) of the Bankruptcy Code is nonexclusive, such that a bankruptcy court has the ability to dismiss a chapter 11 case for any reason cognizable to its equity powers. See H.R. Rep. No. 595, 95th Cong., 2d Sess. 405-06 (1978); see also Official Comm. of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon Corp.), 200 F.3d 154, 160 (3d. Cir. 1999); Carolin Corp. v. Miller, 886 F.2d 693, 699 (4th Cir. 1993).

53.    In the present case, the Debtors submit that dismissal of Cruise Group's Chapter 11 Case in connection with and following consummation of the Sale transaction is warranted and appropriate under the circumstances.  Under the terms of the Sale, the Stalking Horse Bidder proposes to acquire the assets and liabilities of Cruise Group as a going concern through its acquisition of the membership interests of Marshall Islands (as defined in the Stalking Horse Agreement), the indirect parent of Cruise Group.  No prepetition liabilities of Cruise Group will be impaired as a result of the chapter 11 filing or the Sale, or would be impaired as a result of the dismissal.  Accordingly, the Debtors submit that dismissal of Cruise Group's Chapter 11 Case in

connection with and following consummation of the Sale transaction is warranted and appropriate under the circumstances.

## NOTICE

54.     The Sellers have provided notice of this Motion by (i) the Office of the United States Trustee for the District of Delaware; (ii) the United States Securities and Exchange Commission; (iii) the Office of the United States Attorney for the District of Delaware; (iv) the Internal Revenue Service; (v) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis; (vi) counsel to the administrative agent for the Debtors' prepetition lenders; (vii) counsel to the administrative agent for the proposed post-petition lenders; (viii) counsel to the indenture trustee for the Debtors' prepetition secured noteholders; (ix) the indenture trustee for the Debtors' prepetition unsecured noteholders; (x) counsel to the Debtors' controlling shareholder(s); (xi) counsel to the Stalking Horse Bidder, (xii) counsel to Whippoorwill; (xiii) all potential Assigned Contract counterparties; (xiv) all parties known or reasonably believed to have expressed an interest in the Acquired Assets; (xv) the United States Coast Guard; (xvi) all parties who are known to possess or assert a secured claim against the Acquired Assets; and (xvii) the relevant taxing authorities having jurisdiction over any of the Acquired Assets.  Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m).  In light of the nature of the relief requested herein, the Debtors believe no other or further notice is necessary.

55.     Following the entry of the Bidding Procedures Order, the Auction Notice will be served on all parties provided with the notice of this Motion, all parties identified by the Sellers and Imperial as potentially interested purchasers and all parties on the Debtors' consolidated list of creditors.

WHEREFORE, the Sellers respectfully request that the Court (a) enter the Bidding Procedures Order in substantially the form attached hereto as <u>Exhibit A;</u> (b) enter the Sale Order, after the Sale Hearing, substantially in the form attached hereto as <u>Exhibit B</u>, and (c) grant such other and further relief as the Court deems just and proper.

Dated: Wilmington, Delaware
      April 1, 2011

Respectfully submitted,

RICHARDS, LAYTON & FINGER, P.A.

      /s/ Daniel J. DeFranceschi
Daniel J. DeFranceschi (No. 2732)
Michael J. Merchant (No. 3854)
L. Katherine Good (No. 5101)
Amanda R. Steele (No. 5530)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

-and-

STROOCK & STROOCK & LAVAN LLP
Kristopher M. Hansen
Sayan Bhattacharyya
Marianne Mortimer
Matthew G. Garofalo
180 Maiden Lane
New York, New York 10038-4982
Telephone: (212) 806-5400
Facsimile: (212) 806-6006

Proposed Counsel to the Debtors
and Debtors-in-Possession