# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AMBASSADORS INTERNATIONAL, INC., et al.,[1] | Case No. 11-_____ (___) |
| Debtors. | Joint Administration Requested |

## DECLARATION OF CHRISTOPHER SHEPARD IN FURTHER SUPPORT OF A SALE OF SUBSTANTIALLY ALL ASSETS OF CERTAIN OF THE DEBTORS AND RELATED DEBTOR-IN-POSSESSION FINANCING

I, Christopher Shepard, do hereby submit this declaration (the "Declaration") and declare under penalty of perjury that the following information is true to the best of my knowledge, information and belief.

1. I am the Co-Head of Investment Banking at Imperial Capital, LLC ("Imperial"). With respect to my educational background, I have obtained a Bachelor of Science degree (with a concentration in Accounting), a Masters of Business Administration and a Juris Doctorate degree from the University of Michigan. I have over eighteen years experience in financings, mergers and acquisitions and restructurings, and have advised on over $5 billion in transactions in a wide range of industries (including healthcare, telecom, industrial, consumer, media, technology, energy, gaming, real estate and transportation). Prior to joining Imperial, I was an Associate, specializing in public securities and mergers, at the Los Angeles office of Milbank, Tweed, Hadley & McCloy, a New York-based corporate law firm.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Ambassadors International, Inc. (8605); Ambassadors Cruise Group, LLC (2448); Ambassadors, LLC (0860); EN Boat LLC. (8982); AQ Boat, LLC (5018); MQ Boat, LLC (5095); DQ Boat, LLC (5064); QW Boat Company LLC (0658); Contessa Boat, LLC (9452); CQ Boat, LLC (9511); American West Steamboat Company LLC (0656); and Ambassadors International Cruise Group (USA), LLC (7304). The mailing address for each Debtor is 2101 4th Avenue, Suite 210, Seattle, WA 98121.

2. Imperial is a full-service investment bank offering sophisticated institutional sales and trading, a wide range of investment banking, advisory, capital markets and restructuring services and institutional research. In particular, Imperial and its professionals have extensive experience working with financially troubled companies in complex financial restructurings both in chapter 11 cases and in out-of-court situations, and its professionals have extensive experience in deals involving complex operational restructurings. Moreover, Imperial has served as financial and strategic advisors for debtors, creditors and other constituents in numerous chapter 11 cases. See, e.g., In re Ecoly International, Inc., No. 10-25919 (GM) (Bankr. C.D. Cal. Mar. 30, 2011); In re California Coastal Communities, Inc., No. 09- 21712-TA (TCA) (Bankr. C.D. Cal. Sept. 28, 2010); In re Specialty Trust, Inc., No. 10-51432 (GWZ) (Bankr. D. Nev. July 23, 2010); In re South Bay Expressway, L.P., No. 10-04516-LA (LDA) (Bankr. S.D. Cal. June 21, 2010); In re Mesa Air Grp. Inc., No. 10-10018 (MG) (Bankr. D. Del. Feb. 25, 2010); In re Fairfield Residential LLC, No. 09-14378 (BLS) (Bankr. D. Del. Feb. 22, 2010); In re MagnaChip Semiconductor Finance Co., No. 09-12008 (PJW) (Bankr. D. Del. Sept. 10, 2009); In re Qimonda Richmond LLC, No. 09-10589 (MFW) (Bankr. D. Del. May 18, 2009); In re Monaco Coach Corp., No. 09-10750 (KJC) (Bankr. D. Del. April 9, 2009); In re Landsource Communities Development LLC, No. 08-11111 (KJC) (Bankr. D. Del. Aug. 27, 2008); and In re Aloha Airlines Inc., No. 08-00337 (LK) (Bankr. D. Haw. April 8, 2008).

3. I am submitting this declaration in support of the (i) *Motion of the Debtors for Entry of Orders (I) Approving Bidding Procedures for the Sale of Certain of the Debtors' Assets Free and Clear of All Liens, Claims and Encumbrances; (II) Approving the Form and Manner of Notice of the Sale and Assumption and Assignment of Executory Contracts and Unexpired Leases; (III) Scheduling an Auction and Sale Hearing; (IV) Approving Such Sale*

*and (V) Dismissing the Chapter 11 Bankruptcy Case of Ambassadors International Cruise Group (USA), LLC [Docket No. 17].(the "*<u>Sale Motion</u>*") and (ii) Motion of the Debtors for entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (I) Approving Postpetition Financing and Repayment of Certain Prepetition Obligations, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay and (vi) Scheduling a Final Hearing* [Docket No. 11] (the "<u>DIP Motion</u>").[2] Except as otherwise noted, the facts set forth herein are based on my personal knowledge, my review of relevant documents and information provided to me by the Debtors' management and other professionals working with me or under my supervision, and reflects my opinion based on that knowledge and information. If called upon to testify, I could and would testify competently to the facts set forth herein.

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in either the Sale Motion or the DIP Motion.

### A. THE DEBTORS EXTENSIVELY MARKETED THEIR ASSETS PRIOR TO THE PETITION DATE

4. As a result of the events described in the Detillion Declaration, in late January of this year, the Debtors reached out to Imperial to discuss Imperial's potential interest in working with the Debtors to evaluate strategic alternatives and advise on a potential restructuring and/or sale of their businesses. On January 31, 2011, Imperial began its analysis of the Debtors' operations, organization, management, historical financial results, prospective outlook, liquidity, industry, customer base and competition. Following its analysis, and in close consultation with the Debtors and their Board of Directors (the "Board"), Imperial embarked on the process of identifying prospective buyers and marketing the company for sale.

5. In marketing the company to prospective third-party buyers, Imperial identified and approached a total of sixty-five potential strategic and financial acquirers. Imperial identified fifteen "strategic" buyers (including several of Windstar's direct competitors as well as other large cruise operators) and fifty "financial" buyers (primarily private equity firms and hedge funds).

6. Prospective buyers were identified by Imperial in consultation with the Debtors, who provided valuable insight on certain strategic prospects and information on prior contact by a small number of prospective financial buyers, as well as through consultation with senior-level Imperial bankers with experience within the industry and on related transactions. Prospective buyers were also identified through contacts acquired by Imperial in prior similar transactions and through screens of proprietary and pay-for-access databases of large private equity and hedge fund buyers, with screening criteria that included having: (i) an interest in the leisure and hospitality industry, (ii) an interest in distressed and turnaround situations, (iii) an

interest in transportation related opportunities, and/or (iv) current or prior investments in the same or similar lines of businesses as the Debtors.

7. Imperial began contacting these parties for high level discussions on a "no-names basis" to ascertain potential interest starting in mid-February. Imperial drafted and circulated to all prospective buyers a "teaser" describing the investment opportunity, which was accompanied by a standard confidentiality agreement. On February 28, 2011, Imperial began circulating a 59-page confidential information memorandum (the "CIM"), containing more detailed marketing materials to those prospective buyers that had executed a confidentiality agreement with the Debtors.

8. Of the parties that Imperial contacted with "teaser" marketing materials, a total of twenty-one executed confidentiality agreements and received the CIM. Seven of these parties were "strategic buyers" and fourteen were "financial buyers." Included in the CIM were key investment considerations along with details on the Debtors' primary operating business, the Windstar Cruise line ("Windstar"). Such information included certain non-GAAP, cash-based historical and prospective financials, as well as an analysis of Windstar's fleet and product offerings, management team, sales and marketing strategy, business plan and industry. Of the twenty-one prospective buyers that received the CIM, only five parties (four strategic and one financial) engaged with Imperial in any serious discussions on the information contained within the CIM and on a potential acquisition.

9. As of the date hereof, only one prospective third-party buyer has requested formal management presentations on the Debtors' business and only one other prospective bidder has expressed an interest in proceeding to confirmatory diligence (*i.e.*, the process of understanding and testing the assumptions used in developing the Debtors' financial forecast contained within

the CIM). To date, none of the prospective buyers have delivered to the Debtors (or their advisors) any formal expression of interest in acquiring their businesses, although verbal indications of interest in purchasing the Debtors' assets and businesses have been expressed by a small number of prospective buyers.

10. Over the course of the prepetition marketing process, all fifty of the prospective financial buyers that Imperial had targeted, including those fourteen that had entered into a confidentiality agreement and received the CIM, declined to submit a proposal to acquire the Debtors' businesses. Prospective financial buyers generally struggled with certain aspects of the Debtors' business, such as: (i) their large recent cash losses; (ii) their ongoing liquidity requirements; (iii) the small size of the business; (iv) the risk inherent in the Debtors' ability to achieve the significant improvements reflected in their forecast; (v) the high-fixed-cost nature of their business and recurring fleet refurbishment costs; and (vi) the Debtors' inability to bring synergies to bear in the transaction where the prospective financial buyer did not already own a similar business into which it could fold the Windstar operations.

11. Additionally, over the course of the prepetition marketing process, fourteen of the fifteen prospective strategic buyers that Imperial had targeted, including six of the seven that had entered into the confidentiality agreement and received the CIM, passed on the opportunity to submit a proposal to acquire the Debtors' business. As of the date of this declaration only two strategic buyers (the "Potential Alternate Bidders")—each of which is a direct competitor with Windstar—remain in the process.

12. In discussing the investment opportunity with prospective strategic buyers, as an alternative to acquiring the Debtors' going concern operations as a whole, Imperial also explored the target's potential interest in separately acquiring Windstar's primary operating

assets (*i.e.*, its fleet of three luxury motor sail yachts). One prospective strategic buyer considered such an alternative; however, this prospective buyer passed on the opportunity given its perceived risk in placing the assets into active revenue service in a timely manner following such an acquisition.

13. In my opinion, no prospective buyer has dropped out of the marketing process for the Company on account of having insufficient time to complete the transaction, and providing additional time for the process would not materially change the end result. Accordingly, I believe that (i) Imperial's marketing efforts presented the Debtors in its best light; (ii) the strength of the Windstar brand, the Windstar product and the Debtors' turnaround efforts were highlighted in communications to interested buyers (including forecasts for improved results over time); (iii) the Debtors and Imperial carefully selected an appropriate and strategic list of targeted buyers that included all of the "natural buyers" one would expect to target for this business; and (iv) each of those buyers had a more than adequate opportunity to perform diligence on the information presented and submit expressions of interest upon the conclusion of their review.

14. Although Imperial continues to work with the Potential Alternate Bidders in facilitating their diligence investigations, these potential purchasers have been unwilling (to date) to commit to a purchase price for any or substantially all of the Debtors' assets.

15. In addition to potential third-party bidders, commencing in the weeks prior to the petition date, Imperial also engaged in confidential discussions with certain holders of the Debtors' Convertible Notes on various restructuring alternatives, including the alternative for holders or a group of holders to consider their own bid for acquiring the company. To date, the Debtors and Imperial have not received any concrete proposal for a restructuring of their

businesses and liabilities, or a bid for their assets, from the holders of the Convertible Notes that have executed confidentiality agreements with the Debtors. Nor have these holders shown a willingness to provide the necessary additional capital that the Debtors need to satisfy their liquidity needs.

16. The Debtors' prepetition marketing of their businesses and assets was, in my opinion (based on my experience in the field and the circumstances facing the Debtors currently) as robust, fair and aggressive as possible. The potential purchasers that have been approached by Imperial to date have been able to render a fairly quick determination of interest in the Debtors' assets and operations, with most quickly passing after entering into a confidentiality agreement and having an opportunity to review the historical and prospective financial information detailed in the CIM.

### B. THE STALKING HORSE BID IS THE HIGHEST AND BEST BID THE DEBTORS HAVE RECEIVED

17. Concurrently with their search for a third-party purchaser of the Debtors' assets, Imperial and the Debtors initiated discussions with the Debtors' senior lender, Whippoorwill Associates, Inc. ("Whippoorwill"), on a stalking horse bid and financing proposal.

18. Notwithstanding the efforts of the Debtors and Imperial to generate outside interest and secure proposals for the acquisition of the Debtors' assets, the only viable offer that Imperial and the Debtors have received to date is the bid from Whippoorwill (the "Stalking Horse Bid"). Verbal indications of interest from prospective buyers, including those from the Potential Alternate Bidders, have been below the level of the Debtors' current secured indebtedness. Moreover, even though each of the Potential Alternate Bidders continues to conduct due diligence on the Debtors' assets and businesses (and to engage in discussions with Imperial and the Debtors), none of the Potential Alternate Bidders has to date been willing to

provide an offer for a portion, or substantially all, of the Debtors' assets that exceeds the Purchase Price offered by Whippoorwill.  As such, the Stalking Horse Agreement (as committed to by Whippoorwill pursuant to the Commitment Letter) is the highest and best offer that the Debtors have received to date.

**C. THE STALKING HORSE AGREEMENT IS FAIR AND REASONABLE AND WAS NEGOTIATED IN GOOD FAITH AND AT ARMS LENGTH**

19. Lacking any offers from third parties, and with the Stalking Horse Bid on the table, the Debtors' Board directed management and Imperial to pursue the negotiation of the Stalking Horse Agreement with Whippoorwill.  The Stalking Horse Agreement has been extensively negotiated between the parties at arms-length and in good faith.  Although Whippoorwill is arguably an "insider" of the Debtors as such term is defined in the Bankruptcy Code, all parties took precautions to ensure that each step in the negotiation was fair and transparent, with each party retaining separate legal counsel to represent their competing interests.

20. In the course of these negotiations, the Debtors and their advisors were successfully able to negotiate a Stalking Horse Agreement that does not contain a "break-up" fee or similar provision.  This, together with the absence of any "no-shop" or non-solicitation period under the Stalking Horse Agreement, is designed to (i) encourage participation by other prospective buyers evaluating a potential overbid for the Debtors' assets and (ii) establish an open and fair auction process.  Accordingly, I believe that not only is the Stalking Horse Agreement the highest and best offer the Debtors have received to date, I believe that the Stalking Horse Agreement is fair and contains certain features that are in many cases better

than a "market" deal (*e.g.*, absent restrictions that would normally be required from a third-party stalking horse, such as a break-up fee or no-shop period).

**D.   THE SALE PROCESS AND TIMELINES PROPOSED IN THE SALE MOTION, AND THE STALKING HORSE AGREEMENT, ARE WARRANTED UNDER THE CIRCUMSTANCES**

21.   Absent a viable and committed offer for an expeditious sale, outside of bankruptcy the Debtors' going concern operations would increasingly be at risk over time due to a variety of factors, including, among other things: (i) expected liquidity needs that are above the level of the Debtors' current unrestricted cash plus the availability on their revolving credit line; (ii) the Debtors' inability to refinance their current indebtedness and secure additional needed liquidity outside of bankruptcy; (iii) the anticipated delisting of the common stock of Ambassadors International, Inc. and the attendant put right under the Convertible Notes; (iv) the Debtors' expectation that their auditors would deliver an opinion regarding their 2010 financials with a going concern qualification; and (v) the Debtors' expectation that they would breach the covenants under their Prepetition Working Capital Facility and Senior Secured Notes.  Imperial and the Debtors also reasonably expect that the Debtors' chapter 11 filing will likely have an adverse impact on revenues and bookings.

22.   I believe that under these circumstances, the Sale milestones set forth in the Stalking Horse Agreement (which mirror those found in the DIP Credit Agreement) are reasonable and warranted.  The entry of the Bidding Procedures Order within fifteen days of the Petition Date, and the entry of the Sale Order within forty days of the Petition Date, will help maintain an efficient process for the ultimate sale of the Debtors' assets.  A protracted chapter 11 process would have an adverse impact on the Debtors' key relationships with customers, vendors, suppliers and financial partners, which could permanently damage their

businesses.  In my opinion, this is truly a case where time is of the essence, and a drawn-out process would be detrimental to the Debtors' continued viability.  The Debtors' proposed timeframe, therefore, will maximize the going-concern value of their assets.  Accordingly, I respectfully submit that the sale timeline as described above is fair, reasonable, appropriate and necessary under the circumstances.

23. Because the Debtors' marketing efforts to date have drawn few potential alternative bidders (and only one bid, the Stalking Horse Bid, that is a viable and committed offer), a protracted marketing and sales process is unlikely to elicit additional offers and would, instead, threaten the Debtors' going concern value.  Nevertheless, the Debtors' Board directed Imperial and the Debtors to continue to aggressively market to the Potential Alternate Bidders.  To date, Imperial has continued its marketing efforts towards the Potential Alternate Bidders, and has continued to attempt to target additional potential purchasers.

24. Over and above the robust marketing process and negotiations that occurred prior to the Petition Date, and that will continue post-petition in these Chapter 11 Cases, the Debtors have proposed a post-petition process for the Sale of the Debtors' assets that will allow for an Auction to be conducted should any Qualified Bidder (as defined in the Bidding Procedures) ultimately desire to propose a bid.  The Debtors' proposed Auction process will ensure that the value the Debtors will receive in the Sale is "market tested" to ensure it is fair and reasonable.  This process, in my opinion, will ensure that the Debtors receive the greatest value possible for their assets.

25. I believe that the Stalking Horse Agreement and the Sale process negotiated with Whippoorwill (including the timelines set forth in the Stalking Horse Agreement) are fair and reasonable under the circumstances of these Chapter 11 Cases, particularly in light of (i) the

Debtors' and Imperial's efforts to date; (ii) the lack of alternative bids received thus far in marketing the Debtors' assets; and (iii) the opportunity for third-parties to make overbids as part of the Sale process via the Auction.

**E.     THE TERMS OF THE DIP FACILITY ARE FAIR AND
         WARRANTED IN THE CIRCUMSTANCES OF THESE CHAPTER 11 CASES**

26.     The Debtors have an immediate need for financing in order to operate their businesses pending the completion of the Sale. Prior to the Petition Date, the Debtors instructed my firm, Imperial, to explore sources for obtaining such financing. In addition to Whippoorwill (the lender under the Debtors' Prepetition Working Capital Facility), Imperial contacted five other institutional lenders that it believed would have a potential interest in providing debtor-in-possession financing. After being provided the general terms of the Debtors' capital structure and liquidity needs, each of the potential lenders (other than Whippoorwill) opted to pass on the opportunity to provide the Debtors with financing. The lack of interest amongst third-party financing sources was principally due to the fact that the Debtors had an insufficient amount of unencumbered assets to allow a third party lender to provide financing on a non-priming basis.

27.     Even if alternative debtor-in-possession financing were available on favorable terms and conditions and could be consummated in the time frame required to address the Debtors' liquidity needs, obtaining such financing would likely require a difficult and protracted priming contest with the Debtors' prepetition secured creditors, the result of which could not be predicted with any certainty. In my opinion, any uncertainty regarding the Debtors' financing would be extremely damaging to the Debtors' estates and would immediately jeopardize the Chapter 11 Cases at the outset. For these reasons, we determined

12

that there were no financing options available on better terms than those ultimately provided in the proposed DIP Credit Agreement.

28. Imperial, with the assistance of the Debtors and their counsel, conducted extensive negotiations with Whippoorwill over the terms of the DIP Credit Agreement which continued up to the Petition Date. As a result of these negotiations, Imperial, the Debtors and the Debtors' other professionals successfully negotiated a number of key structural and financial improvements in the DIP Credit Agreement as compared to Whippoorwill's initial proposal, which are incorporated into the proposed DIP Credit Agreement and proposed Interim and Final Orders. These improvements include, among other things, increasing the commitment of the DIP Facility by an amount to provide adequate funding during the pendency of these Chapter 11 Cases, providing for a reasonable variance under the Budget; and reducing the amount of the up-front fees in connection with the DIP Facility. The DIP Facility offered by Whippoorwill will provide the necessary working capital for the Debtors to operate their businesses pending the consummation of the Sale. In my opinion, the terms of the DIP Facility including the interest rate and fees paid thereunder are fair based on the credit options available to the Debtors. It is my belief that Whippoorwill has offered a DIP Facility sufficient to finance the Debtors' operations pending the consummation of the Sale, on the most favorable terms available.

29. For the foregoing reasons, I believe the amount and the terms of the DIP Facility are fair and appropriate.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 1st day of April, 2011.

_____
Christopher Shepard
Co-Head of Investment Banking at
Imperial Capital, LLC