# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Case No. 11-11002 (KG) |
| AMBASSADORS INTERNATIONAL, INC, et al.,[1] | Chapter 11 |
| | Joint Administration Requested |
| Debtors. | **Objection Deadline:** April 5, 2011 at 11:00 a.m. |
| | **Hearing Date:** April 5, 2011 at 11:00 a.m. |
| | Related Docket No.: 11 |

**OBJECTION OF THE AD HOC COMMITTEE OF CONVERTIBLE NOTEHOLDERS TO DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364 AND 507 AND RULES 2002, 4001 AND 9014 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (I) APPROVING POSTPETITION FINANCING AND REPAYMENT OF CERTAIN PREPETITION OBLIGATIONS, (II) AUTHORIZING USE OF CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY AND (VI) SCHEDULING A FINAL HEARING**

The Ad Hoc Committee of Convertible Noteholders[2] (the "Ad Hoc Committee") of Ambassadors International, Inc. ("Ambassadors") and its affiliate debtors (collectively, the "Debtors"), by its counsel, Morrison & Foerster LLP and Womble Carlyle Sandridge & Rice, PLLC, submits this Objection (the "Objection") to the Debtors' Motion for Entry of Interim and Final Orders (I) Approving Postpetition Financing and Repayment of Certain Prepetition Obligations, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Ambassadors International, Inc. (8605); Ambassadors Cruise Group, LLC (2448); Ambassadors, LLC (0860); EN Boat LLC. (8982); AQ Boat, LLC (5018); MQ Boat, LLC (5095); DQ Boat, LLC (5064); QW Boat Company LLC (0658); Contessa Boat, LLC (9452); CQ Boat, LLC (9511); American West Steamboat Company LLC (0656); and Ambassadors International Cruise Group (USA), LLC (7304). The mailing address for each Debtor is 2101 4th Avenue, Suite 210, Seattle, WA 98121.

[2] The Ad Hoc Committee consists of Kingstown Capital Management LP, Silverback Asset Management and Pine River Capital Management.

ny-969614

the Automatic Stay and (VI) Scheduling a Final Hearing [Docket No. 11] (the "DIP Motion"). In support thereof, the Ad Hoc Committee respectfully represents and alleges, as follows:

## SUMMARY OF ARGUMENT

The Ad Hoc Committee objects to the DIP Motion[3] on the basis that the interim order (the "Interim Order") contains provisions that unreasonably prejudice the Debtors' unsecured creditors and, in particular, hamper the ability of any competing bidders in the Debtors' sale process to bid on the Debtors' assets. Specifically, Whippoorwill Associates, Inc. ("Whippoorwill"), the Debtors' prepetition lender, one of the Debtors' significant equity holders, and an insider, is using its leverage as both a DIP Lender (defined below) and the stalking horse bidder to require the Debtors to close a sale of substantially all of their assets within forty-five (45) days of the Petition Date (defined below).[4] This timeframe may be not only too short to allow for an appropriate marketing process, but may be too short to allow for any affected creditor to evaluate the propriety of the liens and claims that will form Whippoorwill's credit bid.

The DIP Motion is the first step in what appears to be an attempt by a controlling lender/shareholder to utilize the bankruptcy process to seize its purported collateral without the meaningful oversight and transparency that is fundamental to the bankruptcy process. In order to ensure that these cases are not run solely for the benefit of the Debtors' insiders at the expense of the Debtors' unsecured noteholders, the current accelerated asset sale timeline should be modified to allow sufficient time for the Ad Hoc Committee and/or a subsequently appointed official committee of unsecured creditors ("Creditors' Committee") to fully assess the value of

---

[3] Capitalized terms not otherwise defined herein will have the meaning ascribed to them in the DIP Motion.
[4] *See* DIP Credit Agreement, § 5.16(b)(i); Debtors' Motion for Entry of Orders (I) Approving Bidding Procedures for the Sale of Certain of the Debtors' Assets Free and Clear of All Liens, Claims and Encumbrances; (II) Approving the Form and Manner of Notice of the Sale and Assumption and Assignment of Executory Contracts and Unexpired Leases; (III) Scheduling an Auction and Sale Hearing; (IV) Approving Such Sale; and (V) Dismissing the Chapter 11 Bankruptcy Case of Ambassadors International Cruise Group (USA), LLC [Docket No. 17] (the "Sale Motion").

2

the Debtors' assets, work with the Debtors to conduct a comprehensive marketing process, and investigate the relationship of the parties to the DIP Credit Agreement (defined below).

The Ad Hoc Committee reserves its right to further object to both the DIP Motion with respect to the final order and to object to the Sale Motion.[5] Notwithstanding the Ad Hoc Committee's preliminary concerns with the trajectory of these cases, the Ad Hoc Committee will endeavor to cooperate with the Debtors and any subsequently appointed Creditors' Committee in order to resolve all outstanding issues with the DIP Motion and the Sale Motion before the final hearings on such motions.

## BACKGROUND

A. **The Convertible Noteholders**

1. In April 2007 Ambassadors issued $97.0 million aggregate principal amount of 3.75% Convertible Senior Notes due 2027 (the "Convertible Notes") pursuant to an indenture dated as of April 3, 2007 (the "Convertible Notes Indenture") by and among Ambassadors and Wells Fargo Bank, National Association as indenture trustee.

2. The Convertible Notes were and remain unsecured obligations of Ambassadors and, subject to certain conditions, convertible into shares of Ambassadors' common stock.

3. On November 13, 2009, Ambassadors completed an exchange offer (the "Exchange Offer") in which holders of approximately $65.8 million aggregate principal amount of the Convertible Notes exchanged their Convertible Notes for approximately $18 million aggregate principal amount in newly issued senior secured notes and approximately 15.2 million shares of Ambassadors' common stock.

---

[5] The Ad Hoc Committee is raising these issues now to allow the Court to better understand the landscape of these cases, rather than waiting to object to the Sale Motion or entry of the final order approving the DIP Motion.

4. Before the completion of the Exchange Offer, Ambassadors executed agreements with holders of approximately 59.5% of its then outstanding Convertible Notes, including Whippoorwill, Highbridge Capital Management, LLC ("Highbridge") and Polygon Global Opportunities Master Fund ("Polygon"), pursuant to which Whippoorwill, Highbridge and Polygon agreed, among other things, to exchange their notes in the Exchange Offer, thereby rendering Whippoorwill, Highbridge and Polygon secured creditors of the Debtors with a collective direct and indirect ownership of at least 43% of the Debtors' equity. The members of the Ad Hoc Committee did not accept the Exchange Offer.

**B.     The Debtors' Prepetition Secured Debt**

5. After the completion of the Exchange Offer, Ambassadors and its subsidiaries began soliciting proposals from lenders for a new senior credit facility and ultimately received proposals from only two potential lenders, one of which was Whippoorwill.

6. On March 23, 2010, Ambassadors entered into a term loan and revolving credit facility (the "Prepetition Working Capital Facility"), the terms of which are governed by a Credit and Guaranty Agreement by and among Degrees Limited, Wind Star Limited and Wind Spirit Limited (the "Prepetition Working Capital Facility Borrowers") as borrowers, Ambassadors and certain of its direct and indirect Debtor and non-Debtor subsidiaries as guarantors (the "Prepetition Working Capital Facility Guarantors," and, together with the Prepetition Working Capital Facility Borrowers, the "Prepetition Working Capital Facility Credit Parties"), certain funds and accounts managed by Whippoorwill (the "Prepetition Lenders") as lenders, and Law Debenture Trust Company of New York as administrative agent and collateral agent (the "Prepetition Agent").

7. The Prepetition Working Capital Facility provided for a $5 million revolving credit facility and for a $10 million term loan facility. Borrowings under the Prepetition Working Capital Facility are purportedly secured on a first priority basis by substantially all of the assets of Prepetition Working Capital Facility Credit Parties and guaranteed by the Prepetition Working Capital Facility Guarantors. According to the Debtors, Whippoorwill is the sole lender under the Prepetition Working Capital Facility (Sale Motion at ¶ 7).

8. Additionally, as a result of the Exchange Offer, on November 13, 2009, Ambassadors issued $18 million of 10% Second Lien Notes (the "Second Lien Notes"), issued pursuant to an Indenture, dated as of November 13, 2009 (as supplemented by that certain First Supplemental Indenture, dated as of March 23, 2010, and as further amended, supplemented, restated or otherwise modified, the "Second Lien Indenture") among Ambassadors, as issuer, certain of Ambassadors' Debtor and non-Debtor subsidiaries as guarantors (the "Prepetition Second Lien Guarantors" and, together with Ambassadors, the "Prepetition Second Lien Credit Parties") and Wilmington Trust FSB as collateral agent and trustee (in such capacities, the "Second Lien Trustee"). Whippoorwill is the beneficial owner of 88% of the Second Lien Notes (Sale Motion at ¶ 7).

9. As of the Petition Date, the Debtors are indebted to certain holders of the Second Lien Notes (the "Noteholders," and together with the Prepetition Lenders, the Prepetition Agent and the Second Lien Trustee, the "Prepetition Secured Parties") for approximately $19.7 million including accrued and unpaid interest. The Second Lien Notes are purportedly secured by substantially all of the assets of the Prepetition Second Lien Credit Parties and guaranteed by the Prepetition Second Lien Guarantors (together with collateral securing the Prepetition Working Capital Facility, the "Prepetition Collateral").

### C. The Chapter 11 Cases

10. On April 1, 2011 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

11. On the Petition Date, the Debtors filed the DIP Motion seeking authority to enter into the Amended and Restated Credit and Guaranty Agreement (Postpetition) (the "DIP Credit Agreement"), by and among each of Ambassadors, the Prepetition Working Capital Facility Borrowers as borrowers, Ambassadors and certain of its direct and indirect debtor and non-Debtor subsidiaries as guarantors, the lenders party thereto from time to time (the "DIP Lenders") and Law Debenture Trust Company of New York, as administrative agent and collateral agent (in such capacities, and including any successor administrative agent, the "DIP Agent"), which provides for borrowing under a multiple draw term loan facility (the "DIP Facility") in an interim amount of $5,000,000 (the "Interim New Money DIP Loans") and a final amount of (i) $10,000,000 less any amounts advanced under the Interim Order as Interim New Money DIP Loans, and (ii) a roll-up into the DIP Facility (the "Roll-Up") of all outstanding Prepetition Working Capital Facility Obligations. Based on the DIP Motion, the loan will be made by funds controlled by Whippoorwill (DIP Motion at ¶ 2).

12. On the Petition Date, the Debtors also filed the Sale Motion. The Sale Motion seeks authority to (i) sell substantially all of the Debtors' assets in a sale process pursuant to section 363 of the Bankruptcy Code and (ii) enter into an agreement with Whippoorwill, under which Whippoorwill will serve as a stalking horse bidder in the sale process and, subject to higher and better offers, will be the purchaser (through a newly created entity) of the Debtors' assets.

**ARGUMENT**

13.     For the reasons set forth herein, the Ad Hoc Committee objects to the DIP Motion and believes that certain changes must be made to the Interim Order (where applicable) to ensure the interests of the Debtors' estates, including its unsecured creditors, are not prejudiced through the current insider-driven sale process.

14.     Specifically, the milestone requirements contained in the DIP Credit Agreement do not provide sufficient time for the Ad Hoc Committee and/or a subsequently appointed Creditors' Committee to investigate properly the relationship of the parties to the DIP Credit Agreement as well as the value of the Debtors' assets or the proposed sale process for such assets.

15.     In particular, paragraph 17 of the Interim Order and section 5.16(b)(i) of the DIP Credit Agreement requires that with respect to a sale to the APA Purchaser, the Debtors will consummate and close an Approved Sale consistent with the Sale Order not later than forty-five (45) days after the Petition Date.

16.     In addition, sections 8.1(w), 8.1(x) and 8.1(c) of the DIP Credit Agreement, as incorporated into paragraph 17 of the Interim Order, provide, respectively, that an event of default occurs if an order approving the bidding procedures for the sale process is not entered within fifteen (15) days of the Petition Date, the Sale Order is not entered within forty (40) days of the Petition Date, or if the Approved Sale is not closed within forty-five (45) days of the Petition Date. Where the proposed Interim Order requires that a bidding procedures order be entered even before the Creditors' Committee can begin to investigate whether the sale timeline is reasonable, the Interim Order has the likely effect of pre-approving the sale procedures.

17. Effectively, the DIP Facility all but assures that this sale process will not allow for a meaningful market test or even merely the analysis of whether more time will aid the sale process. If the DIP Facility will be utilized to fund a sale process, then the funding must be sufficient for a true process. Without a process, the Debtors may as well simply surrender their assets to the senior secured creditors.

18. A 45-day marketing and sale process is inadequate, especially in light of the need to investigate several aspects of the Debtors' proposed sale process. For example, the Debtors' proposed sale process will result in Whippoorwill purchasing substantially all of the Debtors' assets through a credit bid. Whippoorwill is an owner of a significant amount of the Debtors' equity and is the sole lender under the Prepetition Working Capital Facility, which will be subject to the Roll-Up. Thus, the Ad Hoc Committee and/or a subsequently appointed Creditors' Committee should be allowed time to investigate Whippoorwill's insider status and level of control with respect to the Debtors in order to ensure that the proposed sale process is not merely an insider's attempt to take control of the Debtors' assets without filing of a chapter 11 plan or engaging in an appropriate plan process. *See Crown Vill. Farm, LLC v. ARL, L.L.C. (In re Crown Vill. Farm, LLC)*, 415 B.R. 86, 93 (Bankr. D. Del. 2009) (acknowledging that where the stalking horse is an insider the sale process is subject to close scrutiny).

19. This case presents a set of facts that warrant an appropriate review. Creditors are entitled to understand whether the proposed transaction is tainted in any way. To the extent that Whippoorwill seeks to credit bid its secured debt, the market needs to understand whether that debt is valid or whether, for example, some of it is subject to recharacterization as disguised equity.

20. As another example of a timeframe that appears unreasonable, paragraph 7 of the Interim Order provides that a Creditors' Committee, if appointed, and any other party-in-interest may challenge the liens of the Prepetition Secured Parties in and to the Prepetition Collateral of the Debtors, or the amount of the Prepetition Obligations within (i) forty-five (45) days from the date scheduled to appoint a Creditors' Committee, (ii) if a Creditors' Committee is not appointed, forty-five days after the Petition Date or (iii) such later date consented to by the Prepetition Agent and the Second Lien Trustee (the "<u>Challenge Period</u>"). However, because the sale is required to close within forty-five days of the Petition Date, the sale would need to be consummated before the Challenge Period expires. The timeline for the proposed sale should be extended so that the auction cannot occur until after a reasonable investigation of the Prepetition Secured Parties' liens and claims is completed.

21. In its current state, the accelerated sale process provided for in the DIP Motion appears to be a plan "sub rosa" that subverts the protections provided by Chapter 11 of the Bankruptcy Code and significantly harms the interests of the Debtors' unsecured creditors by selling substantially all of the Debtors' assets to Whippoorwill without filing a proper Chapter 11 plan and disclosure statement and without allowing for an adequate investigation into the proposed sale. *See In Re Decora Indus., Inv.*, 2002 U.S. Dist. LEXIS 27031, at *24 (D. Del. May 20, 2002) ("The focus of 'sub rosa' plan analysis is oriented toward those situations in which a debtor proposes to sell 'all,' or 'substantially all' of its assets without the benefit of a confirmed plan or a court-approved disclosure statement."). The Debtors should not be permitted to "short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan *sub rosa* in connection with the sale of assets." *In re*

*Braniff Airways, Inc.*, 700 F.2d 935, 940 (5th Cir. 1983); *see Decora Indus.*, 2002 U.S. Dist. LEXIS at *24.

22. In order to ensure a fair and competitive sale process, the Ad Hoc Committee, a subsequently appointed Creditors' Committee and the Debtors should be provided with adequate time to market thoroughly the assets so that any additional potential bidders for the Debtors' assets have sufficient time to assess and formulate their bids. Only then can the Debtors ensure that the offer being made by Whippoorwill is truly the highest and best offer for the Debtors' assets.

23. As drafted, the milestones proposed by the Debtors under the DIP Credit Agreement, as incorporated in the Interim Order, simply do not provide adequate time or protection of the unsecured creditors of these estates. Therefore, the Ad Hoc Committee objects to the DIP Motion on the basis that it unreasonably limits the Ad Hoc Committee's rights and threatens to diminish any potential recovery to unsecured creditors. The Interim Order should be modified to contemplate a timeline that allows for a true investigation of the liens and claims to be credit bid and a reasonable marketing process.

[concluded on the following page]

**WHEREFORE,** for all of the foregoing reasons, the Ad Hoc Committee respectfully requests that this Court enter an order denying the DIP Motion or modify the proposed interim order as recommended by the Ad Hoc Committee, and granting such additional relief as is just and proper.

Dated: April 4, 2011
Wilmington, Delaware

Respectfully submitted,

Anthony Princi, Esq.
Lorenzo Marinuzzi, Esq.
Stefan W. Engelhardt, Esq.
**MORRISON & FOERSTER LLP**
1290 Avenue of the Americas
New York, NY 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
aprinci@mofo.com
lmarinuzzi@mofo.com
sengelhardt@mofo.com

-and-

By: /s/ Matthew P. WArd
Francis A. Monaco, Jr., Esq. (No. 2078)
Matthew P. Ward, Esq. (No, 4471)
**Womble Carlyle Sandridge & Rice, PLLC**
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801
Telephone: (302) 252-4320
Facsimile: (302) 252-4330
fmonaco@wcsr.com
maward@wcsr.com

*Counsel to the Ad Hoc Committee*
*of Convertible Noteholders*