| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 11-11002 (KG) |
| **AMBASSADORS INTERNATIONAL, INC.,** *et al.*,[1] | Jointly Administered |
| | **Hearing Date: April 26, 2011 at 2:00 p.m. (EDT)** |
| Debtors. | **Objection Deadline: April 20, 2011 at 4:00 p.m. (EDT) (Extended for the Committee)** |
| | Re: Docket Nos. 11, 52 |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364 AND 507 AND RULES 2002, 4001 AND 9014 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (I) APPROVING POSTPETITION FINANCING AND REPAYMENT OF CERTAIN PREPETITION OBLIGATIONS, (II) AUTHORIZING USE OF CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY AND (VI) SCHEDULING A FINAL HEARING**

The Official Committee of Unsecured Creditors (the "**Committee**") of the above-captioned debtors and debtors in possession (collectively the "**Debtors**"), hereby objects (the "**Objection**") to the *Motion of the Debtors for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (I) Approving Postpetition Financing and Repayment of Certain Prepetition Obligations, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay and (VI) Scheduling a Final Hearing* (the "**DIP Motion**") [Docket No. 11]. In support of this Objection, the Committee respectfully states as follows:

---

[1]        The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Ambassadors International, Inc. (8605); Ambassadors Cruise Group, LLC (2448); Ambassadors, LLC (0860); EN Boat LLC (8982); AQ Boat, LLC (5018); MQ Boat, LLC (5095); DQ Boat, LLC (5064); QW Boat Company LLC (0658); Contessa Boat, LLC (9452); CQ Boat, LLC (9511); American West Steamboat Company LLC (0656); and Ambassadors International Cruise Group (USA), LLC (7304). The mailing address for each Debtor is 2101 4th Avenue, Suite 210, Seattle, WA 98121.

## PRELIMINARY STATEMENT

1.      As set forth more fully below, the Committee objects to the DIP Motion being granted on a final basis unless the following essential modifications are made:

- Whippoorwill, in its dual role as prepetition lender and postpetition lender, cannot receive postpetition liens on or superpriority administrative expense claims payable from any assets that were not subject to its prepetition liens, including unencumbered vessels, millions of dollars of cash deposits held by credit card processors, and avoidance power actions and the proceeds thereof;

- Whippoorwill is not entitled to findings of fact regarding the extent, validity, priority, perfection, or enforceability of any claims against or security interests in the assets of foreign non-Debtors, and the Committee disputes that this Court has jurisdiction to grant such relief;

- The Committee's right to seek to unwind the Roll-Up of prepetition debt into postpetition DIP obligations must be preserved (including the right to seek recharacterization and/or disgorgement of amounts paid on account of improperly converted prepetition debt); and

- The Committee's rights to investigate the estates' claims and causes of action against Whippoorwill must be fully preserved, with a right to seek disgorgement from Whippoorwill of any amounts improperly credit bid, to prevent the Committee's rights and fiduciary duties from being rendered moot by the expedited sale of the Debtors' assets to Whippoorwill.

2.      By the DIP Motion, the Debtors seek approval of a $19.575 million debtor-in-possession financing facility (the "**DIP Facility**"), with certain funds and accounts managed or advised by Whippoorwill Associates, Inc. (collectively, "**Whippoorwill**") as the lenders (in such capacity, the "**DIP Lender**"), consisting of: (i) a multiple draw term loan facility up to $10 million ($5 million on an interim basis) and (ii) a roll-up of the outstanding obligations under the

Debtors' Prepetition Working Capital Facility (defined below) in the amount of $9.575 million[2] from which no new liquidity will be made available to the Debtors. Although the Debtors may need postpetition financing to fund operations through the proposed Sale (as defined below), the terms of the DIP Facility are highly prejudicial to the general unsecured creditors of the Debtors' estates and reflect Whippoorwill's desire to exercise complete control over these proceedings.

3. It is evident that the DIP Facility was designed solely to enhance Whippoorwill's collateral position and guarantee the success of its "loan-to-own" strategy. Whippoorwill is no stranger to the Debtors: it is the sole lender under the Prepetition Working Capital Facility, the holder of 87.8% of the Second Lien Notes (defined below), a significant shareholder, the proposed DIP Lender, and the stalking horse bidder in connection with the pending sale of substantially all of the Debtors' assets. Whippoorwill is admittedly an "insider" of the Debtors as that term is defined by the Bankruptcy Code. Approval of the DIP Facility without significant modifications simply promotes the sale of the Debtors' assets to Whippoorwill while diminishing any prospect of a dividend to general unsecured creditors.

4. The Committee objects to various terms, conditions, and covenants of the proposed DIP Facility as they are burdensome and outcome-determinative of these cases. In particular, the Committee objects to the DIP Motion on the following grounds:

> Improper Roll-Up of Prepetition Debt - The Committee objects to the Roll-Up of Whippoorwill's prepetition debt into postpetition claims secured by previously unencumbered assets. The only reasons for the Roll-Up appear to be to (i) enhance Whippoorwill's collateral position; (ii) eliminate defects in its prepetition collateral position; (iii) generate additional fees and expenses for Whippoorwill; and (iv) eviscerate any chance of a chapter 11 plan that would provide a dividend to unsecured creditors. In the event this Court approves the Roll-Up over the Committee's objection, the Final DIP Order must grant the Debtors' estates the right to unwind the roll-up and provide that Whippoorwill will disgorge any principal, interest, fees, or

---

[2] In fact, the Roll-Up may exceed $9.575 million. See Interim DIP Order, ¶E(ii); 2(b). The Interim DIP Order provides that all Prepetition Working Capital Facility Obligations shall be deemed to become obligations under the DIP Facility. Prepetition Working Capital Facility Obligations includes the principal amount of $9.575 million plus accrued interest and costs and any fees and expenses due and owing. The DIP Facility is governed by that certain *Amended and Restated Credit and Guaranty Agreement (Post-Petition)* annexed to the Interim DIP Order as Exhibit A (the "**DIP Credit Agreement**").

expenses paid with respect to the roll-up if any portion of the liens securing the Prepetition Working Capital Facility are subsequently avoided.

<u>Improper Enhancement of Lien Position</u> - The Committee objects to the granting of postpetition liens to Whippoorwill on previously unencumbered assets (including, but not limited to, the Delta Queen vessel, prepetition cash deposits such as the $2.5 million on deposit with American Express, and avoidance actions and the proceeds thereof).

<u>Section 506(c) Waiver</u> - The Committee objects to the waiver of the right to surcharge for the cost and expenses associated with the preservation and disposition of Whippoorwill's prepetition collateral.

<u>Unwarranted Adequate Protection</u> - The Committee objects to the various forms of adequate protection, including the allowed, superpriority administrative expense claim, replacement liens, and monthly payments of interest, fees, and other amounts due under the Prepetition Working Capital Facility and the Second Lien Notes. Absent a showing of actual postpetition diminution in the value of the prepetition collateral, Whippoorwill is not entitled to this panoply of adequate protection, particularly because Whippoorwill is both the DIP Lender and the prepetition lender being primed. Moreover, the Final DIP Order should make clear that any adequate protection remains subject to recharacterization or disgorgement in the event any of the underlying prepetition liens are avoided or found to be undersecured.

<u>Undue Restrictions on the Committee's Investigation Rights</u> - The Committee objects to any attempt to impair its fiduciary obligation to conduct an investigation into the prepetition lenders' alleged liens and security interests.

<u>Unrealistic Sale Milestones</u> - The Committee objects to the expedited sale process and unreasonable sale milestones that define events of default under the DIP Facility. The milestones are overly aggressive and virtually eliminate the potential to increase the value realized in the sale of the Debtors' assets through a competitive bidding process.

<u>Improper Automatic Stay Relief</u> – Whippoorwill should not automatically be granted relief from the automatic stay upon an Event of Default. Whippoorwill should instead be required to file a motion seeking relief from the automatic stay, on no less than 5 business days' written notice to the Debtors, the United States Trustee, and the Committee.

<u>Waiver of Equitable Remedies of Marshaling</u> - The Committee objects to the Whippoorwill's attempt to deprive the Debtors (or the Committee) of the right to seek to marshal its collateral and such equitable remedies should not be waived.

# BACKGROUND

**A.    Procedural Background**

5.      On April 1, 2011 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").

6.      On April 11, 2011, the Office of the United States Trustee appointed the Committee pursuant to § 1102(a)(1) of the Bankruptcy Code.  On or about April 13, 2011, the Committee retained Lowenstein Sandler PC to serve as its lead counsel and Bifferato Gentilotti LLC to serve as its Delaware co-counsel.

7.      No trustee or examiner has been appointed in the Debtors' bankruptcy cases.

8.      The Debtors have not yet filed their Schedules of Assets and Liabilities or their Statements of Financial Affairs (collectively, the "**Schedules**").  In fact, the Debtors have filed a motion[3] seeking to extend the time to file their Schedules through and including May 16, 2011— just three days before the hearing on the Sale to Whippoorwill.  See Docket No. 64.

**B.    The Debtors' Prepetition Secured Debt Structure**

9.      On or about March 23, 2010, Ambassadors International Inc. ("**Ambassadors**") and three non-Debtor entities entered into a $5 million revolving credit facility (the "**Prepetition Revolver**") and a $10 million term loan facility (the "**Prepetition Term Loan**" and, together with the Prepetition Revolver, the "**Prepetition Working Capital Facility**") with certain funds and accounts managed by Whippoorwill, as lenders.[4]  According to the Debtors, as of the Petition Date, approximately $9.6 million was outstanding under the Prepetition Term Loan and

---

[3]  A hearing on the motion to extend the Debtors' deadline to file their Schedules is presently scheduled for April 26, 2011.

[4]      The Prepetition Working Capital Facility is evidenced by the Credit and Guaranty Agreement by and among Degrees Limited, Wind Spirit Limited, and Wind Star Limited as borrowers (none of which are Debtors before this Court), Ambassadors International, Inc. as parent, the subsidiaries of Ambassadors party as guarantors, certain funds and accounts managed by Whippoorwill Associates, Inc. as lenders and Law Debenture Trust Company of New York, as administrative agent and collateral agent.

no amounts were outstanding under the Prepetition Revolver.[5]  The Prepetition Working Capital Facility matures in January 2012.

10.  Borrowings under the Prepetition Working Capital Facility are allegedly secured, with certain undisclosed exceptions, on a first-priority basis by substantially all of the assets of Ambassadors and its subsidiaries and guaranteed by each of Ambassadors' wholly owned U.S. and foreign subsidiaries as of the Petition Date (other than those subsidiaries that are borrowers).

11.  In connection with the consummation of an exchange offer relating to Ambassadors' unsecured convertible notes, on or about November 13, 2009, Ambassadors issued approximately $18 million of 10% Senior Secured Notes due 2012 (the "**Second Lien Notes**") pursuant to an Indenture dated as of November 13, 2009 by and among Ambassadors, as issuer, the subsidiaries of Ambassadors party thereto as guarantors, and Wilmington Trust FSB as Trustee.  The Second Lien Notes are allegedly secured by second-priority liens (collectively with the alleged liens securing the Prepetition Working Capital Facility, the "**Prepetition Liens**") on substantially all of the assets of Ambassadors and its subsidiaries that secure the Prepetition Working Capital Facility.  Pursuant to an Intercreditor Agreement dated as of March 23, 2010, the liens securing the Second Lien Notes are second in priority to the liens securing the Prepetition Working Capital Facility.  The Second Lien Notes mature on January 15, 2012.

12.  As of the Petition Date, the Debtors maintained several valuable assets that were unencumbered.   The Delta Queen vessel is currently leased under a bareboat charter agreement pursuant to which the lessee operates a fixed location boutique hotel, restaurant, and bar.  _See Declaration of Mark Detillion in Support of the Chapter 11 Petitions and First Day Motions_ [Docket No. 12].  Moreover, Christopher Shepard of Imperial Capital, LLC testified at the April 15, 2011 hearing on the Bid Procedures Motion (defined below) that the Delta Queen vessel alone had an estimated value in the range of $1.5 million to $4 million and was unencumbered. There was additional testimony at the April 15, 2011 hearing that the Debtors' credit card

---

[5]  The DIP Facility effectively terminates Whippoorwill's commitments under the Prepetition Revolver going forward.

processors currently hold over $9 million of the Debtors' cash as security against potential chargebacks, and that American Express holds a $2.5 million cash deposit.

13.    According to an appraisal performed at the Debtors' request on August 31, 2009, the three vessels comprising the core of the Debtors' business (the Wind Surf, the Wind Spirit, and the Wind Star, each owned by a Bahamian non-Debtor indirect subsidiary of the Debtors) have a combined fair market value of $60.8 million, arguably providing Whippoorwill with a substantial equity cushion.

**C.    The DIP Facility and Interim DIP Order**

14.    As set forth in the DIP Motion, Ambassadors and three non-Debtor entities intend to borrow up to $10 million from Whippoorwill pursuant to a multiple draw term loan facility ($5 million on an interim basis) in addition to a roll-up of $9.575 million of prepetition borrowings outstanding under the Prepetition Working Capital Facility (the "**Roll-Up**").    In connection with the DIP Facility, Whippoorwill will terminate its commitment under the Prepetition Revolver.    Thus, of the $10 million of "new" money provided under the DIP Facility, $5 million appears to be refinancing the Prepetition Revolver.

15.    Also, it is noteworthy that the need for the DIP Facility is largely due to holdbacks by the Debtors' credit card companies in excess of $9 million—cash that will ultimately be released to the Debtors or their successors if operations continue.

16.    On April 5, 2011, the Court conducted "first day" hearings and entered certain orders affording the Debtors various forms of interim relief.    Among other things, the Court entered an order approving the DIP Motion on an interim basis (the "**Interim DIP Order**") [Docket No. 52] and authorized the Debtors to borrow up to $5 million in postpetition financing.

17.    A final hearing on the DIP Motion is currently scheduled for April 26, 2011 at 2:00 p.m. (Eastern).

**D.     Proposed Sale Process**

18.     Contemporaneously with the filing of the DIP Motion, the Debtors filed the *Motion of the Debtors for Entry of Orders (I) Approving Bidding Procedures for the Sale of Certain of the Debtors' Assets Free and Clear of All Liens, Claims and Encumbrances; (II) Approving the Form and Manner of Notice of the Sale and Assumption and Assignment of Executory Contracts and Unexpired Leases; (III) Scheduling an Auction and Sale Hearing; (IV) Approving Such Sale; and (V) Dismissing the Chapter 11 Bankruptcy Case of Ambassadors International Cruise Group (USA), LLC* (the "**Bid Procedures Motion**") [Docket No. 17], seeking approval of procedures (the "**Bid Procedures**") for a proposed sale (the "**Sale**") of substantially all of their assets.  Whippoorwill is the proposed stalking horse bidder.  On April 15, 2011, the Court held a contested hearing on the Bid Procedures Motion.  Following a telephonic continuation of that hearing on April 19, 2011, the Court approved the Bid Procedures.  See Docket No. 115.

<u>**JURISDICTION AND VENUE**</u>

19.     This Court has jurisdiction to consider this Objection pursuant to 28 U.S.C. §§ 1334 and 157(b).  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**OBJECTION**

**I.      THE DIP FACILITY DOES NOT COMPORT WITH GENERAL STANDARDS FOR APPROVAL OF POSTPETITION FINANCING.**

20.     In order to obtain postpetition financing under section 364(d) of the Bankruptcy Code, a debtor bears the burden of proving that (i) it is unable to obtain unsecured credit; (ii) the proposed credit is necessary to preserve the assets of the estate; and (iii) the terms of the financing are fair, reasonable and adequate.  <u>In re Ames Dept. Stores, Inc.</u>, 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990); <u>In re Crouse Group, Inc.</u>, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (holding that proposed financing should be beneficial and reasonable).  Approval of debtor-in-

possession financing is only appropriate if such financing "is in the best interest of creditors generally." In re Roblin Indus., Inc., 52 B.R. 241, 244 (Bankr. W.D.N.Y. 1985).

21.     Courts routinely recognize that "[d]ebtors in possession generally enjoy little negotiating power with a proposed lender, particularly when the lender has a prepetition lien on cash collateral." In re Defender Drug Stores, Inc., 145 B.R. 312, 317 (B.A.P. 9th Cir. 1992). As a result, courts are cautious not to approve postpetition financing terms that are considered harmful to the estate and its creditors. See, e.g., Ames Dep't Stores, 115 B.R. at 40 ("the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest"); In re FXC, Inc., 54 B.R. 833, 838 (Bankr. E.D.N.C. 1985) (stating that "the court should not ignore the basic injustice of an agreement in which the debtor, acting out of desperation, has compromised the rights of unsecured creditors").

22.     While certain favorable terms may be permitted as a reasonable exercise of a debtor's business judgment, bankruptcy courts have not approved postpetition financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the sole benefit of the lender. See In re Tenney Vill. Co., Inc., 104 B.R. 562, 568 (Bankr. D.N.H. 1989) (debtor in possession financing terms must not "pervert the reorganizational process from one designed to accommodate all classes of creditors and equity interests to one specially crafted for the benefit" of the secured creditor.); In re Aqua Assocs., 123 B.R. 192, 195-98 (Bankr. E.D. Pa. 1991) ("credit should not be approved when it is sought for the primary benefit of a party other than the debtor."). Courts reviewing postpetition financing "focus[] their attention on proposed terms that would tilt the conduct of the bankruptcy case [or] prejudice, at an early stage, the powers and rights that the Bankruptcy Code confers for the benefit of all creditors[.]" Ames Dep't Stores, 115 B.R at 37; see also Tenney Vill., 104 B.R. at 568 (denying postpetition financing because it incorporated overreaching terms).

23.     The Committee questions whether the DIP Facility is in the best interests of the Debtors given that certain provisions appear to unjustifiably benefit Whippoorwill at the expense of the Debtors' estates and their unsecured creditors, prejudice the rights and powers conferred on the Committee, and afford Whippoorwill undue control.

**A.     The Roll-Up Must Not Be Approved.**

24.     Through the Roll-Up, the Debtors propose to convert their obligations to Whippoorwill under the Prepetition Working Capital Facility into postpetition secured debt that enjoys superpriority administrative expense status and is secured by assets (such as the Delta Queen vessel, cash deposits and holdbacks held by credit card processors, and avoidance actions and the proceeds thereof) that, upon information and belief, were not previously encumbered. There is no justification for the Roll-Up.

25.     Courts are reluctant to approve financing agreements that propose to convert prepetition debt into postpetition obligations, and raise concerns that such provisions are extraordinary.  See L.B.R. 4001-2(a)(i)(E)[6]; see also In re Verasun, Case No. 08-12606 (BLS), (Bankr. D. Del. Dec. 3, 2008) Transcript at 32:20-25 (Judge Shannon noting that the Bankruptcy Court of the District of Delaware, the Southern District of New York, and other courts, have found that "roll-ups are not favored.  They are strongly discouraged on day one, and the bottom line is that for approval a substantial showing has to be made . . . .").

26.     One reason courts discourage roll-ups is that this form of cross-collateralization and the associated granting of a superpriority administrative claim improperly circumvent the Bankruptcy Code's priorities and distribution framework.  See In re Saybrook Mfg. Co., Inc., 963 F.2d 1490, 1494-96 (11th Cir. 1992) (cross-collateralization is inconsistent with bankruptcy law because (a) it is not authorized as a means of postpetition financing, and (b) it is directly contrary to the fundamental priority scheme of the Bankruptcy Code); Official Comm. of Unsecured

---

[6]     The rationale for highlighting such a provision is evident: the approval of a roll-up results in the conversion of prepetition secured debt that could be satisfied in any number of ways pursuant to a confirmed chapter 11 plan to postpetition secured debt entitled to administrative priority that must be repaid in full, in cash, absent the consent of the lender.  See 11 U.S.C. §1129(a)(9).

Creditors of New World Pasta Co. v. New World Pasta Co., 322 B.R. 560, 569 n.4 (M.D. Pa. 2005) (noting that roll-up provisions "have the effect of improving the priority of a prepetition creditor"); Tenney Vill., 104 B.R. at 570 (holding that Section 364 of the Bankruptcy Code does not authorize the granting of administrative expense priority for prepetition debt).

27.     In this case, the Roll-Up is objectionable because it permits the obligations under the Prepetition Working Capital Facility to be deemed a fully secured allowed claim outside the scope of the Committee's lien investigation.   Furthermore, the Roll-Up impermissibly enables Whippoorwill to encumber previously unencumbered assets (such as the Delta Queen vessel) and effectively sanitizes Whippoorwill's prepetition collateral by replacing prepetition liens subject to the Committee's challenge with postpetition liens approved by this Court.   For this reason alone, the Committee submits that the Roll-Up should not be permitted.

28.     In the event the Court approves the Roll-Up over the Committee's objection, proper safeguards must be put in place to ensure that, in the event the Committee or another party in interest avoids any of the Prepetition Liens (or a determination is made that such liens were undersecured), an adequate remedy is available to ensure that the Roll-Up does not provide Whippoorwill a windfall at the expense of the Debtors' general unsecured creditors.   Language must be added to the Final DIP Order to ensure that (i) the estates (and the Committee) can unwind the Roll-Up and (ii) Whippoorwill will disgorge any principal, interest, fees, or expenses paid on account of the Roll-Up in the event this Court subsequently determines that the Roll-Up was prejudicial to the estates.   The Committee submits that language similar to the language set forth in Local Bankruptcy Rule 4001-2(k)(3) for the United States Bankruptcy Court for the Southern District of New York is warranted.[7]

---

[7]     S.D.N.Y. L.B.R. 4001-2(k)(3) provides in pertinent part: A proposed order approving cross-collateralization or a rollup shall include language that reserves the right of the Court to unwind, after notice and hearing, the postpetition protection provided to the prepetition lender or the paydown of the prepetition debt, whichever is applicable, in the event that there is a timely and successful challenge to the validity, enforceability, extent, perfection, or priority of the prepetition lender's claims or liens, or a determination that the prepetition debt was undersecured as of the petition date, and the cross-collateralization or rollup unduly advantaged the lender.

**B.    The DIP Facility Improperly Expands Whippoorwill's Collateral Package**

29.     The Debtors have agreed to provide Whippoorwill, as collateral for the DIP Facility, with (i) postpetition security interests in and liens on all of the Debtors' assets (the "**DIP Collateral**"), including a perfected first-priority lien on any and all collateral unencumbered as of the Petition Date (including the Delta Queen vessel, cash deposits, and avoidance actions and the proceeds thereof); (ii) priming first-priority liens on the DIP Collateral that is subject to the Prepetition Liens; (iii) perfected junior liens upon certain of the Debtors' assets encumbered by certain other prepetition liens; and (iv) superpriority administrative expense claims for all of the obligations under the DIP Facility (the "**DIP Superpriority Claim**").[8] See Interim DIP Order at ¶ 2(d), (f), (h), (j).

30.     Unencumbered assets that existed as of the Petition Date, such as the Delta Queen vessel, cash deposits and holdbacks, and avoidance actions and the proceeds thereof, may be the only source of recovery for general unsecured creditors.  Permitting the Debtors to simply give that value to Whippoorwill at this early stage of these cases is unnecessary and unjustifiable. The Debtors should not permit an undue amount of value to shift to Whippoorwill at the expense of unsecured creditors in exchange for the DIP Facility.  Whippoorwill is improperly grabbing unencumbered collateral to which it had no prepetition rights, and usurping value that belongs to the Debtors' unsecured creditors.

31.     The Interim DIP Order further provides that the DIP Superpriority Claim shall be payable from all prepetition and postpetition property of the Debtors.  See Interim DIP Order at ¶ 2(j).  The Committee submits that it is wholly inappropriate for Whippoorwill to satisfy the DIP Superpriority Claim with postpetition unencumbered assets and the proceeds of avoidance actions, given that Whippoorwill's objective appears to be to fund this case through the Sale and leave behind an empty shell.

---

[8]       In addition certain non-Debtor credit parties, which own the assets underlying the Debtors' business, would also grant first-priority liens on their assets for the benefit of Whippoorwill to secure borrowings under the DIP Facility.

32.     The Debtors propose to afford Whippoorwill, as DIP Lender, a perfected first-priority lien on all avoidance actions and any proceeds thereof.  See Interim DIP Order, ¶ 2(d)(i). Whippoorwill's postpetition liens and security interests should not include avoidance actions or the proceeds thereof.  Bankruptcy courts customarily restrict the ability of debtors in possession to pledge avoidance power actions as security.  See, e.g., Official Comm. of Unsecured Creditors v. Goold Electronics Corp. (In re Goold Electronics Corp.), 1993 WL 408366, *3-4 (N.D. Ill., Sept. 22, 1993) (vacating DIP financing order to the extent that the order granted the lender a security interest in the debtor's preference actions).  There simply is no basis for granting Whippoorwill a lien on avoidance actions and the proceeds thereof, and the Debtors have failed to set forth grounds justifying this extraordinary provision.  See L.B.R. 4001-2(a)(i)(D).  The Final DIP Order must make clear that avoidance actions and any proceeds from avoidance actions are expressly excluded from Whippoorwill's postpetition liens and superpriority administrative claims.

33.     Furthermore, it is inappropriate to secure the Roll-Up and other prepetition debt with liens on avoidance actions and the proceeds thereof.  Section 552(a) of the Bankruptcy Code specifically prohibits property acquired after the commencement of a bankruptcy case from being subjected to a lien securing prepetition debt.  See Barber v. McCord Auto Supply (In re Pearson Indus. Inc.), 178 B.R. 753, 764-65 (Bankr. C.D. Ill. 1995); In re Ludford Fruit Prods. Inc., 99 B.R. 18, 24-25 (Bankr. C.D. Cal. 1989).  It is well established that any avoidance action comes into existence only after the filing of a bankruptcy petition.  Therefore, securing prepetition debt through a lien on after-acquired property contravenes section 552(a) through the artifice of the Roll-Up.

34.     The Committee further objects to the definition of Avoidance Actions in the DIP Facility.  The DIP Credit Agreement and the Interim DIP Order contain differing definitions. See DIP Credit Agreement § 1.1; Interim DIP Order ¶¶ 2(d)(i).  The definition contained in the DIP Credit Agreement, "causes of action under Chapter 5 of the Bankruptcy Code," would grant Whippoorwill a lien against *any* chapter 5 causes of action that the estates may have, including

claims against Whippoorwill, such as causes of action for equitable subordination under section 510 and fraudulent conveyances under section 548 of the Bankruptcy Code. While Whippoorwill undoubtedly intended to obtain this type of control and advantage through broad definition of "Avoidance Actions," granting Whippoorwill such broad leverage over the Debtors' estates is improper.

        **C.**      **The Proposed Adequate Protection is Excessive**

35.     The DIP Facility provides various forms of adequate protection to Whippoorwill[9] as the sole lender under the Prepetition Working Capital Facility and as holder of substantially all of the Second Lien Notes. <u>See</u> Interim DIP Order, ¶ 4. The Committee submits that the adequate protection set forth in the Interim DIP Order (collectively, the "**<u>Adequate</u> <u>Protection</u>**") is unduly broad and must be limited as follows. First, Whippoorwill should only be entitled to postpetition replacement liens in the DIP Collateral in the same nature, extent, and validity that Whippoorwill held in the prepetition collateral. Second, Whippoorwill should only be entitled to superpriority claims against the estates to the extent of any proven, actual diminution in the value of its prepetition collateral. Third, Whippoorwill should only be entitled to payment of postpetition interest and fees in connection with the Prepetition Working Capital Facility upon a demonstration that it is oversecured. Any payment of postpetition interest or fees as adequate protection must remain subject to recharacterization and/or disgorgement to the extent the underlying liens are avoided or found to be undersecured. Finally, any cash payment for fees, costs, and expenses including legal and other professionals' fees and expenses should be subject to Committee review for reasonableness.

36.     The Adequate Protection must be limited to that which is necessary to protect Whippoorwill against diminution in the value of its prepetition collateral. The purpose of adequate protection is to protect the value of a secured lender's bargained-for property interest in its prepetition collateral. <u>In re Swedeland Dev. Group, Inc.</u>, 16 F.3d 552, 564 (3d Cir. 1994)

---

[9]     To the extent that any trustee or agent would receive payments of adequate protection for the benefit of Whippoorwill, references to Whippoorwill in this subsection include such trustee or agent.

("[T]he whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.")  Adequate protection is intended to *preserve* a secured creditor's proprietary interest following the commencement of a bankruptcy case, not to *enhance* that creditor's position.

### D.     Proposed Fees and Interest Rate Charged by Whippoorwill are Excessive

37.     Whippoorwill is entitled to a $200,000 "Commitment Fee" under the DIP Facility. This fee represents just 2% of the $10 million of new money Whippoorwill may lend under the DIP Facility.  However, the Debtors have proposed a timeline for the Sale such that the DIP Facility will be repaid in approximately 46 days.  Even assuming the DIP Facility was fully drawn on the Petition Date, this represents an incremental annualized borrowing cost of 15.9% — in addition to the 12% interest rate.  Such a fee is unreasonable and unnecessary under the circumstances of the Debtors' cases.  This is not a situation where a fee is necessary to induce a disinterested postpetition lender to extend postpetition credit.  Whippoorwill has a compelling incentive extend the DIP Facility: to protect its preexisting debt and equity investments and solidify its bidding position in the Sale.  Such an incentive exists without the need for any additional fees.  Whippoorwill is not entitled to pay itself sizable fees at unsecured creditors' expense, for lending money to protect its own investments.

38.     The DIP Facility further obligates the Debtors to pay "[a]gents such other fees in the amounts and at times separately agreed upon." <u>See</u> DIP Facility, § 2.11(b).  The DIP Credit Agreement should disclose all fees anticipated to be paid to the agents and former agents, and any Final DIP Order should provide that such fees are subject to recharacterization and/or disgorgement.

### E.     The DIP Facility Effectively Cedes Control of These Cases to Whippoorwill

39.     The Committee objects to the any provision in the Interim DIP Order that ties the expedited Sale process and unreasonable Sale milestones to defaults under the DIP Facility. The milestones are overly aggressive and virtually eliminate any potential to increase the value realized from the Debtors' assets through a competitive bidding process.

40.     By way of example, an Event of Default will occur if (i) an order approving the Sale is not entered within 40 days of the Petition Date; (ii) the Debtors have not consummated and closed the approved Sale to Whippoorwill within 45 days after the Petition Date; or (iii) the Debtors have not consummated and closed a Sale to a party (other than Whippoorwill) within 50 days of the Petition Date.  These milestones are not justified and are designed solely to give Whippoorwill total control over the Debtors' cases.  The deadlines are extremely short and devoid of any realistic mechanisms to effect any necessary extensions and will ultimately lead to a fire sale of the Debtors' assets to—and for the exclusive benefit of—Whippoorwill.  The proposed milestones raise the question of whether the DIP Facility was truly negotiated at arm's length between the Debtors and Whippoorwill.  See In re EDC Holding Co., 676 F.2d 945, 948 (7th Cir. 1982) ("[w]here it is evident from the loan agreement itself that the transaction has an intended effect that is improper under the Bankruptcy Code," credit is not being extended in good faith).

## II.     CERTAIN PROVISIONS OF THE DIP FACILITY PROHIBIT THE COMMITTEE FROM FULFILLING ITS FIDUCIARY DUTIES.

### A.     Lien Review Period is Inadequate

41.     The Interim DIP Order provides the Committee with 45 days from the date first scheduled by the U.S. Trustee to appoint the Committee, to review the nature, extent, and priority of the liens securing the Prepetition Working Capital Facility and the Second Lien Notes, and to commence an adversary proceeding (a) challenging the prepetition liens or (b) asserting any other causes of action (the "**Lien Investigation Period**").  See Interim DIP Order ¶ 7.  The 45-day period does not provide a sufficient opportunity for the Committee and its professionals to ascertain whether the prepetition liens are valid and/or properly perfected.  In addition, the Debtors have not set forth any justification for this extraordinary provision.  See L.B.R. 4001-2(a)(i)(B).  The short Lien Investigation Period serves only to further Whippoorwill's self-serving objective: selling the Debtors' assets to itself before the Committee has any opportunity to review the Prepetition Liens and assert any potential claims against Whippoorwill.

42.     The Lien Investigation Period currently expires _after_ the Committee's deadline to object to the Sale.  Until the Committee has concluded its investigation, or Whippoorwill has established the validity of its alleged prepetition liens, the Final DIP Order should not afford Whippoorwill the unassailable privilege of credit bidding.  If Whippoorwill is permitted to credit bid in the Sale, the Final DIP Order _must_ protect the Committee's right to challenge the Prepetition Liens after the Sale closes, and to seek disgorgement in cash of any value obtained by Whippoorwill through a credit bid of claims that were not secured by valid and perfected prepetition liens.  The Final DIP Order must safeguard the Committee's ability to fulfill its fiduciary duties.

43.     Given the complexity of the Debtors' prepetition capital structure, their myriad prepetition collateral pledges to Whippoorwill in its various roles, the presence of foreign non-debtor entities with collateral located in foreign jurisdictions and the interplay of maritime law, all of which must be fully analyzed by the Committee, it is unreasonable to expect the Committee's investigation to be completed by the deadline proposed in the Interim DIP Order.

44.     The Debtors are seeking a ruling from this Court that Whippoorwill's alleged liens and claims against assets of foreign non-Debtor entities are valid and enforceable.  See Interim DIP Order at ¶¶ E(iii) ("Prepetition Secured Credit Parties" includes non-Debtor subsidiaries), E(v) ("Prepetition Collateral" includes "substantially all assets of such Prepetition Secured Credit Parties"), E(vi), (vii), (viii) (findings of fact regarding the priority and enforceability of prepetition liens and enforceability of prepetition obligations).  The non-Debtor subsidiaries are not before this Court, and the Committee disputes the Debtors' implicit assertion that this Court has jurisdiction to grant such extraordinary relief.

45.     Moreover, the Debtors have not yet filed their Schedules, and the Debtors have sought an extension of time to file these documents.  The Committee thus has no way of knowing the true extent of the Debtors' assets at this juncture.  It is clearly unreasonable to expect that the Committee will be in a position to fully review and analyze the nature, extent, and

validity of the Prepetition Liens within 45 days of its appointment and with even less time to determine whether Whippoorwill is entitled to credit bid.

46.     Additionally, the Committee objects to paragraph 7 of the Interim DIP Order on the following three grounds.  First, the Committee's right to assert or prosecute any and all claims, causes of action, and objections against Whippoorwill—other than a challenge to the extent, validity, priority, or perfection of Whippoorwill's alleged prepetition liens and claims—should not be restricted at all and should be deleted from paragraph 7 of the Interim DIP Order and any parallel provision in the Final DIP Order.  Second, the Final DIP Order should expressly grant the Committee standing to challenge the Prepetition Liens or bring other claims and causes of action against Whippoorwill and any other prepetition lender without the need to file a motion for standing at a later date.[10]  Third, the Final DIP Order should expressly permit extension of the Lien Investigation Period (i) by consent of the Committee and Whippoorwill, without further order of the Court, or (ii) upon motion by the Committee for cause if such consent is withheld, provided that the filing of such a motion by the Committee before the expiration of the Lien Investigation Period shall serve to automatically extend the Lien Investigation Period until such time as the Court may hear the motion.

**B.     Unreasonably Low Cap on the Committee's Lien Investigation Expenses**

47.     The Interim DIP Order attempts to curtail the Committee's ability to investigate Whippoorwill's prepetition liens and security interests by imposing a $25,000 expense cap on the Committee's lien investigation efforts (the "**Lien Investigation Cap**").  Given the complexity of the Debtors' capital structure, and Whippoorwill's pervasive presence through the capital structure, this limitation is inappropriate and would preclude the Committee from doing much more than obtaining UCC filing searches on the Debtors—much less investigating the extent, validity, priority, and perfection of Whippoorwill's purported prepetition liens and security

---

[10]     Courts have routinely approved DIP financing agreements that grant standing to the creditors' committee without the need for a standing motion.  See, e.g., In re American Safety Razor, LLC, Case No. 10-12351 (Bankr. D. Del. Aug. 27, 2010); In re PCAA Parent LLC, Case No. 10-10250 (Bankr. D. Del. Mar. 2, 2010); In re Pliant Corp., Case No. 09-10443 (Bankr. D. Del. Mar. 20, 2009).

interests. The Committee's lien investigation is further complicated by virtue of the fact that the bulk of the Debtors' value lies in assets held by foreign non-Debtor entities. Any Final DIP Order should eliminate the Lien Investigation Cap to ensure the Committee's ability to satisfy its fiduciary obligations to creditors by conducting a full and fair review of Whippoorwill's alleged prepetition liens and claims.

## III. ADDITIONAL CONCERNS WITH PROVISIONS IN THE DIP FACILITY

### A. Expedited Discovery Requested from Whippoorwill

48. The Final DIP Order should compel Whippoorwill and the Debtors to comply with the Committee's discovery requests on an expedited basis to ensure that the Committee has sufficient information to conduct a thorough investigation into Whippoorwill's prepetition and postpetition conduct and the nature extent and validity of Whippoorwill's prepetition liens prior to the proposed Sale and expiration of the Lien Investigation Period.

### B. Prohibition of Marshalling Should be Stricken.

49. Paragraph 20(e) of the Interim DIP Order provides that "[n]either the DIP Secured Parties nor the Prepetition Secured Parties shall be subject to the equitable doctrine of 'marshaling' or any other similar doctrine with respect to any of the DIP Collateral or Prepetition Collateral, as applicable." Marshaling requires a secured creditor to first seek recovery from assets against which other creditors, here the unsecured creditors, do not have a claim (*i.e.*, non-debtor assets) before looking to common assets. See In re Advanced Marketing Servs., Inc., 360 B.R. 421, 427 n.8 (Bankr. D. Del. 2007) ("[Marshaling] requires the senior secured creditor to first collect its debt against the collateral other than that in which the junior secured creditor holds an interest, thereby leaving that collateral for the junior secured creditor's benefit.") (citation omitted). To the extent it may be appropriate for the Bankruptcy Court to apply the equitable doctrine of "marshaling," the Court's equitable power to invoke the "marshaling" doctrine cannot be negotiated away and must remain intact. Any language in the Final DIP Order infringing upon the Court's power to apply doctrines such as "marshaling" or any other similar equitable doctrines should be stricken.

### C.     Section 506(c) Surcharge Rights Should Not be Waived

50.     The Interim DIP Order provide for a waiver of the Debtors' rights under section 506(c) of the Bankruptcy Code to surcharge the collateral for any costs and expenses of administration in these cases.  <u>See</u> Interim DIP Order at ¶ 20.  Section 506(c) of the Bankruptcy Code permits administrative expense claimants providing postpetition unsecured credit to surcharge lenders' collateral if that funding increased the value of the collateral.  Waiver of surcharge rights serves no purpose other than to eliminate a potential avenue of recovery for the Debtors' estates by ensuring that the costs of the Debtors' restructuring will be borne by the unsecured creditors alone—even if the unsecured creditors receive no value.

51.     Courts routinely reject attempted waivers of surcharge rights under section 506(c).  <u>In re Visual Indus., Inc.</u>, 57 F.3d 321, 325 (3d Cir. 1995) ("[Section] 506(c) is designed to prevent a windfall to the secured creditor . . . .  The rule understandably shifts to the secured party . . . the costs of preserving or disposing of the secured party's collateral, which costs might otherwise be paid from the unencumbered assets of the bankruptcy estate  . . . .") (internal citation omitted); <u>Kivitz v. CIT Group/Sales Fin., Inc.</u>, 272 B.R. 332, 334 (D. Md. 2000) (a secured party, and not other creditors, must bear the cost of preserving or disposing of its own collateral.); <u>see also</u> <u>In re Motor Coach Indus. Intl, Inc.</u>, Case No. 08-12136 (Bankr. D. Del. Oct. 22, 2008) (Final Order Authorizing Debtors to Obtain Postpetition Financing) (Docket No. 244) (removing a section 506(c) waiver from the final postpetition financing order after the creditors' committee objected to its inclusion).  A provision should be included in the Final DIP Order stating that the Debtors' estates retain their rights under section 506(c) of the Bankruptcy Code.

### D.     "Equities of the Case" Waiver Is Inappropriate.

52.     The Committee objects to paragraph 20(f) of the Interim DIP Order and any parallel provision in the Final DIP Order, which provides that "the 'equities of the case' exception [to section 552(b)] shall not apply with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral or the DIP Collateral." Section 552(b) of the Bankruptcy Code provides that if a debtor enters into a security agreement prepetition that covers proceeds,

products, offspring or profits of the collateral, such terms of the security agreement and applicable nonbankruptcy law will be enforced against proceeds, products, offspring or profits acquired postpetition, unless, based on the equities of the case, the court orders otherwise. See 11 U.S.C. § 552(b). Here the equities of the case may dictate that Whippoorwill should not be able to enforce its prepetition security agreement against postpetition proceeds, products, offspring or profits.

### E. Other Proposed Modifications

53. The Committee further objects to a number of other provisions of the DIP Facility including, without limitation, the following:

(a) Committee Access to Information. The Committee's professionals must receive all information, reports and documents that are provided to Whippoorwill as the DIP Lender. The Committee should be provided the same access to the Debtors' books, records, financial information and facilities as is granted to the agents under the DIP Facility.

(b) Fees. Under Paragraph 2(a) of the Interim DIP Order, the Debtors are authorized and directed to pay the principal, interest, fees, expenses, indemnities and other amounts described in the DIP Facility, including, commitment fees and reasonable professional fees without court approval. While the Committee is granted the right to review the fees for reasonableness, the Committee requests the opportunity to object on grounds of reasonableness.

(c) Self-Executing Stay Relief Is Inappropriate. Paragraph 18(a) the Interim DIP Order provides Whippoorwill with self-executing relief from the automatic stay after five days' notice of the Event of Default. This provision imposes a heightened burden of proof on the Debtors and the Committee to commence a contested matter or adversary proceeding seeking injunctive relief to reimpose the automatic stay in the event Whippoorwill acts precipitously (*i.e.*, if an alleged event of default has not actually occurred). The standard that must be met by the Debtors and the Committee under the Interim DIP Order is higher than that which Whippoorwill would be required to meet to obtain stay relief under section 362(d) of the Bankruptcy Code.

Thus, the Final DIP Order should prohibit Whippoorwill from exercising any of its remedies against property of the estates until stay relief is granted by the Court after notice and a hearing.

## RESERVATION OF RIGHTS

The Committee reserves the right to object to any provisions of the DIP Motion and the DIP Facility on any grounds whatsoever at the hearing thereon, including any grounds not raised in this Objection.

## CONCLUSION

WHEREFORE, the Committee respectfully requests that the Court enter an order (i) denying the DIP Motion and (ii) granting such other and further relief as the Court deems just and proper.

Dated:   April 20, 2011

Respectfully Submitted,

**BIFFERATO GENTILOTTI LLC**
By: _____*/s/ Garvan F. McDaniel*_____
Garvan F. McDaniel (Bar No. 4167)
800 North King Street, Plaza Level
Wilmington, Delaware 19801
Telephone: (302) 429-1900
Facsimile: (302) 429-8600

-and-

**LOWENSTEIN SANDLER P.C.**
Kenneth A. Rosen, Esq.
John K. Sherwood, Esq.
Alison E. Kowalski, Esq.
Andrew Behlmann, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
Telephone: (973) 597-2500
Facsimile: (973) 597-2400
*Proposed Co-Counsel to the Committee*