# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>AMBASSADORS INTERNATIONAL, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 11-11002 (KG)<br>Jointly Administered |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF AMBASSADORS INTERNATIONAL, INC., *et al.*, ON BEHALF OF THE DEBTORS' ESTATES,<br><br>                   Plaintiff,<br><br>    v.<br><br>WHIPPOORWILL ASSOCIATES, INC.; LAW DEBENTURE TRUST COMPANY OF NEW YORK; WILMINGTON TRUST FSB; JOHN DOES 1-10; AND XYZ COMPANIES 1-10,<br><br>                   Defendants. | Adv. No. 11-_____ (KG)<br><br><br>**ADVERSARY COMPLAINT** |

      The Official Committee of Unsecured Creditors (the "Committee") of the debtors and

debtors-in-possession (each a "Debtor" and collectively the "Debtors") in the above-captioned

chapter 11 bankruptcy cases, on behalf of the Debtors' chapter 11 estates, as and for its adversary

complaint (the "Complaint") against the above-captioned Defendants pursuant to Rule 7001 of

the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), hereby respectfully alleges

as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Ambassadors International, Inc. (8605); Ambassadors Cruise Group, LLC (2448); Ambassadors, LLC (0860); EN Boat LLC. (8982); AQ Boat, LLC (5018); MQ Boat, LLC (5095); DQ Boat, LLC (5064); QW Boat Company LLC (0658); Contessa Boat, LLC (9452); CQ Boat, LLC (9511); American West Steamboat Company LLC (0656); and Ambassadors International Cruise Group (USA), LLC (7304). The mailing address for each Debtor is 2101 4th Avenue, Suite 210, Seattle, WA 98121.

# SUMMARY OF PROCEEDING

1.    The Committee brings this action to (i) recover, for the benefit of the Debtors' estates, the damage caused by breaches of fiduciary duties and aiding and abetting of the Debtors' breach of their fiduciary duties by Whippoorwill Associates, Inc. ("Whippoorwill")[2], (ii) equitably subordinate Whippoorwill's claims under the Working Capital Facility and the Second-Lien Notes to the claims of the Debtors' other creditors and/or recharacterize some or all of Whippoorwill's claims as equity interests; and (iii) avoid and recover certain transfers made prior to the filing of these bankruptcy cases for the exclusive benefit of Whippoorwill.

2.    These causes of action arise out of a scheme perpetrated by Whippoorwill, beginning in November 2009, to control and dominate the Debtors for its sole benefit and to the express detriment of the Debtors and their non-insider creditors.  Whippoorwill strategically and intentionally positioned itself throughout the Debtors' capital structure through a series of trades and transactions that ultimately led to its current status as the sole lender under the Working Capital Facility, holder of 88% of the Second Lien Notes, the lender under the DIP Credit Facility, a significant equity owner, and a statutory insider of the Debtors pursuant to the Bankruptcy Code.

3.    Whippoorwill overtly abused its power as a lender and shareholder of the Debtors.  At every opportunity, Whippoorwill made management and strategic decisions for the Debtors, but ultimately only considered the economic impact of its decisions as to Whippoorwill.

---

[2] Upon information and belief, Whippoorwill owns common shares of the Debtors, participations or other interests in or assignments of the Debtors' credit facilities, and bonds issued by the Debtors for its own account and/or through various funds or discretionary accounts (the "Whippoorwill Funds and Accounts") controlled or managed by Whippoorwill, including without limitation Whippoorwill Distressed Opportunity Fund, L.P., Whippoorwill Offshore Distressed Opportunity Fund, Ltd., Wellpoint, Inc., Blue Cross of California, Whippoorwill Associates, Inc. Profit Sharing Plan, and Harvard Special Situations Account.  For the sake of clarity, all references to Whippoorwill in this Complaint refer to Whippoorwill Associates, Inc. in its capacity as affiliate of or authorized agent for any such funds or discretionary accounts.  At least three of the six known Whippoorwill Funds and Accounts are direct affiliates of Whippoorwill Associates, Inc.  By virtue of their control and/or management by Whippoorwill Associates, Inc., the Whippoorwill Funds and Accounts are insiders of the Debtors.

Whippoorwill completely disregarded the interests of the Debtors and the interests of all other creditors. Whippoorwill's scheme was to position itself to either own the Debtors' assets free and clear of all junior indebtedness (and reap the tremendous upside that will be realized from the Debtors' restructured balance sheet), or demand payment in full on an extremely expedited basis.

4. By all indications in late 2010, the Debtors' turnaround was well underway. The Debtors third-quarter 2010 financial results showed significant year-over-year improvement. ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████

5. Indeed, the only reasonable path for the Debtors would have been to continue operating well into 2011 before filing bankruptcy. ████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████ ████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████ Letting the Debtors continue to operate would have prevented Whippoorwill from buying the Debtors' assets at a rock-bottom price ███

████████████████████████████████████████████████████

████ ████████████████████████████████Whippoorwill and the Debtors constructed a false emergency—the risk of convertible noteholders' put right being triggered by a NASDAQ delisting—"necessitating" an April 1 filing. However, the put right was never a real issue.

6. █████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ while leaving the general unsecured creditors with no recovery. Whippoorwill's inequitable conduct should not be countenanced by this Court.

## JURISDICTION, VENUE, AND STANDING

7. On April 1, 2011 (the "<u>Petition Date</u>"), the Debtors filed voluntary chapter 11 bankruptcy petitions in the United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>").

8. The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 151, 157, and 1334(b) and the Standing Order of the United States District Court for the District of Delaware referring all cases and proceedings arising under the Bankruptcy Code to the Bankruptcy Judges of this District.

9. This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b). In the event any part of this adversary proceeding is found to be non-core, the Committee consents to the entry of final orders and judgments by this Court pursuant to Bankruptcy Rule 7008.

10.     Venue is proper in this Court and this District pursuant to 28 U.S.C. §§ 1408 and 1409 because this adversary proceeding arises under and in connection with the cases styled *In re Ambassadors International, Inc., et al.*, under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), currently pending before the Court.

11.     The Committee has standing to bring this Complaint pursuant to the *Final Order (I) Authorizing the Debtors to Obtain Postpetition Secured Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(d)(1) and 364(e) and (II) Authorizing the Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection (V) And Modifying The Automatic Stay* (the "Final DIP Order"). See Case No. 11-BK-11002, Docket No. 160.  In the event the Court determines that, notwithstanding the Final DIP Order, the Committee lacks standing to assert one or more of the claims stated herein, the Committee hereby seeks entry of an order granting the Committee standing to assert such claim or claims *nunc pro tunc* to the date of this Complaint.

## THE PARTIES

12.     Plaintiff is the Official Committee of Unsecured Creditors duly appointed in the Debtors' bankruptcy cases pursuant to section 1102 of the Bankruptcy Code by the Office of the United States Trustee for the District of Delaware on April 11, 2011.

13.     Upon information and belief, defendant Whippoorwill Associates, Inc. is a Delaware corporation with executive offices located at 11 Martine Avenue, 11th Floor, White Plains, New York 10606.

14.     Upon information and belief, defendant Wilmington Trust FSB is a federal savings bank with executive offices located at 520 Madison Avenue, 33rd Floor, New York, New York 10022.

15. Upon information and belief, defendant Law Debenture Trust Company of New York is a trust company chartered by the New York State Department of Banking, with executive offices located at 400 Madison Avenue, Suite 4D, New York, New York 10017.

16. John Does 1-10 and XYZ Companies 1-10 (the "Additional Parties") are persons and legal entities—including without limitation consultants, law firms, accounting firms, and other funds and/or discretionary accounts controlled and managed by Whippoorwill—that aided and abetted, benefitted from, or otherwise participated in the wrongful acts alleged in this Complaint. The identity of the Additional Parties will be determined through discovery in this adversary proceeding.

## BACKGROUND

### A.     History of the Debtors' Businesses

17. Ambassadors International, Inc. ("Ambassadors"), the lead Debtor, was founded in 1967 as a travel services company incorporated in Washington and reincorporated in Delaware in 1995. Following a series of acquisitions in 2006 and 2007, and prior to 2009, Ambassadors operated in several business segments, including a domestic and international cruise business, a travel and events business, a marina design, management, and development business, and a property and casualty reinsurance business.

18. In April 2, 2007, Ambassadors Cruise Group, LLC, a wholly owned subsidiary of Ambassadors, through its wholly owned subsidiary, Ambassadors International Cruise Group, LLC acquired Windstar Cruises ("Windstar"), an internationally flagged small-ship cruise line that operates a three-ship fleet of masted sailing yachts: the Wind Star, the Wind Surf, and the Wind Spirit (the "Windstar Vessels"). Following a series of divestitures, the cruise business,

which offers sailings in the Caribbean, Europe, the Americas, and the Greek Isles aboard the Windstar Vessels, is now the Debtors' only line of business.

19.     Ambassadors owns 100% of the equity interests in Ambassadors International Marshall Islands, LLC, a foreign non-Debtor that, in turn, owns 100% of the equity interests in Ambassadors International Cruise Group, LLC ("AICG"), another foreign non-Debtor. AICG in turn owns 100% of the equity interests in Windstar Sail Cruises Limited, another foreign non-Debtor that owns 100% of the equity interests in each of three other non-Debtor Bahamas companies: Wind Star Limited, Wind Spirit Limited, and Degrees Limited (collectively the "Windstar Entities"), each of which owns one of the Windstar Vessels.

## B.     Unsecured Convertible Notes

20.     One day after acquiring Windstar, on or about April 3, 2007, Ambassadors issued approximately $97,000,000 aggregate principal amount of 3.75% Convertible Senior Notes due 2027 (the "Convertible Notes") pursuant to that certain Indenture (the "Convertible Notes Indenture") by and between Ambassadors as issuer and Wells Fargo Bank N.A. as trustee. Ambassadors used approximately $60,000,000 of the net proceeds to retire seller financing incurred in the acquisition of the Windstar Vessels. The Debtors allege that as of the Petition Date, approximately $31,200,000 aggregate principal amount of Convertible Notes remained outstanding.

21.     The Convertible Notes Indenture provides holders of Convertible Notes with the right (the "Put Right") to require Ambassadors to repurchase a given holder's Convertible Notes upon the occurrence of a "Fundamental Change." Among other events, the delisting of the Ambassadors' common stock from the NASDAQ Global Market and failure to list the stock on a

national securities exchange or automated over-the-counter trading market would constitute a "Fundamental Change" under the Convertible Notes Indenture, thereby triggering the Put Right.

**C.    Whippoorwill's Entry Into the Debtors' Capital Structure**

22.    ██████████████████████████████████████████████
██████████████████████████████████████████████

23.    In approximately February 2009, the Debtors announced their intention to exit all lines of business other than Windstar and sell their non-Windstar assets. The Debtors have since sold or are in the process of marketing and winding down all non-Windstar assets.

24.    ██████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████████

**D.    The Exchange Offer**

25.    ██ ████████ ████████ ████ ████████ ████ ██ ██ ████
██████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████

26.    ████████ ████████ ██ ████ ██ ████████ ████████ ██ ██
██████████████████████████████████████████████
████████████████████████████████████ ██████
██████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████

27.     On November 13, 2009, Ambassadors consummated the Exchange Offer, and Whippoorwill, Highbridge Capital Management, LLC ("Highbridge"), and Polygon Global Opportunities Master Fund ("Polygon") exchanged an aggregate principal amount of $65,800,000 of Convertible Notes for approximately $18,000,000 of 10% Senior Secured Notes due 2012 (the "Second-Lien Notes") and 15,200,000 shares of Ambassadors' common stock.

28.     The Second-Lien Notes are governed by that certain Indenture (the "Second-Lien Indenture") by and among Ambassadors as issuer, certain of Ambassadors' wholly owned subsidiaries[3] as guarantors (collectively, in such capacity, the "Second-Lien Guarantors" and their guaranty, the "Second-Lien Guaranty"), and Wilmington Trust FSB as trustee (in such capacity, the "Second-Lien Trustee").

29.     Pursuant to that certain Pledge and Security Agreement of even date with the Second-Lien Indenture, Ambassadors and the Second-Lien Guarantors granted security interests (the "Second-Lien Note Liens") in substantially all of their personal property to the Second-Lien Trustee as collateral for the Second-Lien Notes.

30.     ██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████ By way of the Exchange Offer, Whippoorwill was instantaneously elevated to secured creditor, obtained a lien on all of Ambassadors' and the Second Lien Guarantors' personal property, and controlled 43% of the Debtors' equity.

---

[3] The Second-Lien Guarantors include all of Ambassadors' wholly owned subsidiaries other than Cypress Reinsurance Ltd., Ambassadors, LLC, AQ Boat, LLC, and EN Boat, LLC.

31.     Following the consummation of the Exchange Offer, Whippoorwill has been and currently is an "insider" of the Debtors as that term is defined in section 101(31) of the Bankruptcy Code and relevant case law.   By virtue of their control and/or management by Whippoorwill Associates, Inc., the Whippoorwill Funds and Accounts are also insiders of the Debtors.

32.     ████████████████████████████████████████████████████████
████████████████████████████████████As of the Petition Date, Whippoorwill held 87.77% of the Second-Lien Notes.

E.      **First-Lien Secured Working Capital Credit Facility**

33.     ████████████████████████████████████████ ████ ████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████

34.     ████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████

35.     ████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

36.     On March 23, 2010, Ambassadors, as parent, and the non-Debtor Windstar Entities, as borrowers, entered into a Credit and Guaranty Agreement (the "First-Lien Credit Agreement") with Law Debenture Trust Company of New York as Administrative Agent and Collateral Agent (in such capacity, the "First-Lien Agent") and the lenders (the "First-Lien Lenders") party thereto.  All of the lenders under the First-Lien Credit Agreement were funds and accounts managed by Whippoorwill, and, in some instances, direct affiliates of Whippoorwill.

37.     Pursuant to the First-Lien Credit Agreement, the First-Lien Lenders agreed to lend to the Debtors (i) a $5 million revolving line of credit (the "Prepetition Revolver") and (ii) a $10 million term loan facility maturing January 2, 2012 (the "Prepetition Term Loan" and collectively with the Prepetition Revolver, the "Working Capital Facility").  As of the Petition Date, the Prepetition Revolver was undrawn and the Prepetition Term Loan had a balance outstanding of approximately $9,575,000.

38.     Ambassadors and certain of its direct and indirect subsidiaries[4] (collectively the "First-Lien Guarantors") jointly and severally guarantied (the "First-Lien Guaranty") to the Agent payment in full of all of the Windstar Entities' obligations under the Working Capital Facility.

39.     Pursuant to a Pledge and Security Agreement of even date with the First-Lien Credit Agreement, the Windstar Entities and the First-Lien Guarantors each purportedly granted

---

[4] All of the direct and indirect subsidiaries of Ambassadors guarantied the Working Capital Facility except for AQ Boat, LLC and EN Boat, LLC.

to the First-Lien Agent for the benefit of the First-Lien Lenders a lien on and security interest in substantially all of their personal property (the "Working Capital Facility Liens").

40. ██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

F. ██████████████████████████

41. ████████████████████████████████ ████

████████████████████████████████████████████

████████████████████████████████

42. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

43. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

44. Tellingly, Birkholz's employment agreement with the Debtors dated April 26, 2010 provides for immediate vesting of his compensatory stock options upon a "Change in Control" of the Debtors—a definition that expressly excludes a takeover by Whippoorwill.

45. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮

## G.   The Pretextual Foundation for the Debtors' Bankruptcy Filings

46. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

47. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮

48. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮

49. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

██████████████ ████████████████████████████████████

████████████████████████████████████████████

50.   █████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████

██████████████ The Debtors have since taken the position that a delisting from the NASDAQ Capital Market would trigger the Put Right under the Convertible Notes and the Debtors would not have sufficient liquidity to satisfy the obligations if the Convertible Noteholders required the Debtors to repurchase the notes for face value.

51.   The liquidity crisis supposedly threatened by virtue of the Put Right was a fabrication. ████████████████████████ the Debtors could avoid triggering the put right by transitioning the trading of Debtors' stock to the Over-the-Counter Bulletin Board (the "OTCBB"). █████████████████████████████████████.

██████████████████████████████████████████████

██████████████████████████ Mr. Detillion reaffirmed his findings regarding the availability of OTCBB trading for Ambassadors' common stock in his testimony at the Debtors section 341 meeting of creditors.

52.   █████████████████████████████████████

████████████████████████ the Debtors made no attempt to move to the OTCBB, ████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████

53.     ████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████

54.     Even if the common stock could not trade OTCBB (thus avoiding triggering of
the Put Right)████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████   ██████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████

55.     ████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████████████████

56.　████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████

57.　████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████　████████████████████████

████████████████████████████　██████████

██████████████████████████

H.　**Imperial's Marketing Process**

58.　████████████████████████████████████

59.　In late January 2011, the Debtors—██ ████████████ ████████—engaged Imperial Capital ("Imperial") to locate third parties interested in purchasing the company, to advise the Debtors on restructuring terms, and to assist them in negotiations with creditors.

60.　████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

61.　████████████████████████████████████

████████████████████████████████████　██████████

████████████████████████████████████████

████████████████████

62.     Imperial conducted a one-month "sale process" ████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████ This
process effectively established a ceiling for bids, rather than a floor for competitive bidding.

63.     ████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
█████████████████████████████

64.     ████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████ ███████████████████
████████████████████████████████████████████████████████████
████████████████████

65.     Interested parties seeking to conduct any due diligence faced additional hurdles
because the Windstar Vessels were at sea and due diligence would have had to have been
coordinated with the next available port. ████████████████████████████
████████████████████████

66.     ███ ████ ███ ██ ████████ ███ ███████ ██████ ███████ ██
████████████████████████████████████████████████████ ███
████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████  ████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████

67. ██████████████████████████████████████████

████████████████████  █████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████

68. ██████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████

69. ██████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████  ██████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

## I.  Whippoorwill's Stalking-Horse Bid

70. ██████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████ Providing the Debtors additional time to restructure their liabilities was not one of Whippoorwill's options. ████████████████████████

███████████████████████████████████████████

██████████████████████████████████

71. ██████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████

72.  Although the 120-day maturity of the DIP facility, for which Whippoorwill is the lender, would appear to enable the Debtors to conduct a fulsome postpetition marketing process, the terms of that facility and the Debtors' proposed bidding procedures further evidence Whippoorwill's intention to be cashed out or own the Debtors' assets as quickly as possible.  As

initially proposed, the Debtors' bidding procedures would have required entry of an order approving a sale just 40 days after the Petition Date.

73.     Whippoorwill's stalking-horse bid was not the product of Debtors' sound business judgment, as the Debtors' business judgment has been supplanted by that of Whippoorwill. ████

████████████████████████████████████████████████████████

████████████████████████████████████████

**J.     The Debtors' Bankruptcy Filings**

74.     ████████████████████████████████████████████

75.     ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████   ████████████████████████████████████████████████

████████████████████████████████████████████████

76.     ████████████████████████████████████████████

████ under the guise of avoiding a nonexistent liquidity crisis relating to the Put Right.  As of that date, the Debtors were current on their obligations under the Working Capital Facility, the Second Lien Notes, and the Convertible Notes.  ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

77.     ████████████████████████████ the Debtors filed their bankruptcy petitions on April 1, 2011, using the Put Right as a pretext.

78. ███████████████████████████████████████████ it is no surprise that the consideration offered by the only third-party bidder for the Debtors' assets was just enough to pay Whippoorwill in full and pay the fees of estate professionals, but not a dollar more. The third-party bid was the product of a flawed sale process run by and for the sole benefit of Whippoorwill. The process was not evidence of the fair value of the Debtors' assets.

### FIRST COUNT
**Equitable Subordination of the Working Capital Facility and Second-Lien Notes**

79. The Committee restates the allegations set forth in the preceding paragraphs of this Complaint as though fully set forth herein.

80. Whippoorwill engaged in inequitable conduct by, among other things, ███████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████

81. Whippoorwill's inequitable conduct resulted in injury to the Debtors and their creditors by, among other things, precluding a fulsome marketing process to maximize the value realized in the sale of the Debtors' assets and likely decreasing the amount of funds available to pay the Debtors' other creditors.

82. Whippoorwill's inequitable conduct conferred an unfair advantage on Whippoorwill by, among other things, elevating Whippoorwill's unsecured debt to secured status, placing Whippoorwill in control of the Debtors' board, ensuring Whippoorwill will be paid in full for its claims while other creditors may receive little or no distribution.

83. Equitable subordination of any and all claims asserted by or for the benefit of Whippoorwill against the Debtors is consistent with the provisions of the Bankruptcy Code.

84. By reason of the foregoing, in order to remedy the harm caused by Whippoorwill's inequitable conduct, any and all claims asserted by Whippoorwill, including without limitation claims arising from the Working Capital Facility and the Second-Lien Notes, should be equitably subordinated to the claims of the Debtors' unsecured creditors pursuant to 11 U.S.C. § 510 and all other applicable law.

## SECOND COUNT
### Constructively Fraudulent Transfer Pursuant to 11 U.S.C. § 548(a)(1)(B)
### (Second-Lien Note Liens)

85. The Committee repeats the allegations set forth in the preceding paragraphs of this Complaint as though fully set forth herein.

86. The Debtors' grant of the Second-Lien Note Liens was a transfer of an interest of the Debtors in property.

87. The Debtors granted the Second-Lien Note Liens on or within two years before the Petition Date.

88. The Debtors received no value, or less than reasonably equivalent value, in exchange for the Second-Lien Note Liens.

89. The Debtors were insolvent at the time they granted the Second-Lien Note Liens, or became insolvent as a result of the Second-Lien Note Liens.

90. After granting the Second-Lien Note Liens, the Debtors were left with unreasonably small capital for the business in which they were engaged.

91.     When they granted the Second-Lien Note Liens, the Debtors intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

92.     Neither Whippoorwill nor the Second-Lien Trustee was a transferee in good faith, as defined in 11 U.S.C. § 548(c), with respect to the Second-Lien Note Liens.

93.     By reason of the foregoing, the Second-Lien Note Liens constitute avoidable fraudulent transfers pursuant to 11 U.S.C. § 548(a)(1)(B).

## THIRD COUNT
### Actual Fraudulent Transfer Pursuant to 11 U.S.C. § 548(a)(1)(A)

94.     The Committee repeats the allegations set forth in the preceding paragraphs of this Complaint as though fully set forth herein.

95.     The granting of the Second-Lien Note Liens, to the extent given by the Debtors, constitutes a "transfer" as that term is defined in section 101(54) of the Bankruptcy Code.

96.     The Debtors granted the Second-Lien Note Liens with actual intent to hinder, delay, or defraud the Debtors' creditors, both existing at the time of the granting on the Second-Lien Note Liens and who thereafter became creditors of the Debtors.

97.     By reason of the foregoing, the Second-Lien Note Liens constitute avoidable fraudulent transfers pursuant to 11 U.S.C. § 548(a)(1)(A).

## FOURTH COUNT
### Fraudulent Transfer Pursuant to 11 U.S.C. § 544 and Applicable State Law

98.     The Committee repeats the allegations set forth in the preceding paragraphs of this Complaint as though fully set forth herein.

99. The granting of the Second-Lien Note Liens was a fraudulent transfer to or for the benefit of Whippoorwill within the meaning of applicable state laws, including without limitation the Delaware Uniform Fraudulent Transfer Act, 6 DEL. C. ANN. §§ 1301–1312.

100. Based upon all of the foregoing, the Second-Lien Note Liens are avoidable fraudulent transfers under 11 U.S.C. § 544(b).

**FIFTH COUNT**
**Preservation of Avoided Transfers Pursuant to 11 U.S.C. § 551**

101. The Committee repeats the allegations set forth in the preceding paragraphs of this Complaint as though fully set forth herein.

102. Pursuant to 11 U.S.C. § 551, any transfer avoided under section 522, 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code is preserved for the benefit of a debtor's estate with respect to property of the estate.

103. By reason of the foregoing, the Second-Lien Note Liens should be preserved for the benefit of the Debtors' estates.

**SIXTH COUNT**
**Repayment of Avoided Transfers Pursuant to 11 U.S.C. § 550**

104. The Committee repeats the allegations set forth in the preceding paragraphs of this Complaint as though fully set forth herein.

105. Pursuant to 11 U.S.C. § 550(a), a transferee of an avoided transfer is liable to a transferor debtor's estate for the value of the avoided transfer.

106. Based upon all of the foregoing, the Second-Lien Trustee and/or Whippoorwill are liable to the Debtors' estates for the value of the Second-Lien Note Liens and pre-judgment interest at the maximum rate allowed by law.

## SEVENTH COUNT
### Recharacterization

107.    The Committee repeats the allegations set forth in the preceding paragraphs of this Complaint as though fully set forth herein.

108.    Under the equitable powers conferred upon the Court by section 105 of the Bankruptcy Code, the Court can look beyond the form of a transaction and consider a transaction's substance to determine whether a given transaction described as debt should be recharacterized as equity.

109.    By reason of the foregoing, in order to achieve justice, in light of Whippoorwill's domination of the Debtors' strategic plans and day-to-day operations, and to reflect the true nature of their investments in the Debtors, any claims asserted by Whippoorwill against the Debtors' estates (regardless of whether secured, administrative, or unsecured) should be deemed equity interests, not debt.

## EIGHTH COUNT
### Aiding and Abetting Breach of Fiduciary Duty

110.    The Committee repeats the allegations set forth in the preceding paragraphs of this Complaint as though fully set forth herein.

111.    As officers of the Debtors, Birkholz and/or Detillion owed fiduciary duties to the Debtors and their unsecured creditors.

112.    Birkholz and/or Detillion, ███████████████████████████████ ███████████ breached their fiduciary duties to the Debtors and their unsecured creditors.

113.    Whippoorwill knew that Birkholz and/or Detillion were breaching their fiduciary duties and engaging in other misconduct.

114. Whippoorwill assisted, encouraged, and directed breaches of fiduciary duty by Birkholz and/or Detillion, and failed to properly monitor, oversee, or investigate such breaches of fiduciary duty by, among other things, ███████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████

115. The foregoing acts and omissions by Whippoorwill caused damage to the Debtors and their estates and unsecured creditors.

## NINTH COUNT
### Aiding and Abetting Fraudulent Transfers

116. The Committee repeats the allegations set forth in the preceding paragraphs of this Complaint as though fully set forth herein.

117. Whippoorwill was aware that, by granting the Second-Lien Note Liens, the Debtors were making fraudulent transfers pursuant to 11 U.S.C. § 544 and 548 and state law.

118. Whippoorwill assisted, encouraged, and directed the Debtors to grant the Second-Lien Note Liens for Whippoorwill's benefit.

119. The foregoing acts and omissions by Whippoorwill caused damage to the Debtors and their estates and unsecured creditors.

## TENTH COUNT
### Unjust Enrichment

120. The Committee repeats the allegations set forth in the preceding paragraphs of this Complaint as though fully set forth herein.

121. By reason of all of the foregoing, Whippoorwill received benefits at the expense of the Debtors and their estates and unsecured creditors.

122. The enrichment of Whippoorwill was inequitable, and violates fundamental principles of justice, equity, and good conscience.

123. The Debtors, their estates, and the Committee are entitled to restitution for amounts by which Whippoorwill was unjustly enriched.

## ELEVENTH COUNT
### Declaration as to Validity, Perfection, and Enforceability of Working Capital Facility Liens and Second-Lien Note Liens

124. The Committee repeats the allegations set forth in the preceding paragraphs of this Complaint as though fully set forth herein.

125. The Debtors have stipulated that the First-Lien Agent and the Second-Lien Trustee hold perfected liens on and security interests in substantially all of the Debtors' assets.

126. The Committee's investigation has revealed insufficient evidence to establish that the Working Capital Facility Liens or the Second-Lien Note Liens are perfected in accordance with applicable law with respect to the Unencumbered Assets identified on Exhibit A annexed hereto.

127. The Committee seeks a determination as to the validity, perfection, and enforceability of the Working Capital Facility Liens and the Second-Lien Note Liens asserted by the First-Lien Agent and the Second-Lien Trustee against the Unencumbered Assets.

128. The Committee further seeks to recover and recoup any and all Unencumbered Assets, or the proceeds thereof, applied by the First-Lien Agent or the Second-Lien Trustee to the Working Capital Facility or the Second-Lien Notes.

## TWELFTH COUNT
### Objection to Claims

129. The Committee repeats the allegations set forth in the preceding paragraphs of this Complaint as though fully set forth herein.

130. Pursuant to 11 U.S.C. § 502(a), the Committee has the right to object to the allowance of any claim asserted against the Debtors' estates.

131. The First-Lien Agent and the Second-Lien Trustee seek to recover approximately $9.575 million on account of the Working Capital Facility and $19.7 million on account of the Second-Lien Notes, respectively.

132. Pursuant to 11 U.S.C. § 502(d), the Court shall disallow any claim of any entity from which property is recoverable under, *inter alia*, 11 U.S.C. § 550, or that is a transferee of a transfer avoidable under, *inter alia*, 11 U.S.C. §§ 544, 547, or 548.

133. By reason of the foregoing, the Court should disallow any alleged claim by or for the benefit of Whippoorwill against the Debtors' estates.

## THIRTEENTH COUNT
### Liability for Reasonable Attorneys' Fees and Costs

134. The Committee repeats the allegations set forth in the preceding paragraphs of this Complaint as though fully set forth herein.

135. In order to return the Debtors' estates to the position they would be in but for the aforementioned fraudulent, inequitable, and otherwise inappropriate conduct, Whippoorwill is liable to the Debtors' estates for the reasonable attorneys' fees and costs incurred in the prosecution of this Complaint.

## RESERVATION OF RIGHTS

136. The Committee repeats the allegations set forth in the preceding paragraphs of this Complaint as though fully set forth herein.

137. The causes of action set forth in this Complaint are based upon the information provided to date by the Debtors in connection with the filing of their chapter 11 cases and in response to the Committee's formal and informal discovery requests.

138.    As discovery proceeds, the Committee may become aware of additional causes of action not set forth in this Complaint.  The Committee expressly reserves any and all rights to amend this Complaint to add additional claims, or to bring additional claims in the future, based on newly discovered information not available as of the filing of this Complaint.

**WHEREFORE,** the Committee respectfully requests that the Court grant judgment:

(i)     equitably subordinating any claims asserted against the Debtors by or for the benefit of Whippoorwill to the claims of the Debtors' other unsecured creditors;

(ii)    recharacterizing any claims asserted by or on behalf of Whippoorwill as equity interests, not debt;

(iii)   disallowing any claims asserted by or on behalf of Whippoorwill;

(iv)    declaring the validity, perfection, and enforceability of the Working Capital Facility Liens and the Second-Lien Note Liens against any of the Unencumbered Assets;

(v)     declaring any of the Working Capital Facility Liens and/or Second-Lien Note Liens that were not duly perfected as of the Petition Date, or that are voidable under applicable law, null and void and/or avoided and directing that all such alleged collateral or proceeds thereof applied to the Working Capital Facility or the Second-Lien Notes be disgorged by the recipient thereof and returned to the Debtors' estates;

(vi)    avoiding the Second-Lien Note Liens and ordering Whippoorwill and/or the Second-Lien Trustee to turn the value of such transfers over to the Debtors' estates pursuant to 11 U.S.C. § 550;

(vii)   avoiding the Second-Lien Note Liens and preserving the Second-Lien Note Liens for the benefit of the Debtors' estates;

(viii)  awarding compensatory and consequential damages against Whippoorwill;

(ix)　awarding punitive damages against Whippoorwill;

(x)　awarding the Committee costs of suit and reasonable attorneys' fees against Whippoorwill;

(xi)　awarding pre-judgment interest against Whippoorwill at the maximum rate allowed by law; and

(xii)　granting such other and further relief as the Court deems just and proper.

Dated:　May 18, 2011

Respectfully Submitted,

**BIFFERATO GENTILOTTI LLC**
By: _____/s/ Garvan F. McDaniel_____
Garvan F. McDaniel (Bar No. 4167)
Mary E. Augustine (Bar No. 4477)
800 North King Street, Plaza Level
Wilmington, Delaware 19801
Telephone: (302) 429-1900
Facsimile: (302) 429-8600

-and-

**LOWENSTEIN SANDLER P.C.**
Kenneth A. Rosen, Esq.
John K. Sherwood, Esq.
Sheila Sadighi, Esq.
Wojciech F. Jung, Esq.
Andrew Behlmann, Esq.
Alison E. Kowalski, Esq.
65 Livingston Avenue
Roseland, NJ 07068
Telephone: (973) 597-2500
Facsimile: (973) 597-2400
*Proposed Co-Counsel to the Committee*