# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>AMBASSADORS INTERNATIONAL, INC., et al.,<br><br>Debtors. | Chapter 11<br><br>Case No. 11-11002 (KG)<br><br>Jointly Administered |

## OBJECTION OF WHIPPOORWILL ASSOCIATES, INC. TO DISCLOSURE STATEMENT FOR THE PLAN OF LIQUIDATION PROPOSED BY THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

Whippoorwill Associates, Inc., as agent for certain of its discretionary funds and accounts ("*Whippoorwill*"), hereby submits this objection (the "*Objection*") in the above-captioned jointly administered bankruptcy cases of Ambassadors International, Inc. and its affiliated debtors and debtors-in-possession (collectively, the "*Debtors*") with respect to the Disclosure Statement, dated August 11, 2011 (the "*Disclosure Statement*") [Docket No. 367] filed in connection with the Plan of Liquidation Proposed by the Official Committee of Unsecured Creditors, dated August 11, 2011 (the "*Plan*")[1] [Docket No. 366], and in support hereof, respectfully represents as follows:

## PRELIMINARY STATEMENT

The Plan is simply not feasible. The estate has less than $1.5 million in cash to pay and/or reserve for over $1.8 million in estate administrative professional expenses outstanding at the Disclosure Statement's filing (the amount accrued to date is likely to be significantly larger) plus: (a) over $270,000 in priority claims; (b) the costs of soliciting votes on and consummating the Plan; (c) the secured and administrative priority indemnity claims (*i.e.*, ongoing legal fees and expenses) of the secured lenders, the Secured Notes indenture trustee and the Prepetition

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan.

Agent (unless and until the underlying claims are disallowed); (d) an estimated $200,000 to $400,000 to fund the Litigation Trust; (e) United States Trustee fees; and (f) any other pre- and post-consummation administrative expenses of operating the estates and the proposed Litigation Trust. Even if one were to assume the conservative estimates used by the Committee are correct, the Plan cannot be, and will never be, confirmed absent a significant infusion of liquidity to satisfy all outstanding secured, administrative and priority claims in full. Apparently recognizing as much, not only has the Committee requested (and obtained) a stay of the litigation it brought against Whippoorwill, but to date, it has not even filed a solicitation procedures motion (as required to be considered by the Court by Bankruptcy Rule 3017(e)) related to the Disclosure Statement for which it now seeks approval.

The Plan ignores basic tenets of the Bankruptcy Code with respect to chapter 11 plan confirmation requirements by, among other things, requiring *administrative* creditors to defer payment and absorb all of the risk on account of their Administrative Claims, thereby enabling the unsecured, non-priority, structurally subordinated holders of the Convertible Notes to take a cost and risk-free shot at a Litigation Trust. For a variety of reasons, this proposed "fix" is no fix at all. First, it is entirely unclear which (if any) administrative claimants have agreed to reduce their recovery, and absent such agreement, the Plan cannot be confirmed under Section 1129(a)(9)(A). Moreover, even if *all* estate professionals have agreed to such treatment (an agreement which the Plan assumes, but the existence of which has not been disclosed), Whippoorwill has not and will not agree to such treatment on account of *its* secured and administrative expense indemnity claim (granted pursuant to the Final DIP Order ¶ 4), and unless cash sufficient to pay for that claim is reserved in a segregated account to pay for Whippoorwill's ongoing litigation costs, the Plan cannot be confirmed. The net effect of the

proposed Plan is likely only to drive the Debtors' estates into further administrative insolvency – a risk that makes no difference to the Convertible Noteholders.

There are other fundamental problems with the Plan as well; problems that, unless and until rectified, render the Plan patently unconfirmable. Among the most noteworthy, the Plan mischaracterizes - and then misclassifies - Whippoorwill's Indemnification Claim as a general Unsecured Claim (notwithstanding the fact that previous orders entered by this Court, and negotiated by the Committee, expressly provide that such claim is a secured administrative claim unless and until the Committee successfully challenges Whippoorwill's pre-petition liens). Making matters worse, in direct contradiction to the law of the Third Circuit, the Plan proposes to substantively consolidate the Debtors' estates, thereby eviscerating the multiple pre-petition guarantees provided to Whippoorwill (and any other structurally senior creditors of the debtor subsidiaries) while providing an unlawful windfall for the structurally subordinated Convertible Noteholders.

Whippoorwill remains eager to address the baseless assertions made in the litigation brought against it - a litigation that has been stayed for months at the Committee's request. The stay was put in place ostensibly to permit the Committee to file a plan of liquidation. The Plan currently before the Court falls woefully short of the threshold test of confirmability, and soliciting votes on this Plan is a fruitless exercise that the Debtors' estates simply cannot afford and will only result in further delaying resolution of the Committee's litigation.

# OBJECTION

## I. THE DISCLOSURE STATEMENT CANNOT BE APPROVED BECAUSE THE PLAN IS PATENTLY UNCONFIRMABLE.

1. A disclosure statement should not be approved when it describes a plan that is patently unconfirmable. *In re Phoenix Petroleum Co.*, 278 B.R. 385, 394 (Bankr. E.D.Pa. 1996) ("If the disclosure statement describes a plan that is so 'fatally flawed' that confirmation is 'impossible,' the court should exercise its discretion to refuse to consider the adequacy of disclosures."); *In re Curtis Center Limited P'Ship*, 195 B.R. 631, 638 (Bankr. E.D.Pa. 1996) ("a disclosure statement should be disapproved where the plan it describes is patently unconfirmable."). Courts evaluate confirmability prior to the confirmation hearing to "avoid engaging in a wasteful and fruitless exercise of sending the disclosure statement to creditors and soliciting votes on the proposed Plan when the plan is unconfirmable on its face." *In re Atlanta West VI*, 91 B.R. 620, 622 (Bankr. N.D. Ga. 1988). As summarized below,[2] the Plan is patently unconfirmable and, therefore, the Disclosure Statement should not be approved.

2. The cost and delays attendant to engaging in solicitation in respect of this unconfirmable Plan would have severe, negative consequences to creditors in this case, by driving the estates further into administrative insolvency. The Committee's litigation against Whippoorwill was stayed for 90 days on July 15, 2011. (Adversary Case 11-52002) [Docket No. 13]. Presumably, the Committee will seek to extend the stay until the Litigation Trust can be established and is capable of taking ownership over the Committee's complaint.[3] Plan

---

[2] In the event that the Disclosure Statement is approved, Whippoorwill reserves the right to make the arguments set forth herein, as well as any other arguments, in opposition to confirmation of the Plan.

[3] Upon information and belief, the Committee has taken no steps to identify or potentially engage a Litigation Trustee. The order of this Court staying the Committee's complaint directs the Committee to notify counsel to Whippoorwill if and when confidential information is provided to individuals being considered by the Committee to serve as the Litigation Trustee. To date, neither Whippoorwill nor its counsel has received any such notification.

4

§ 9.04. If the stay were to be extended and if (a) the Committee files (which it has failed to do to date) a motion seeking to establish solicitation procedures which this Court grants and (b) the Plan is distributed and ultimately not confirmed because of any one of its number of infirmities, the litigation would remain un-resolved for the foreseeable future (perhaps as long as it takes for the Committee to draft a confirmable plan of liquidation and re-engage in distribution and solicitation). In the meantime, no party will prosecute the complaint (and indeed, no cash will be available to fund such prosecution). As noted above, Whippoorwill is ready and willing to address the Committee's assertions in or outside the structure of a chapter 11 plan. Permitting the Committee to distribute this unconfirmable Plan denies Whippoorwill the opportunity to defend itself.

### A. The Plan Cannot be Confirmed Because it Does Not Propose to Pay Administrative Claimants in Full, in Cash.

3. Bankruptcy Code Section 1129(a)(9)(A) requires that, as a prerequisite to confirmation, a plan provide for the payment to all holders of administrative claims allowed pursuant to Bankruptcy Code sections 507(a)(2) or 507(a)(3), *on the plan effective date or as soon as the claim is allowed*, "cash equal to the allowed amount of such claim." 11 U.S.C. 1129(a)(9)(A). The Plan fails this simple requirement on numerous fronts.

4. <u>Estate Professional Fee Claims Are Not Paid in Full in Cash</u>. Estate professional fees allowed pursuant to Section 330 of the Bankruptcy Code are entitled to priority pursuant to Bankruptcy Code Section 507(a)(2), and hence, must be paid in full, in cash on the Effective Date of the Plan pursuant to Section 1129(a)(9)(A). Perhaps the most glaring problem with the Plan is that, absent exit financing (which is not contemplated under the Plan), the approximately $1.5 million in cash left in the Debtors' estates (reduced to as little as approximately $800,000 after the payment of priority claims and the pre-funding of up to

$400,000 in expected Litigation Trust costs as set forth in footnote "D" to the Liquidation Analysis (Exhibit B to the Disclosure Statement)) is *nowhere near enough to fund the $1.8 million in estate professional fees outstanding at the Disclosure Statement's filing*, let alone the fees that will be incurred up to, and after, consummation. Indeed, the Liquidation Analysis estimates a potential for less than a 50% recovery for these claimants. Disclosure Statement Ex. B. On its face, this violates Bankruptcy Code Section 1129(a)(9)(A).

5. Attempting to rectify this problem, Section 3.04 of the Plan provides that, in the event such fees exceed available cash (and they already have), "Holders of Professional Fee Claims shall agree to defer the payment of Professional Fee Claims [until] such funds become available from the Litigation Trust Assets." Plan § 3.04. *Yet, no information is provided regarding any agreement or settlement between estate professionals governing such distribution.* Upon information and belief, no such agreement has been reached; Section 3.04 of the Plan seeks to impose a pro rata distribution scheme and cap Professional Fee Claims without the consent of the affected professionals. This cap violates applicable bankruptcy law. *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 174 (Bankr. D. N.J. 2010) (stating that the Bankruptcy Code "does not permit a plan to cap the amount to be paid toward administrative expenses without the consent of the claimants.").

6. <u>Whippoorwill's Fees are Not Paid in Full, in Cash</u>. Pursuant to the Final DIP Order, Whippoorwill is entitled, as adequate protection (for, among other things, its agreement to subordinate a portion of its collateral to the Carve-Out), to payment of its ongoing legal fees and expenses. Moreover, under the Final DIP Order (and applicable loan documents), Whippoorwill maintains a superpriority secured Administrative Claim for reimbursement of these claims. Like the estate professional fees discussed above, because the

6

Final DIP Order affords Whippoorwill's claim administrative status pursuant to Section 503(b) of the Bankruptcy Code, it, too, must be paid in full, in cash pursuant to Section 1129(a)(9)(A) of the Bankruptcy Code. *See In re ARS Analytical, LLC*, 433 B.R. 848, 863 (Bankr. D. N.M. 2010) (holding that a plan which fails to reference a claim that "must be paid as an administrative expense under 11 U.S.C. 1129(a)(9)(A) in cash upon confirmation . . . is unconfirmable on its face.").

7. The Plan does not even attempt to meet the Section 1129(a)(9)(A) test. Rather, the Plan provides, without any analysis, that the Committee "disputes" Whippoorwill's Indemnification Claim. The Plan is devoid of any mechanism for payment of or reserve for this Administrative Claim. The fact that the Committee disputes the claim, in any event, does not obviate it from reserving for the payment of the claim which, unless and until successfully challenged, is expressly allowed by the Final DIP Order. *See In re Spansion, Inc. ("Spansion")*, 426 B.R. 114, 146 (Bankr. D. Del. 2010) (directing the debtors set aside a reserve for a disputed administrative claim and stating that "[p]riority should not be subject to the risk that the newly reorganized debtor lacks funds or motivation to resolve the outstanding dispute").

8. This Court's ruling in *Spansion* concerned, in part, plan objections raised by a creditor asserting a disputed administrative expense claim against the estates. At confirmation, the debtors and the creditor differed as to the amount and validity of such claim. Prior to confirmation, the creditor asked the Court to estimate the claim for confirmation purposes. The Court estimated the alleged administrative expense claim at approximately $4.2 million. *Spansion*, 426 B.R. at 146.

9. Claim estimation did not ease all concerns regarding the disputed claim's payment under the *Spansion* plan. The plan did not direct the debtors to pay the estimated amount or reserve funds for the claim's payment, if and when it was allowed. This failure, the *Spansion* court held, threatened confirmation because a debtor could not ignore a claim or its priority because such claim was disputed at confirmation. Reserving sufficient funds to pay for the estimated amount of such claim, the court continued, constituted a reasonable compromise, ensuring the creditor's eventual payment and permitting plan confirmation notwithstanding the requirements of Section 1129(a)(9)(A). *Id.*; *see also In re Adelphia Bus. Solutions, Inc.*, 341 B.R. 415, 419 (Bankr. S.D.N.Y. 2003) (ordering the debtors to set aside a reserve for a disputed administrative expense claim).

10. Similarly, here, the Court should require, as a condition to confirmation, that the Plan (a) provide for payment of Whippoorwill's ongoing legal fees (as is required in the Final DIP Order) and (b) reserve an amount reasonably necessary (to be determined at a subsequent hearing) to provide for the payment of Whippoorwill's Indemnification Claim in full in the event the litigation against Whippoorwill is unsuccessful. Absent such a provision, the Plan is unable to meet the requirements of Section 1129(a)(9) because not all administrative claims are paid in full. Similar provisions are necessary for the Secured Notes indenture trustee and the Prepetition Agent.

**B.  The Plan Cannot be Confirmed Because it is Not Feasible.**

11. Section 1129(a)(11) of the Bankruptcy Code requires, as a condition of confirmation, that the Court make a finding that the plan in question is feasible. 11 U.S.C. 1129(a)(11). The feasibility test contemplates "the probability of actual performance of the provisions of the plan. Sincerity, honesty and willingness are not sufficient to make the plan

feasible and neither are any visionary promises." *In re Clarkson*, 767 F.2d 417, 420 (8th Cir. 1985). Rather, for a liquidating plan, *"the main focus of the feasibility analysis pertains to whether or not [the plan proponent] will have sufficient resources to fund the Plan." In re Nickels Midway Pier, LLC*, 2010 WL 2034542, at *18 (Bankr. D.N.J. 2010). Putting aside the lack of ability to pay all administrative claimants (described above), there are numerous other payments proposed by the Plan that simply cannot be made.

12. <u>There is no Cash Available to Pay the Liquidation Trustee.</u> The Plan provides that on the Effective Date, the Litigation Trust will be formed and a Litigation Trustee will pursue estate causes of action. Pursuant to the Plan, the Litigation Trust (Plan § 9.03) may employ and compensate professionals, and (Plan § 9.06) will indemnify the Litigation Trust Board and Litigation Trustee in connection with their duties. Although footnote "D" to the Liquidation Analysis provides that the Committee intends to "pre-fund" the trust with an amount of between $200,000 and $400,000, as noted above, there is *no* cash available to make this pre-funding or to support the contemplated the indemnity obligations. Moreover, to the extent that there is any cash available after application of the Carve-Out (which appears not to be the case), that cash, pursuant to the Final DIP Order, secures Whippoorwill's Indemnification Claim.

13. <u>There is No Cash Available to Pay the Indenture Trustee for the Convertible Noteholders.</u> In one of the more ironic twists in the Plan, it appears that the *only* creditor that is entitled to be paid in full, in cash, on the Effective Date is the (unsecured, non-priority) Convertible Notes Indenture Trustee. Indeed, payment of all Convertible Notes Indenture Trustee expenses is a prerequisite to confirmation even though administrative, priority and secured creditors are asked to take a haircut. See Plan § 10.06 ("All reasonable

9

fees and expenses of the Convertible Notes Indenture Trustee and its professionals, including attorneys' fees and expenses, will be paid by the Debtors to the Convertible Notes Indenture Trustee pursuant to the Confirmation Order on the Effective Date without the need for the Convertible Notes Indenture Trustee to file an application for payment."). As noted above, however, there is no cash to pay these fees (indeed, the payment thereof is not even set forth in the Liquidation Analysis). Moreover, Whippoorwill (a secured, administrative creditor) would object to the payment of any such fees out of its cash collateral, unless and until its Indemnification Claim is paid in full and/or properly reserved for as mandated by Bankruptcy Code Section 1129(a)(9)(A) (discussed above). Even if Whippoorwill's claim were an unsecured claim, which it is not, payment of the Convertible Notes Indenture Trustee expenses is improper prior to the payment in full of all claimants in a structurally senior position to the Convertible Noteholders, thus the payment of such fees is improper under any analysis.

14. <u>There is no Cash Available to Pay Priority Claims or Priority Tax Claims.</u> The Liquidation Analysis provides that approximately $270,000 in Priority Claims and Priority Tax Claims will be paid in full on account of estate professionals' agreement to a reduced recovery for Professional Fee Claims. Disclosure Statement Ex. B. No such agreement was disclosed in the Disclosure Statement and accordingly, upon information and belief no such agreement exists and no funds will be available to fund such priority claims. In addition, the scheme directing the payment of Priority Claims under Section 4.02 of the Plan (requiring the payment of the unpaid portion of an Allowed Priority Claim as late as "the date upon which there are sufficient Cash proceeds to pay the Allowed Priority Claim" flatly violates Section 1129(a)(9)(C) of the Bankruptcy Code, which requires cash payments of a <u>value</u> equal to the allowed amount of such claim. Plan § 4.02.

### C. The Plan Cannot be Confirmed Because It Improperly Classifies Whippoorwill's Secured Claim.

15. Section 1122 of the Bankruptcy Code (classification of claims) provides, in relevant part, that a "plan may place a claim or interest in a particular class <u>only</u> if such claim or interest is substantially similar to other claims or interests of such class." 11 U.S.C. § 1122(a) (emphasis added). Dissimilar claims must be classified separately. *See In re Boston Post Road Limited P'Ship*, 21 F.3d 477, 481 (2d Cir. 1994); *In re G-I Holdings Inc.*, 420 B.R. 216, 258 (Bankr. D. N.J. Nov. 12, 2009) (stating that Section 1122 requires all claims classified together be substantially similar so as to "[insure] that large claims of differing legal natures do not dictate other claims within a class."); *In re Armstrong World Industries, Inc.*, 348 B.R. 136, 159 (D. Del. 2006) (noting that a classification structure satisfies Section 1122 when a reasonable basis exists for the structure, and the claims within each class are substantially similar).

16. The Committee's contention that Whippoorwill's Indemnification Claim is a Class 3 "Unsecured Claim"[4] (and only to the extent it is allowed) violates Section 1122 of the Bankruptcy Code. Whippoorwill's Indemnification Claim is both a secured Indemnification Claim under the Prepetition Facility, and an Administrative Claim under Paragraph 4 of the Final DIP Order. Any attempt to group Whippoorwill's Indemnification Claim with non-substantially similar "Unsecured Claims," therefore, violates Section 1122(a) of the Bankruptcy Code, rendering the Plan unconfirmable. Even if Whippoorwill's Indemnification Claim could be considered a general unsecured claim, such claim would be structurally senior to the claims

---

[4] An Unsecured Claim is defined as "any Claim or portion thereof, against the Debtors, other than an Administrative Claim, Priority Tax Claim, Priority Claim, Secured Claim or Assumed Liability." Plan § 1.105.

in other Debtor estates that hold no assets other than the worthless equity or membership interests of a Debtor subsidiary.

### D. The Plan Cannot Be Confirmed Because it Substantively Consolidates the Debtors' Estates to the Detriment of Whippoorwill.

17. The Disclosure Statement notes that the Plan is "premised upon the 'substantive consolidation' of the estates solely for the purposes of, among other things, voting, confirmation, and making distributions to the holders of allowed claims against the Debtors under the Plan." Disclosure Statement p. iii. Yet, concurrently, the Disclosure Statement fails to provide any meaningful information that would justify substantive consolidation of the Debtors' estates. Accordingly, the Plan is unconfirmable – and the Disclosure Statement must not be approved.

18. In the Third Circuit, substantive consolidation requires a finding that post-petition the debtors' assets and liabilities are so scrambled that separating them is cost-prohibitive and harmful to all creditors. *In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2005). Whippoorwill is unable to locate in the Disclosure Statement any justification for the substantive consolidation of the Debtors. This is especially problematic given that pursuant to Whippoorwill's pre-petition (and post-petition) advances of credit to the Debtors, Whippoorwill was provided with guarantees from each debtor entity. Even if Whippoorwill's claim is unsecured as the Committee asserts (and it surely is not), that claim is still structurally senior to the claims of the Convertible Noteholders, who hold no guarantees. Substantive consolidation of the Debtors therefore would have an unfair impact on Whippoorwill (and any other creditor at the subsidiary level) yet provide a windfall to the Convertible Noteholders. There is no reason to commingle assets and liabilities here, and the Plan as drafted cannot be confirmed under Third Circuit law.

## II. THE DISCLOSURE STATEMENT CANNOT BE APPROVED BECAUSE THE DISCLOSURE STATEMENT FAILS TO PROVIDE ADEQUATE DISCLOSURE

19. Pursuant to Section 1125 of the Bankruptcy Code, a plan proponent must provide holders of impaired claims with "adequate information" regarding a debtor's proposed chapter 11 plan. Section 1125(a)(1) of the Bankruptcy Code provides:

> "[A]dequate information" means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan . . .

11 U.S.C. § 1125(a)(1). "Adequate information" under Section 1125 of the Bankruptcy Code is "determined by the facts and circumstances of each case." *See Oneida Motor Freight, Inc. v. United Jersey Bank (In re Oneida Motor Freight)*, 848 F.2d 414, 417 (3d Cir. 1988), *cert. denied*, 488 U.S. 967 (1988).

20. The general purpose of the disclosure statement is to provide "adequate information" to enable "impaired" classes of creditors and interest holders to make an informed judgment about the proposed plan and determine whether to vote in favor of or against the plan. *In re Phoenix Petroleum Co.*, 278 B.R. 385, 392-93 (Bankr E.D. Pa 2001); *see, e.g., Century Glove, Inc. v. First American Bank of New York*, 860 F.2d 94, 100 (3rd Cir. 1988); *In re River Village Assocs.*, 181 B.R. 795, 804 (E.D. Pa. 1995); *In re Monroe Well Service, Inc.*, 80 B.R. 324, 330 (Bankr. E.D. Pa. 1987). Thus, a debtor's disclosure statement must, as a whole, provide information that is "reasonable" to permit an "informed judgment" by impaired creditors entitled to vote on the plan. *See In re Dakota Rail, Inc.*, 104 B.R. 138, 142 (Bankr. D. Minn. 1989).

21. The Disclosure Statement submitted by the Committee fails to meet this threshold in the following respects:

13

22. <u>Disclosure Regarding Whippoorwill's Indemnification Claim</u>. First, the Disclosure Statement contains no information regarding Whippoorwill's Indemnification Claim. Both the Plan and Disclosure Statement conclude that Indemnification Claims in general constitute disputed, contingent Unsecured Claims. Disclosure Statement § II(D). No information is provided with respect to how the Committee made such determination or even the its basis for disputing the validity of such claims. No information is available with respect to the impact of Whippoorwill's Indemnification Claim, if it is allowed as either a superpriority Administrative Claim under the Final DIP Order or a secured indemnity claim under the Prepetition Facility, on the Committee's Liquidation Analysis or the solvency of the Liquidation Trust. It is not clear whether the Liquidation Trust would ultimately pay the Indemnification Claim or whether Whippoorwill's Indemnification Claim would be paid from remaining Sale Proceeds – and if from the latter, whether Sale Proceeds will be reserved for such payment.

23. <u>Disclosure Regarding Carve-Out Dispute</u>. More explanation is required regarding the Committee's assertions regarding the Carve-Out and how such assertions, if proved correct, will influence creditor recoveries and the Litigation Trust. For example, the Committee states in its Liquidation Analysis that, "if the Carve-Out dispute is resolved in the Committee's favor, Whippoorwill Associates may have to disgorge unauthorized payments received." Disclosure Statement Ex. B fn. C. This statement is patently false. Regardless of any dispute over the amount of the Carve-Out, the Final DIP Order expressly provides for the payment of Whippoorwill's fees and expenses (subject to procedures allowing the Committee to review related documentation). In any event, because the purchaser of the Debtors' assets required, as a condition precedent, that Whippoorwill release its liens on all non-debtor assets, the Sale Order expressly provided for the payment of all obligations to Whippoorwill at Closing

in order to ensure that Whippoorwill would release its liens on those non-debtor assets. Sale Order ¶ 5. Absent this agreement, the sale would not have closed, and the business would have liquidated to the detriment of the Debtors' structurally senior creditors, employees, vendors, suppliers and customers. Regardless of any purported dispute over the Carve-Out, the Committee has no argument in law or equity to reopen this issue *after* Whippoorwill consensually released its liens on non-debtor assets, which are in no way related to the Carve-Out (Final DIP Order ¶ 9).

24. <u>Disclosure Regarding Purported "Repayment" of Whippoorwill</u>. The Committee's contention that "all outstanding claims" (*See* Disclosure Statement § II(D)) arising under the Prepetition Facility, the Secured Notes and/or the DIP Facility were repaid with Sale Proceeds is misleading and conflicts with the Sale Order and the payoff letters governing secured creditors' respective releases of their liens. The Debtors repaid outstanding amounts <u>at the Closing Date</u> under the three facilities. Sale Order ¶ 5. Such repayment, moreover, did not prohibit the credit parties from incurring additional obligations under any surviving provision of any such facility or terminate the Debtors' adequate protection obligations under the Final DIP Order. Indeed, the Committee can point to no court order or contractual provision prohibiting the Debtors' incurrence of secured Indemnification Claims or superpriority Administrative Claims for indemnification. To the contrary, these claims were preserved in the applicable payoff letter and the Sale Order.

25. <u>Discrepancy on Impairment</u>. There is a discrepancy in the Disclosure Statement and the Plan with respect to whether Priority Claims are impaired under the Plan and therefore, whether holders of such claims would vote on the Plan. Compare Disclosure Statement Art. III with Plan § 4.02. The Disclosure Statement, moreover, concurrently

15

provides that (a) holders of Class 2 Priority Claims "will be solicited" in respect of the Plan and yet (b) are "deemed to accept" the Plan. See Disclosure Statement § II(d), Art. III. No explanation is offered regarding why a class would be solicited if it is deemed to accept.

26. <u>Releases / Exculpation Provisions</u>. The Plan includes indemnification and exculpation in favor of certain parties – most notably Committee members and professionals. Disclosure is needed in respect of claims being released and the reasons for such releases to demonstrate the reasonableness thereof. Further, the relevant Plan sections, Sections 11.03 and 11.04, do not comply with Bankruptcy Rule 3016. Plan §§ 11.03-11.04.

**WHEREFORE,** for the foregoing reasons, Whippoorwill hereby requests that the Court sustain this Objection, deny approval of the Disclosure Statement and grant such other and further relief as the Court deems just and proper.

Dated: September 20, 2011

                                          YOUNG CONAWAY STARGATT & TAYLOR, LLP

                                          Sean M. Beach (No. 4070)
                                          Robert F. Poppiti, Jr. (No. 5052)
                                          The Brandywine Building
                                          1000 West Street, 17th Floor
                                          Wilmington, Delaware 19801
                                          Telephone: (302) 571-6600
                                          Facsimile: (302) 571-1253

                                                    - and -

                                          GIBSON, DUNN & CRUTCHER LLP

                                          Matthew J. Williams
                                          Josh Weisser
                                          200 Park Avenue
                                          New York, New York 10166-0193
                                          Telephone: (212) 351-4000
                                          Facsimile: (212) 351-4035
                                          Counsel to Whippoorwill Associates, Inc.